Judge Hellerstein

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ALLSTATE INSURANCE COMPANY,
ALLSTATE LIFE INSURANCE
COMPANY, ALLSTATE LIFE
INSURANCE COMPANY OF NEW YORK
A.K.A. ALLSTATE LIFE OF NEW YORK,
AND AMERICAN HERITAGE LIFE
INSURANCE COMPANY,

       Plaintiffs,

    -against-

COUNTRYWIDE FINANCIAL CORP.,
COUNTRYWIDE HOME LOANS, INC.,
COUNTRYWIDE CAPITAL MARKETS,
LLC, COUNTRYWIDE SECURITIES
CORP., CWALT, INC., CWABS, INC.,
CWHEQ, INC., CWMBS, INC., BANK OF
AMERICA CORP., BAC HOME LOANS
SERVICING, LP, NB HOLDINGS CORP.,
ANGELO MOZILO, DAVID SAMBOL,
ERIC SIERACKI, RANJIT KRIPALANI,
STANFORD KURLAND, DAVID A.
SPECTOR, N. JOSHUA ADLER, AND
JENNIFER SANDEFUR,

       Defendants.

10 CIV 9591

___CV____ (2010)

**COMPLAINT**

**JURY TRIAL DEMANDED**



RECEIVED
DEC 27 2010
U.S.D.C. S.D.N.Y.
CASHIERS

NATURE OF ACTION ................................................................................................1

JURISDICTION AND VENUE ...............................................................................12

SUBSTANTIVE ALLEGATIONS ..........................................................................13

I.      ALLSTATE'S INVESTMENTS IN COUNTRYWIDE CERTIFICATES ....................13

II.     COUNTRYWIDE'S MANDATE TO MATCH ANY PRODUCT ON THE
        MARKET REQUIRED IT TO SYSTEMATICALLY IGNORE ITS STATED
        UNDERWRITING PROCEDURES ...........................................................16

        A.      Countrywide Makes Origination Volume King..........................................16

        B.      Countrywide Cedes its Underwriting Policy to the Market's Lowest
                Common Denominator By Way of a "Matching" Mandate ................................18

        C.      The "Matching" Policy Demanded the Systemic Abandonment of
                Countrywide's Own Policies ........................................................19

        D.      Securitization Allowed Countrywide to Transfer the Risks Created by Its
                Underwriting Abandonment to Investors Like Allstate........................................22

III.    COUNTRYWIDE'S MATERIAL MISREPRESENTATIONS ......................................25

        A.      General Underwriting Guidelines.........................................................25

        B.      Owner-Occupancy Statistics.............................................................26

        C.      Loan-to-Value Ratios and Appraisals ....................................................26

        D.      Debt-to-Income ..........................................................................28

        E.      No Adverse Interest in Selection ........................................................28

        F.      Ratings ................................................................................29

        G.      Share of Mortgage Loans Granted Pursuant to Full-Documentation
                Procedures ............................................................................30

        H.      Servicing Quality ......................................................................30

        I.      Case-by-Case Underwriting Exceptions ..................................................31

IV.     ALL OF THE REPRESENTATIONS WERE UNTRUE AND MISLEADING
        BECAUSE COUNTRYWIDE SYSTEMATICALLY IGNORED ITS OWN
        UNDERWRITING GUIDELINES..........................................................31

A.    A Statistical Analysis of Allstate's Certificates Shows That the
      Representations Were False .................................................................35

      (1)    The securities' high default rates and souring credit ratings ...................35

      (2)    There are numerous indications that borrowers did not actually
             occupy the mortgaged properties as claimed .............................................38

      (3)    Re-calculating the loan-to-value ratios .....................................................41

      (4)    Statistical studies by others have similarly revealed that the
             problems in Countrywide-originated loans were tied to
             underwriting abandonment ........................................................................45

      (5)    Other parties' reviews of Countrywide's full loan files have
             revealed even greater deviations ...............................................................46

B.    Countrywide's Own Internal Documents Demonstrate It Abandoned Its
      "Theoretical" Underwriting Standards ..................................................49

      (2)    Countrywide's internal post-mortem shows it systematically
             ignored the risks created by its "matching" strategy .................................50

      (3)    Mozilo's emails show he "personally observed a serious lack of
             compliance" ...............................................................................................51

      (4)    Internal quality reviews highlight that loans were being issued
             outside of Countrywide's underwriting guidelines....................................53

      (5)    Exceptions were used as a way to deploy the "matching" strategy,
             despite Countrywide's "theoretical" underwriting guidelines..................57

      (6)    Countrywide admits to "cherry picking" deals ..........................................60

      (7)    In short, Countrywide "basically continued to operate as though
             they never received" risk policies. ............................................................60

C.    The Sworn Testimony of Countrywide's Own Former Officers
      Demonstrate That It Abandoned Its "Theoretical" Underwriting Standards.........62

      (1)    Chief Risk Officer John McMurray:  "Matching policy" resulted in
             "routinely" using loan "exceptions" ........................................................62

      (2)    Vice President of Credit Risk Management Christian Ingerslev:
             "Focus groups" confirmed borrowers were misrepresenting income........65

      (3)    Managing Director Frank Aguilera:  "Matching" strategy was "not
             a tolerable process" for subprime products................................................66

ii

    (4)    CEO Angelo Mozilo:  Matching strategy was a "dangerous game" .........66

    (5)    Depositor President Nathan Adler:  "Salability" was the sole factor for giving "exceptions" ...................................................................66

D.    Other Statements Provided By Countrywide Employees and Customers Further Confirm Countrywide's Abandonment of its Underwriting Standards ...........................................................................................67

    (1)    Former employees:  Borrowers were coached on how to use no-doc loans to circumvent prior loan rejections .............................67

    (2)    Former employee:  Countrywide knew appraisals were being inflated ............................................................................................70

    (3)    Borrowers:  Countrywide falsified our records .........................70

    (4)    Former employees:  Countrywide steered borrowers to riskier (higher fee) products and heavily incentivized employees to do so .........71

E.    Other Evidence That the Representations Were False............................................73

    (1)    Appraisal company:  Countrywide pressured companies to obtain inflated home values ...................................................................73

    (2)    The ratings were a garbage-in, garbage out process further hindered by conflicts of interest and outdated models............................77

    (3)    Government investigations and other lawsuits .........................80

    (4)    Studies of the percent of loans approved on a fully-documented basis..........................................................................................83

    (5)    Servicing failures ....................................................................83

V.     COUNTRYWIDE KNEW ITS REPRESENTATIONS WERE FALSE ......................87

VI.    ALLSTATE'S DETRIMENTAL RELIANCE AND DAMAGES ...................95

VII.   OTHER MATTERS............................................................................................97

A.    Defendants' Liability as Control Persons ............................................97

B.    Bank of America's Liability as a Successor-in-Interest by De Facto Merger.........................................................................................110

C.    Allstate's 1933 Act Claims Have Been Tolled By Previously-Filed Class Action Complaints ...............................................................................121

FIRST CAUSE OF ACTION ...................................................................................................124

SECOND CAUSE OF ACTION ..............................................................................................126

THIRD CAUSE OF ACTION ..................................................................................................128

FOURTH CAUSE OF ACTION ...............................................................................................129

FIFTH CAUSE OF ACTION ...................................................................................................130

SIXTH CAUSE OF ACTION ...................................................................................................132

SEVENTH CAUSE OF ACTION .............................................................................................135

EIGHTH CAUSE OF ACTION ................................................................................................137

NINTH CAUSE OF ACTION ..................................................................................................139

PRAYER FOR RELIEF ..........................................................................................................139

JURY TRIAL DEMANDED ....................................................................................................140

Plaintiffs Allstate Insurance Company, Allstate Life Insurance Company, Allstate Life Insurance Company of New York, and American Heritage Life Insurance Company (collectively "Allstate"), by and through their attorneys, bring this action against Countrywide Financial Corporation ("Countrywide Financial"), Countrywide Home Loans, Inc. ("Countrywide Home Loans"), Countrywide Capital Markets, LLC ("Countrywide Capital Markets") formerly known as Countrywide Capital Markets, Inc., Countrywide Securities Corporation ("Countrywide Securities"); and CWALT, Inc. ("CWALT"), CWABS, Inc. ("CWABS"), CWHEQ, Inc. ("CWHEQ"), and CWMBS, Inc. ("CWMBS") (the "Depositors") (all collectively, "Countrywide" or "the Countrywide Defendants"); Angelo Mozilo, David Sambol, Eric Sieracki, Ranjit Kripalani, Stanford Kurland, David A. Spector, N. Joshua Adler, and Jennifer Sandefur (the "Officer Defendants"); and Defendants Bank of America Corporation ("Bank of America"), BAC Home Loans Servicing, LP, and NB Holdings Corporation (together "the Bank of America Defendants"), and allege as follows:

## NATURE OF ACTION

1.     This action arises out of Countrywide's sale of certain residential mortgage-backed securities (the "Certificates") to Allstate.  The Certificates were sold pursuant to registration statements and prospectuses that contained untrue statements and omissions of material facts, in violation of Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "1933 Act");  Sections 10(b) and 20(a) of the Securities and Exchange Act of 1934 (the "1934 Act"); and common-law fraud and negligent misrepresentation.

2.     Beginning in 2003, Countrywide began systematically to ignore the underwriting standards it touted.  Countrywide was singularly focused on increasing its market share, offloading the risk onto Allstate and other institutional investors that purchased securities backed by pools of Countrywide's mortgages.  In pursuit of market share, unbeknownst to Allstate,

1

Countrywide internally adopted a "matching" strategy that would approve any mortgage product feature offered by a competitor.  By mixing and matching the worst features of mortgage products from different competitors, Countrywide's composite product offering became very aggressive within the industry.

3.      This "matching" strategy could only be implemented through the substantial and material abandonment of Countrywide's claimed credit-risk-reducing underwriting procedures. To get around these "theoretical" requirements, Countrywide set up a system whereby any loan would be approved by way of underwriting "exceptions," and coached borrowers on how to apply for loan products that required little or no income or asset verification.  This systemic abandonment of Countrywide's stated underwriting guidelines infected all of the loans it securitized.  Whereas Allstate was made to believe it was buying highly-rated, safe securities backed by pools of loans with specifically-represented risk profiles, in fact the Defendants knew the loans offloaded onto Allstate were a toxic mix of loans given to borrowers that could not afford the properties, and thus were highly likely to default.

4.      Countrywide's material misrepresentations and omissions regarding the riskiness and credit quality of the Certificates in which Allstate invested, made through the registration statements, prospectuses and prospectus supplements, term sheets, and other written materials (the "Offering Materials"),  are numerous.  For example:

(i)      ***Underwriting guidelines***.  The Offering Materials consistently represented that Countrywide followed a conservative, reliable, reasonable underwriting process whose purpose was to evaluate a borrower's ability to repay their loan.  Internal Countrywide materials recently made available by the SEC, however, and other sources all confirm that Countrywide "ceded" its standards to the lowest common denominator in the market.  Countrywide

2

undermined whatever "theoretical" remaining standards it even purported to follow internally by way of, among other things, loan "exceptions," low-documentation loan procedures, and simply ignoring the rejection of deals by its own credit officers.

(ii)     ***Owner Occupancy Statistics***.  The Offering Materials made specific representations regarding the percentage of borrowers who would be occupying the property being mortgaged – a key risk characteristic for Allstate given that borrowers are less likely to walk away from the properties in which they live, as compared to second homes or investment properties.  Analytical tools recently made available confirm that in truth, a far greater percentage of the loans underlying Allstate's Certificates were in fact given to borrowers who lived elsewhere, such as investors or people purchasing vacation homes.

(iii)     ***Loan to Value Ratios and Independent Appraisals***.  The Offering Materials represented that the loans had specific loan-to-value and combined loan-to-value ratios.  This is another key risk metric, because these statistics represent the equity "cushion" that borrowers have, and the likelihood of repayment to lenders upon foreclosure.  Countrywide represented that these values were calculated using independent appraisers, when in fact it knew they were derived from affiliates and other appraisers who knowingly inflated property values to qualify borrowers for larger loans than they could truly afford.  Analytical tools recently made available confirm that the Offering Materials' statistics vastly overstated the value of the collateral being included in the loan pools.

(iv)     ***Purpose and use of exceptions and low-documentation procedures***.  The Offering Materials represented that "exceptions" to Countrywide's underwriting guidelines were given on the basis of countervailing features of the borrowers' risk profiles that 'made up' for negative aspects of the risk profile.  Internal documents and testimony given in the SEC action

3

that have recently been made available, however, confirm that "exceptions" were instead used merely as a tool to circumvent the underwriting process and increase market share.  Similarly, though the Offering Materials represented that low-documentation loans were sometimes used, they materially misstated the number of such loans that underlie the Certificates.  Defendants also hid from Allstate that these alternative-documentation procedures were being used as another way to circumvent the underwriting guidelines.  Countrywide would shift borrowers that would otherwise be rejected into such programs, and then help them falsify their applications in such a way as to ensure the borrower received approval for a loan.

5.      Allstate purchased over $700 million in Countrywide mortgage-backed securities (the "Certificates") between March 2005 and June 2007 in reliance on these and the other misrepresentations and omissions, as set forth below.  The details of the securities at issue in this action are set forth in Exhibit A.  The exhibits attached to this Complaint are all incorporated as if set forth fully herein.

6.      The systemic abandonment of Countrywide's stated underwriting practices has predictably led to soaring default rates in the mortgage loans underlying Allstate's Certificates (the "Mortgage Loans").  For instance, despite the fact that the majority of Allstate's Certificates started out with AAA ratings – the same rating given to treasury bills backed by the full faith and credit of the United States government – 93% of them are now not even considered to be investment grade.  These problems are so drastic and their onset was so rapid (in comparison to the long-term security of the investments Allstate thought it was purchasing) that the Certificates' poor performance to date is itself powerful evidence that the Mortgage Loans were not underwritten according to the procedures represented to Allstate.  With the underlying loans

performing so poorly, the market value of Allstate's Certificates has plummeted, causing Allstate to incur significant losses.

## PARTIES

7.      ***The Plaintiffs.***  Plaintiff Allstate Insurance Company is an insurance company formed under the laws of, and domiciled in, the State of Illinois, with its principal place of business in Northbrook, Illinois.  It is the nation's largest publicly held personal lines insurer selling property and casualty insurance.  Allstate Insurance Company is licensed to do business in New York and writes insurance policies to New York residents.  Allstate is a wholly-owned subsidiary of Allstate Insurance Holdings, LLC, which is a Delaware limited liability company. Allstate Insurance Holdings, LLC is a wholly-owned subsidiary of The Allstate Corporation, which is a Delaware corporation.

8.      Plaintiff Allstate Life Insurance Company is an insurance company formed under the laws of, and domiciled in, the State of Illinois, with its principal place of business in Northbrook, Illinois.  It sells life insurance and annuity products.  Allstate Life Insurance Company is a wholly-owned subsidiary of Allstate Insurance Company.

9.      Plaintiff Allstate Life Insurance Company of New York is an insurance company formed under the laws of, and domiciled in, the State of New York, with its principal place of business in Hauppauge, New York.  Allstate Life Insurance Company is licensed to do business in New York and writes insurance policies to New York residents.  It sells life, accident and health insurance and annuity products.  Allstate Life Insurance Company of New York is a wholly-owned subsidiary of Allstate Life Insurance Company.

10.     Plaintiff American Heritage Life Insurance Company is an insurance company formed under the laws of, and domiciled in, the State of Florida, with its principal place of business in Jacksonville, Florida.  It sells life, accident and health insurance and annuity

products.  American Heritage Life Insurance Company is a wholly-owned subsidiary of American Heritage Life Investment Corporation, which is a Delaware corporation.  American Heritage Life Investment Corporation is a wholly-owned subsidiary of The Allstate Corporation.

11.      ***The Countrywide Defendants.***  Defendant Countrywide Financial is a corporation organized under the laws of the State of Delaware with its principal executive offices at 4500 Park Granada, Calabasas, California.   Pursuant to a merger completed on July 1, 2008, Countrywide Financial has been merged into and is now part of Bank of America.

12.      Defendant Countrywide Home Loans, a wholly-owned subsidiary of Countrywide Financial, is a corporation organized under the laws of the State of New York with its principal place of business at 4500 Park Granada, Calabasas, California.  Countrywide Home Loans is now part of Bank of America and operates under the trade name "Bank of America Home Loans."

13.      Defendant Countrywide Capital Markets, a wholly-owned subsidiary of Countrywide Financial, is a corporation organized under the laws of the State of California with its principal place of business at 4500 Park Granada, Calabasas, California.  Countrywide Capital Markets (now part of Bank of America) operates through its two main wholly-owned subsidiaries, Defendant Countrywide Securities Corporation and Countrywide Servicing Exchange.

14.      Defendant Countrywide Securities Corporation is a corporation organized under the laws of the State of Delaware with its principal place of business at 4500 Park Granada, Calabasas, California.  Countrywide Securities is now part of Bank of America.

15.      ***The Depositors.***  Defendant CWALT is a Delaware corporation and a limited purpose subsidiary of Countrywide Financial Corporation with its principal place of business at

4500 Park Granada, Calabasas, California.  CWALT was the Depositor for certain of the

Offerings in which Allstate invested, the Registrant for certain Registration Statements filed with

the SEC, and an issuer of certain mortgage-backed Certificates purchased by Allstate.

16.    Defendant CWABS is a Delaware corporation and a limited purpose subsidiary of

Countrywide Financial Corporation with its principal place of business at 4500 Park Granada,

Calabasas, California.   CWABS was the Depositor for certain of the Offerings in which Allstate

invested, the Registrant for certain Registration Statements filed with the SEC,  and an issuer of

certain mortgage-backed Certificates purchased by Allstate.

17.    Defendant CWHEQ is a Delaware corporation and a limited purpose subsidiary of

Countrywide Financial Corporation with its principal place of business at 4500 Park Granada,

Calabasas, California.  CWHEQ was the Depositor for certain of the Offerings in which Allstate

invested, the Registrant for certain Registration Statements filed with the SEC,  and an issuer of

certain mortgage-backed Certificates purchased by Allstate.

18.    Defendant CWMBS is a Delaware corporation and a limited purpose subsidiary

of Countrywide Financial Corporation with its principal place of business at 4500 Park Granada,

Calabasas, California.  CWMBS was the Depositor for certain of the Offerings in which Allstate

invested, the Registrant for certain Registration Statements filed with the SEC, and an issuer of

certain mortgage-backed Certificates purchased by Allstate.

19.    ***The Officer Countrywide Defendants.***  Defendant Angelo Mozilo is Countrywide

Financial's co-founder and served on Countrywide Financial's Board of Directors from 1969 to

July 1, 2008.  Mozilo also served as Countrywide Financial's Chairman of the Board starting in

March 1999 and in various other executive positions since Countrywide Financial's inception,

including President from March 2000 through December 2003, and Chief Executive Officer

from February 1998 to July 1, 2008.  He was a member of Countrywide Financial's Executive

Strategy Committee, which, from its creation in 2005, was responsible for establishing and

evaluating Countrywide's overall strategic direction and governing its annual planning process.

Mozilo also served on Countrywide Financial's Credit Committee and Finance Committee and,

as CEO and Chairman of the Board, directly oversaw the Ethics and Asset/Liability Committees.

Mozilo resigned from all of the above positions on July 1, 2008.  Mozilo resides in Thousand

Oaks, California.

20.     Defendant David Sambol joined Countrywide Financial in 1985.  Sambol held

numerous key executive positions at Countrywide.  From 1994 to 2003, Sambol was a Managing

Director and served as Countrywide Financial's Senior Managing Director and Chief of

Production for its loan sector.  From 2004 to 2006, Sambol was President and COO of

Countrywide Home Loans, where he led all operations and had oversight responsibility for the

company.

21.     From 2004 to 2006, Sambol served as Countrywide Financial's Executive

Managing Director for Business Segment Operations, heading up all revenue-generating

operations at Countrywide Financial, as well as the corporate operational and support units

comprised of Administration, Marketing and Corporate Communications, and Enterprise

Operations and Technology.  From September 2006 through mid-2008, when he retired, Sambol

was Countrywide Financial's President and Chief Operating Officer.  Beginning in 2007, Sambol

was CEO of Countrywide Home Loans and a member of Countrywide Financial's Board of

Directors.  Beginning in 2007, Sambol also was CEO and President of CWHEQ and a member

of its Board of Directors.  Sambol resides in Hidden Hills, California.

22.     During his tenure at Countrywide, Sambol was also a member of several Countrywide Financial committees, including the (1) Executive Strategy Committee; (2) Asset/Liability Committee; (3) Finance Committee; (4) Audit and Ethics Committee; and (5) Committee to Set Loan Loss Allowance.

23.     Defendant Eric Sieracki served as Countrywide Financial's Executive Managing Director and Chief Financial Officer from April 2005 through Countrywide's merger with Bank of America in 2008.  Prior to his appointment as CFO, Sieracki occupied other high-level positions within Countrywide, including with CWALT, CWABS, CWHEQ, and CWMBS. Sieracki signed the Registration Statements for the following securitizations:  CWALT 2006-30T1, CWALT 2006-45T1, CWALT 2006-9T1, CWALT 2006-J1, CWALT 2007-18CB, CWALT 2007-20, CWHEL 2005-B, CWHL 2005-HYB-7, CWHL 2006-9, CWL 2005-11, CWL 2005-13, CWL 2005-16, CWL 2005-17, CWL 2006-1, CWL 2006-9, CWL 2006-S1, CWL 2006-S2, CWL 2006-S5, CWL 2006-S8, CWL 2007-4, CWL 2007-S1, and CWL 2007-S2. Sieracki resides in Lake Sherwood, California.

24.     Defendant Ranjit Kripalani joined Countrywide Financial and its subsidiary Countrywide Securities in 1998, as Countrywide Financial's Executive Vice President, and Countrywide Securities' National Sales Manager.  He served in numerous high-level positions across Countrywide since, including with CWALT, CWABS, CWHEQ and CWMBS.  Kripalani signed the Registration Statements for the following securitizations:  CWALT 2007-18CB and CWALT 2007-20.    Kripalani resides in Manhattan Beach, California.

25.     Defendant Stanford Kurland was President and COO of Countrywide Financial from 1988 until he ceased working for Countrywide Financial on September 7, 2006.  He served in numerous high-level positions across Countrywide.  At all relevant times up to his 2006

departure from Countrywide, Kurland was also the CEO, President and Chairman of the Board of CWABS.  He was also Chairman of the Board, President, and CEO of CWALT, CWABS, CWHEQ, and CWMBS.  Kurland signed the registration statements for the following securitizations:  CWALT 2005-25T1, CWALT 2006-30T1, CWALT 2006-45T1, CWALT 2006-9T1, CWALT 2006-J1, CWHEL 2005-B, CWHL 2005-HYB7, CWHL 2006-9, CWL 2005-1, CWL 2005-11, CWL 2005-13, CWL 2005-16, CWL 2005-17, CWL 2005-3 CWL 2006-1, CWL 2006-9, CWL 2006-S1, CWL 2006-S2, CWL 2006-S5, CWL 2006-S8, CWL 2007-4, CWL 2007-S1, and CWL 2007-S2.  Kurland resides in Hidden Hills, California and is employed by PennyMac, a mortgage company in Calabasas, California, that invests in distressed mortgages of the type that Kurland helped originate as a Countrywide executive.

26.    Defendant David A. Spector joined Countrywide in 1990 and served as its Executive Vice President of Secondary Markets.  He was subsequently promoted to Managing Director in 2001 and served as Senior Managing Director of Secondary Marketing at Countrywide Financial from 2004 to 2006.  He was also a member of the Board of Directors for CWALT, CWABS, CWHEQ, and CWMBS.  Spector signed the Registration Statements for the following securitizations:  CWALT 2005-25T1, CWALT 2006-30T1, CWALT 2006-45T1, CWALT 2006-9T1, CWALT 2006-J1, CWHEL 2005-B, CWHL 2005-HYB7, CWHL 2006-9, CWL 2005-1, CWL 2005-11, CWL 2005-13, CWL 2005-16, CWL 2005-17, CWL 2005-3, CWL 2006-1, CWL 2006-9, CWL 2006-S1, CWL 2006-S2, CWL 2006-S5, CWL 2006-S8, CWL 2007-4, CWL 2007-S1, and CWL 2007-S2.  Spector resides in Martinez, California.  Like Kurland, Spector is also employed by PennyMac.

27.    Defendant N. Joshua Adler served as President, CEO, and was a member of the Board of Directors for CWALT, CWABS, CWMBS, and CWHEQ.  Adler signed the

10

Registration Statements for the following securitizations:  CWALT 2007-18CB and CWALT 2007-20.  Adler resides in Calabasas, California.

28.     Defendant Jennifer Sandefur joined Countrywide Financial in 1994 as Vice President and Assistant Treasurer and was shortly thereafter promoted to Treasurer of Countrywide Home Loans.  She served as Senior Managing Director and Treasurer of Countrywide Financial at the time of her departure in 2008.  She also held high-level positions with CWALT, CWABS, CWHEQ, and CWMBS.  Sandefur signed the Registration Statement for the CWALT 2007-18CB securitization.  Sandefur resides in Somis, California.

29.     ***The Bank of America Defendants.***  Defendant Bank of America Corporation is a Delaware corporation with its principal executive offices at 100 North Tryon Street, Charlotte, North Carolina.  Defendants Countrywide Financial, Countrywide Home Loans, Countrywide Capital Markets, and Countrywide Securities all became part of Bank of America following the merger of Countrywide Financial into Bank of America on July 1, 2008.

30.     Defendant BAC Home Loans Servicing, LP is a limited partnership and subsidiary of Bank of America with its principal executive offices at 4500 Park Granada, Calabasas, CA.  BAC Home Loans Servicing, LP is identified in mortgage contracts and other legal documents as "BAC Home Loans Servicing, LP FKA Countrywide Home Loans Servicing, LP," meaning it was formerly known as Countrywide Home Loans Servicing, LP, the Countrywide subsidiary responsible for servicing Countrywide's mortgage loans after they are originated.

31.     Defendant NB Holdings Corporation is a Delaware corporation.  NB Holdings Corporation is one of the shell entities used to effectuate the Bank of America-Countrywide merger, and is a successor to Defendant Countrywide Home Loans. On July 3, 2008, Defendant

CHL completed the sale of substantially all of its assets to NB Holdings Corporation, a wholly-owned subsidiary of Bank of America.

32. ***Relevant Non-Parties.***  The Certificates for each securitization relevant to this action were issued by a trust.  The issuing trusts (collectively, the "Trusts") are identified in Exhibit A along with other details regarding Allstate's purchases. The Trusts are common-law trusts formed under the laws of the State of New York.

33. The Trusts are managed by a trustee.  The trustee for Allstate's Countrywide Offerings was The Bank of New York, a New York banking corporation, for all Offerings except for CWHEL 2005-B.  The trustee for that Offering was Wilmington Trust Company, a Delaware banking corporation.

34. At all relevant times, the Defendants committed the acts, caused or directed others to commit the acts, or permitted others to commit the acts alleged in this Complaint.  Any allegations about acts of corporate Defendants means that those acts were committed through their officers, directors, employees, agents, and/or representatives while those individuals were acting within the actual or implied scope of their authority.

## JURISDICTION AND VENUE

35. This Court has jurisdiction over the action pursuant to 28 U.S.C. § 1331.  The federal claims asserted herein arise under Section 10(b) of the Securities and Exchange Act of 1934 (the "1934 Act"), 15 U.S.C. § 78j(b); Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5; Section 20(a) of the 1934 Act, 15 U.S.C. § 78t(a); 28 U.S.C. § 1337; and Section 27 of the 1934 Act, 15 U.S.C. § 78aa.  The federal claims asserted herein also arise under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "1933 Act"), 15 U.S.C. §§ 77k, 77l(a)(2), and 77o; Section 22 of the 1933 Act, 15 U.S.C. § 77v; and 28 U.S.C. § 1337.

36.     This Court has supplemental jurisdiction over Allstate's state-law claims pursuant to 28 U.S.C. § 1367.

37.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b) and Section 27 of the 1934 Act, 15 U.S.C. § 78aa.  Defendants can be found and transact business in this District and many of the acts and practices giving rise to Allstate's claims occurred in substantial part in this District.  Defendants are also subject to personal jurisdiction in this District.

## SUBSTANTIVE ALLEGATIONS

## I.      ALLSTATE'S INVESTMENTS IN COUNTRYWIDE CERTIFICATES

38.     Allstate made its Countrywide investments as part of a broader plan to invest in a diverse array of mortgage-backed securities.  Allstate typically purchased senior classes of mortgage-backed securities (e.g. those rated AAA/Aaa or AA/Aa by the rating agencies Standard & Poor's and Moody's Investors Service).  Allstate purchased the Certificates from Countrywide to generate income and total return through safe investments.  But Allstate also purchased these securities with the expectation that the investments could be—and indeed some would be—sold on the secondary market.

39.     Allstate made the following purchases of Countrywide Certificates, representing a total investment of over $700 million.  Exhibits A and B to this Complaint set forth information about the Certificates and the Offerings in greater detail.

| Asset | Full Name of Offering | Purchase Price |
|---|---|---|
| CWALT 2005-25T1 A6 | Mortgage Pass-Through Certificates, Series 2005-25T1 | 5,148,437 |
| CWALT 2005-25T1 A6 | Mortgage Pass-Through Certificates, Series 2005-25T1 | 5,148,437 |
| CWALT 2006-30T1 1A3 | Mortgage Pass-Through Certificates, Series 2006-30T1 | 38,492,814 |
| CWALT 2006-45T1 2A6 | Mortgage Pass-Through Certificates, Series 2006-45T1 | 5,709,930 |

| | | |
|---|---|---|
| CWALT 2006-9T1 A4 | Mortgage Pass-Through Certificates, Series 2006-9T1 | 13,057,391 |
| CWALT 2006-J1 1A6 | Mortgage Pass-Through Certificates, Series 2006-J1 | 24,545,197 |
| CWALT 2007-18CB 1A2 | Mortgage Pass-Through Certificates, Series 2007-18CB | 24,982,422 |
| CWALT 2007-20 A1 | Mortgage Pass-Through Certificates, Series 2007-20 | 22,000,000 |
| CWALT 2007-20 A1 | Mortgage Pass-Through Certificates, Series 2007-20 | 13,000,000 |
| CWHEL 2005-B, 2A | Revolving Home Equity Loan Asset Backed Notes, Series 2005-B | 25,000,000 |
| CWHL 2005-HYB7 3A2 | Mortgage Pass-Through Certificates, Series 2005-HYB7 | 22,525,023 |
| CWHL 2006-9 A10 | Mortgage Pass-Through Certificates, Series 2006-9 | 34,765,770 |
| CWHL 2006-9 A10 | Mortgage Pass-Through Certificates, Series 2006-9 | 20,887,501 |
| CWL 2005-1, MF2 | Asset-Backed Certificates, Series 2005-1 | 2,699,893 |
| CWL 2005-1, MF3 | Asset-Backed Certificates, Series 2005-1 | 1,499,962 |
| CWL 2005-1, MF4 | Asset-Backed Certificates, Series 2005-1 | 1,999,916 |
| CWL 2005-1, MF5 | Asset-Backed Certificates, Series 2005-1 | 1,249,986 |
| CWL 2005-11, AF5A | Asset-Backed Certificates, Series 2005-11 | 11,999,332 |
| CWL 2005-11, AF6 | Asset-Backed Certificates, Series 2005-11 | 24,999,925 |
| CWL 2005-13, AF5 | Asset-Backed Certificates, Series 2005-13 | 9,999,433 |
| CWL 2005-13, AF6 | Asset-Backed Certificates, Series 2005-13 | 8,841,703 |
| CWL 2005-13, AF6 | Asset-Backed Certificates, Series 2005-13 | 4,999,770 |
| CWL 2005-16 2AF2 | Asset-Backed Certificates, Series 2005-16 | 9,999,947 |
| CWL 2005-16 2AF5 | Asset-Backed Certificates, Series 2005-16 | 19,998,986 |
| CWL 2005-17, 1AF2 | Asset-Backed Certificates, Series 2005-17 | 12,999,766 |
| CWL 2005-17, 1AF5 | Asset-Backed Certificates, Series 2005-17 | 4,999,896 |

| | | |
|---|---|---|
| CWL 2005-17, 1AF5 | Asset-Backed Certificates, Series 2005-17 | 12,060,058 |
| CWL 2005-17, 1AF5 | Asset-Backed Certificates, Series 2005-17 | 12,060,058 |
| CWL 2005-3, MF2 | Asset-Backed Certificates, Series 2005-3 | 8,499,866 |
| CWL 2005-3, MF3 | Asset-Backed Certificates, Series 2005-3 | 10,539,509 |
| CWL 2005-3, MF4 | Asset-Backed Certificates, Series 2005-3 | 4,589,945 |
| CWL 2005-3, MF5 | Asset-Backed Certificates, Series 2005-3 | 3,249,865 |
| CWL 2006-1, AF5 | Asset-Backed Certificates, Series 2006-1 | 9,999,873 |
| CWL 2006-1, AF6 | Asset-Backed Certificates, Series 2006-1 | 9,999,802 |
| CWL 2006-9 1AF6 | Asset-Backed Certificates, Series 2006-1 | 3,203,649 |
| CWL 2006-9 1AF6 | Asset-Backed Certificates, Series 2006-1 | 3,203,649 |
| CWL 2006-9 1AF6 | Asset-Backed Certificates, Series 2006-1 | 4,036,093 |
| CWL 2006-S1, A2 | Home Equity Loan Asset Backed Certificates, Series 2006-S1 | 11,199,824 |
| CWL 2006-S1, A2 | Home Equity Loan Asset Backed Certificates, Series 2006-S1 | 38,799,390 |
| CWL 2006-S2, A2 | Home Equity Loan Asset Backed Certificates, Series 2006-S2 | 19,999,824 |
| CWL 2006-S5, A3 | Home Equity Loan Asset Backed Certificates, Series 2006-S5 | 24,999,422 |
| CWL 2006-S5, A4 | Home Equity Loan Asset Backed Certificates, Series 2006-S5 | 9,999,795 |
| CWL 2006-S8, A3 | Home Equity Loan Asset Backed Certificates, Series 2006-S8 | 14,999,731 |
| CWL 2006-S8, A6 | Home Equity Loan Asset Backed Certificates, Series 2006-S8 | 7,499,840 |
| CWL 2006-S8, A6 | Home Equity Loan Asset Backed Certificates, Series 2006-S8 | 5,999,872 |
| CWL 2007-4 M1 | Asset-Backed Certificates, Series 2007-4 | 15,249,301 |
| CWL 2007-4 M1 | Asset-Backed Certificates, Series 2007-4 | 15,249,301 |
| CWL 2007-4 M2 | Asset-Backed Certificates, Series 2007-4 | 13,999,714 |

| CWL 2007-4 M2 | Asset-Backed Certificates, Series 2007-4 | 13,999,714 |
| CWL 2007-S1 A3 | Home Equity Loan Asset Backed Certificates, Series 2007-S1 | 8,999,559 |
| CWL 2007-S1 A3 | Home Equity Loan Asset Backed Certificates, Series 2007-S1 | 8,999,559 |
| CWL 2007-S1 A3 | Home Equity Loan Asset Backed Certificates, Series 2007-S1 | 6,999,657 |
| CWL 2007-S1 A4 | Home Equity Loan Asset Backed Certificates, Series 2007-S1 | 6,999,510 |
| CWL 2007-S1 A4 | Home Equity Loan Asset Backed Certificates, Series 2007-S1 | 6,999,510 |
| CWL 2007-S1 A4 | Home Equity Loan Asset Backed Certificates, Series 2007-S1 | 5,999,580 |
| CWL 2007-S1 A6 | Home Equity Loan Asset Backed Certificates, Series 2007-S1 | 8,999,896 |
| CWL 2007-S1 A6 | Home Equity Loan Asset Backed Certificates, Series 2007-S1 | 8,999,896 |
| CWL 2007-S1 A6 | Home Equity Loan Asset Backed Certificates, Series 2007-S1 | 6,999,919 |
| CWL 2007-S2 A6 | Home Equity Loan Asset Backed Certificates, Series 2007-S2 | 9,999,371 |
| CWL 2007-S2 A6 | Home Equity Loan Asset Backed Certificates, Series 2007-S2 | 8,499,465 |
| CWL 2007-S2 A6 | Home Equity Loan Asset Backed Certificates, Series 2007-S2 | 8,499,465 |

## II.   COUNTRYWIDE'S MANDATE TO MATCH ANY PRODUCT ON THE MARKET REQUIRED IT TO SYSTEMATICALLY IGNORE ITS STATED UNDERWRITING PROCEDURES

### A.   Countrywide Makes Origination Volume King

40.     Countrywide's remarkable growth from 2003 to 2007 was fueled by its success in the process of pooling residential mortgages, "securitizing" the pool by issuing securities backed by it, then selling the securities to investors.  The value and marketability of the securities was dependent on the represented quality of the mortgages selected for the underlying pools.

41.     During a conference call with analysts in 2003, Mozilo stated that his goal for Countrywide Financial was to "dominate" the mortgage market and "to get our market share to

the ultimate 30% by 2006, 2007." Accomplishing Mozilo's goal of a 30% market share required Countrywide to systematically departing from its credit risk and underwriting standards.

42.     This abandonment of Countrywide's underwriting guidelines came under the direction of Mozilo and Sambol, and was first put into action in a company-wide mandate by Sambol. Around May 2003, Sambol became particularly close to Mozilo and emerged as a major force within Countrywide Financial and Countrywide Home Loans, taking complete charge of loan production in 2004. Countrywide's senior management, particularly Sambol, who ran Countrywide's loan production machine as President and Chief Operating Officer of Countrywide Home Loans, sent a clear message to loan origination and underwriting employees that overall volume was far more important than creditworthiness.

43.     Rather than relying on its underwriting standards to maintain Countrywide's profitability, Sambol argued that by originating and procuring a large volume of loans, regardless of their relative risk, Countrywide would be able to cover any losses incurred by the riskier loans by the profits it generated on other loans.

44.     Mozilo's 30% market share dictate resulted in a "culture change" starting in 2003. A former senior regional vice president of Countrywide was quoted in *Business Week* as saying that Countrywide "approached making loans like making widgets, focusing on cost to produce and not risk or compliance. Programs like 'Fast and Easy' where the income and assets were stated, not verified, were open to abuse and misuse. The fiduciary duty of making sure whether the loan should truly be [extended] was not as important as getting the deal done."

45.     Countrywide's senior management imposed intense pressure on underwriters to approve mortgage loans, in some instances requiring underwriters to process 60 to 70 mortgage loan applications in a single day and to justify any rejections they made. This created an

incentive not to review loans thoroughly but instead simply to rubber-stamp them "approved." That pressure even came from the most senior levels of management—a former executive reported that Sambol was "livid" at a 2005 meeting because call-center employees were not selling enough adjustable-rate mortgages, which begin with "teaser" rates but quickly reset to higher rates and thus are highly profitable for Countrywide.

  **B.**  **Countrywide Cedes its Underwriting Policy to the Market's Lowest Common Denominator By Way of a "Matching" Mandate**

  46.  In order to meet its volume and market share goals, Countrywide abandoned any semblance of underwriting standards. Unknown to Allstate, the only underwriting principles at work within Countrywide were: (1) is another company doing it, and/or (2) can we sell it.

  47.  Countrywide had a policy of matching any product that a competitor was willing to offer. A former finance executive at Countrywide explained that: "To the extent more than 5 percent of the [mortgage] market was originating a particular product, any new alternative mortgage product, then Countrywide would originate it . . . . [I]t's the proverbial race to the bottom."

  48.  Reuters reported that Mozilo saw the mortgage industry's lending standards "come unglued." Yet Countrywide stuck to its "matching" strategy. Matching the most aggressive mortgage products in an "unglued" industry would obviously make Countrywide among the most aggressive. But this understates the severity of the impact Countrywide's "matching" strategy had. Countrywide would mix and match the terms offered by multiple lenders. The resulting composite offering would be *even more* aggressive than any one competitor who had a particular feature matched. Countrywide's aggressive mortgage products presented "layered" risks created by its undisclosed "matching" philosophy.

49.     To conceal its greatly increased production of subprime loans, Countrywide employed an internal, undisclosed definition of prime versus subprime, and thus, in its public reports, Countrywide Financial classified loans as "prime" that clearly were subprime under well-established industry standards.  A former senior underwriter at Countrywide reported that Countrywide regularly classified loans as "prime" even if they were issued to non-prime borrowers, including people who recently went through bankruptcy.  According to the SEC, Countrywide included in the prime category loans with FICO scores below 620, and further included loan products with increasing amounts of credit risk such as reduced or no-documentation loans and pay-option adjustable-rate mortgages ("ARMs").

**C.     The "Matching" Policy Demanded the Systemic Abandonment of Countrywide's Own Policies**

50.     Countrywide's "matching" strategy in an "unglued" market required it to systematically abandon its underwriting guidelines.  It was impossible for its protocols to even nominally keep up with the pace of change dictated by Countrywide's "matching" strategy.

51.     According to the SEC, Countrywide created an underwriting process that incorporated at least four attempts to approve loans.  First, loans were processed by an automated system that would either approve the loan or refer it to manual underwriting.  The manual underwriter would then seek to determine if the loan could be approved under his or her exception authority.  If the loan exceeded the underwriter's exception authority, it was then referred to the Structured Lending Desk, where underwriters with broader exception authority attempted to get the loan approved.  Finally, if all prior attempts to find an "exception" failed, it would be referred to the Secondary Markets Structured Lending Desk, where the sole criterion for approving was whether it could be sold.

52.     One major way Countrywide deployed its "matching" strategy, despite its "theoretical" underwriting policies, was to expand the number of employees who could grant exceptions throughout this process.  A wide range of employees received authority to grant exceptions and to change the terms of a loan, including underwriters, their superiors, branch managers, and regional vice presidents.  Even if Countrywide's computer system recommended denying a loan, an underwriter could override that denial by obtaining permission from his or her supervisor.

53.     Countrywide routinely approved "exception" loans that did not satisfy even Countrywide's weakened "theoretical" underwriting criteria through a high-volume computer system called the Exception Processing System (but only after Countrywide charged these high risk borrowers extra points and fees).  The Exception Processing System was known to approve virtually every borrower and loan profile with a pricing add-on when necessary, and was previously known within Countrywide as the "Price Any Loan" system.  Indeed, Mozilo and Sambol authorized the establishment of the exception-based Structured Loan Desk in Plano, Texas, specifically to grant exceptions from the underwriting guidelines to which Countrywide told the public it was adhering.

54.     According to the SEC, Countrywide's culture of "exceptions" started at the top, with Mozilo personally approving loans by way of guideline exceptions pursuant to a "Friends of Angelo" program.

55.     Unknown to Allstate and contrary to Defendants' representations, these exceptions were not based on any countervailing compensating factors.  Rather, they were given merely to allow Countrywide to "match" what competitors were offering, and because Countrywide believed the loans could be sold in the secondary market to investors like Allstate.

56.     According to the SEC, at one point, **_23% of Countrywide's subprime first-lien loans were generated as "exceptions_."**  Similarly, according to the California Attorney General's complaint against Countrywide and Mozilo, a former supervising underwriter at Countrywide stated that up to 15% or 20% of the loans that Countrywide generated were processed via the Exception Processing System, of which very few were ever rejected.  One former Countrywide employee remarked that he could "count on one finger" the number of loans that his supervisors permitted him to reject as an underwriter with Countrywide's Structured Loan Desks.  All of these studies of Countrywide's use of "exceptions" implicated Countrywide's practices at the same time that Allstate was originating the Mortgage Loans underlying Allstate's Certificates.

57.     Another way Countrywide found to get around its "theoretical" underwriting policies was the systematic abuse of no- and low-documentation loan processes.  With these products, the borrower is not required to provide the normal confirmations and details for credit criteria such as annual income or current assets.  Low-documentation mortgages were originally designed for professionals and business owners with high credit scores, who preferred not to disclose their confidential financial information.  Traditionally, these loans generally also required low loan-to-value ratios.  Countrywide repeatedly represented that risky products such as low-doc loans were adhering to these traditional applications by providing low-documentation products only to the most sophisticated and creditworthy borrowers.

58.     To the contrary, low-doc loans were instead used as a tool to get around Countrywide's "theoretical" underwriting standards.  When a loan officer knew an application would not be approved on the basis of the applicant's actual financial condition, the officer often steered applicants into low-documentation products.  Once in those programs, Countrywide

21

coached borrowers on how to falsify the application to ensure it would be approved, and in some instances would even fill out the required misrepresentations without the borrower's knowledge. Countrywide's abuse of these alternative-documentation procedures is directly relevant to Allstate's Certificates, which often included loans approved through these procedures—indeed, as described further below, on information and belief the loan pools underlying Allstate's Certificates included even more alternative-documentation loans than Countrywide disclosed at the time of purchase.

> **D.** **Securitization Allowed Countrywide to Transfer the Risks Created by Its Underwriting Abandonment to Investors Like Allstate**

59.    Countrywide was willing to let its "matching" policy trump sound underwriting practices because it was routinely placing the resulting risk from its risky loans on investors like Allstate.  Countrywide aggressively securitized the risky mortgages it was issuing by aggregating or pooling them, and then issuing and selling securities to the public that were backed by the mortgage pools.

60.    Specifically, as it relates to the Certificates purchased by Allstate, many of the loans that Countrywide Home Loans originated in the relevant period were pooled together by the Depositors, and deposited into special purpose entities or trusts created by Countrywide through the Depositors.  The Trusts in turn issued Certificates backed by the loans, which were then sold by the Countrywide Securities and other underwriters to Allstate.

61.    The cash flows from the pooled loans, in the form of payments of interest and principal, were used to make payments on the Certificates.  The purchase of each Certificate was thus the purchase of a right to participate in the cash flows generated by the underlying pool.

62.    In other words, the individual Countrywide Defendants' roles were:

a.      Countrywide Home Loans acted as the sponsor of the Securitizations and as one of the Sellers.  It originated the Mortgage Loans that were pooled together in the securitizations and then sold, transferred, or otherwise conveyed title to those loans to the Depositor pursuant to Pooling and Servicing Agreements, which are governed by New York law.

b.      Countrywide Securities was the Lead Manager of the underwriters for the Offerings.  In that role, it was responsible for underwriting and managing the Securitizations' sale of certificates to Allstate and other investors, including screening the Mortgage Loans for compliance with Countrywide's underwriting guidelines.

c.      CWABS, CWALT, CWMBS, and CWHEQ were the Depositors for the Offerings.  The Depositors are the issuers of the securities for purposes of the 1933 Act.  The Depositors purchased the Mortgage Loans from Countrywide Home Loans and one or more other Sellers pursuant to the Pooling and Servicing Agreements, which are governed by New York law.  The Depositors then sold, transferred, or otherwise conveyed the Mortgage Loans to the Trustee, Wilmington Trust Company (for the CWHEL 2005-B Offering) and The Bank of New York (for all other Offerings), which held the Loans in the Trusts for the benefit of Allstate and other Certificateholders.  The Depositors then issued the Certificates, which represent interests in the Mortgage Loans held by the Trusts, to Plaintiffs and other investors.  The Depositors and the Sellers and Underwriters marketed and sold the Certificates to investors such as Allstate.  The Certificates were sold in classes according to their expected credit ratings, and were expected to provide interest on the income stream generated by the Mortgage Loans in the collateral pools.  The Depositors were established as limited-purpose finance subsidiaries of Countrywide Financial.

d.      Defendant Countrywide Financial is the corporate parent of Countrywide Home Loans, Countrywide Securities, and the Depositors.  In that capacity, it directed and controlled those Defendants' activities related to the Securitizations.  Countrywide Financial and/or Countrywide Home Loans also guaranteed Countrywide Home Loans Servicing's loan-servicing activities when required by the owner of the Mortgage Loans.

63.      The following chart summarizes the roles above using one of the Offerings in which Allstate invested as an example:



## III.   **COUNTRYWIDE'S MATERIAL MISREPRESENTATIONS**

64.     As it is the stream of payments from borrowers that funds payments to investors, if enough loans in the pool default, investors will not be paid the interest returns promised and may even lose their principal.  The market value for the Certificates also decreases as the perceived risk of the underlying pool increases.  As such, any representation bearing on the riskiness of the underlying Mortgage Loans was material to investors, including Allstate.

### A.     **General Underwriting Guidelines**

65.     The underwriting process used to form the pools of Mortgage Loans underlying Allstate's Certificates was material to Allstate because, as discussed above, the quality of loans in the pool determines the risk of the Certificates backed by those loans.  If a reasonable underwriting process was not actually followed, the chances that the loans had riskier features than what Countrywide claimed (whether due to error, borrower misrepresentation, or otherwise) greatly increases.  This makes the resulting loan pool much more risky.  A systemic underwriting failure decreases the reliability of *all* of the information investors have about the loans, and thus greatly increases their perceived and actual risk, and greatly decreases their market value.

66.     Countrywide represented it consistently followed a conservative, reliable, reasonable underwriting program.  For example, in the Offering Materials for CWALT 2006-9T1, Countrywide represented that "All of the mortgage loans will have been originated or acquired by Countrywide Home Loans in accordance with its credit, appraisal and underwriting standards" and that "Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral."

67. The Offering Materials for each of the securitizations at issue here had similar representations. The specific representations at issue in the Offering Materials on which Allstate relied are found in Exhibits F through DD.

**B.    Owner-Occupancy Statistics**

68. Owner-occupancy statistics were material to Allstate and other investors because high owner-occupancy rates should have made the Certificates safer investments than Certificates backed by second homes or investment properties. Homeowners who reside in mortgaged properties are less likely to default than owners who purchase homes as investments or second homes and live elsewhere.

69. Each of the Offering Materials contained detailed statistics regarding the Mortgage Loans in the collateral pool, including the reported owner-occupancy characteristics of the Mortgage Loans. The statistics reported whether the borrowers intended to occupy the properties as owners, or use the properties as investment properties or second homes. For example, in the Offering Materials for CWALT 2006-9T1, Countrywide represented that among the 779 initial Mortgage Loans in the offering, 679 of the Mortgage Loans (86% of the total) were for primary residences, i.e. owner-occupied properties.

70. The Offering Materials for each of the securitizations at issue here had similar representations and statistics. Examples of each can be found in Exhibits F through DD.

**C.    Loan-to-Value Ratios and Appraisals**

71. The loan-to-value ("LTV") ratio is the ratio of a Mortgage Loan's original principal balance to the appraised value of the mortgaged property. The related Combined LTV ("CLTV") takes into account other liens on the property. These ratios were material to Allstate and other investors because higher ratios are correlated with a higher risk of default. A borrower with a small equity position in a property has less to lose if he or she defaults on the loan. There

26

is also a greater likelihood that a foreclosure will result in a loss for the lender if the borrower fully leveraged the property. These are common metrics for analysts and investors to evaluate the price and risk of mortgage-backed securities.

72.    For example, in the CWABS 2007-04 transaction, Countrywide represented that the weighted average LTV ratio was 77.0%. Allstate's subsequent loan-level analysis, described further below, has subsequently determined that the weighted average LTV for this portfolio was actually 87.0%.

73.    The Offering Materials provided in connection with the Offerings also represented that one or more *independent* appraisals were obtained for nearly every Mortgage Loan. For example, in the Offering Documents for CWALT 2006-9T1, Countrywide represented as follows:

> Except with respect to mortgage loans originated pursuant to its Streamlined Documentation Program, Countrywide Home Loans obtains appraisals from independent appraisers or appraisal services for properties that are to secure mortgage loans. Appraisers inspect and appraise the proposed mortgaged property and verify that the property is in acceptable condition. Following each appraisal, the appraiser prepares a report which includes a market data analysis based on recent sales of comparable homes in the area and, when deemed appropriate, a replacement cost analysis based on the current cost of constructing a similar home. All appraisals are required to conform to Fannie Mae or Freddie Mac appraisal standards then in effect.

74.    These representations regarding independence were material to Allstate and other investors because they signaled the reliability of the LTV ratios discussed above.

75.    The Offering Materials for each of the securitizations at issue here had similar representations. Examples of each can be found in Exhibits F through DD.

D.    **Debt-to-Income**

76.    The ratio of a borrower's debt to his or her income was material to Allstate and other investors because it represents a borrower's ability to afford the mortgage payments at issue, and thus implicates the likelihood of default.

77.    In the Offering Documents for the CWABS 2007-04 Offering, for example, Countrywide represented that "After obtaining all applicable employment, credit and property information, Countrywide Home Loans uses a debt-to-income ratio to assist in determining whether the prospective borrower has sufficient monthly income available to support the payments of principal and interest on the mortgage loan in addition to other monthly credit obligations."  Countrywide stated that "The maximum monthly debt-to-income ratio varies depending upon a borrower's credit grade and documentation level . . . but does not generally exceed 55%."

78.    The Offering Materials for each of the securitizations at issue here often had similar representations.  Examples of each can be found in Exhibits F through DD.

E.    **No Adverse Interest in Selection**

79.    Whether or not Countrywide was "cherry picking" the higher-quality loans for itself and leaving behind a poorer-quality pool for offloading onto investors was material to Allstate and other investors because such a process would flag to investors the poor quality of the loans actually being securitized, regardless of the general underwriting processes that Countrywide supposedly followed.

80.    For example, in the CWALT 2007-20 Offering Documents, Countrywide represented that "the mortgage loans were selected from among the outstanding one- to four-family mortgage loans in Countrywide Home Loans' portfolio as to which the representations and warranties set forth in the pooling and servicing agreement can be made and that the

28

selection was not made in a manner intended to affect the interests of the certificateholders adversely."

81.     The Offering Materials for each of the securitizations at issue here had similar representations.  Examples of each can be found in Exhibits F through DD.

**F.     <u>Ratings</u>**

82.     Each of the Certificates purchased by Allstate received a rating purportedly indicating the rating agencies' view of the risk profile of the securities.  The initial and current ratings given to the Certificate are contained in Exhibit C.  The ratings were material to reasonable investors, including Allstate, because the ratings were important to investors in making their investment decisions.  The securities would have been unmarketable and would not have been issued but for the provision of these ratings.

83.     The Offering Materials represented that the rating agencies conducted an analysis that was designed to assess the likelihood of delinquencies and defaults in the underlying mortgage pools.  For example, the Offering Materials for CWL 2005-1 stated that "It is a condition to the issuance of the securities of each series offered hereby and by the prospectus supplement that they shall have been rated in one of the four highest rating categories by the nationally recognized statistical rating agency or agencies (each, a "Rating Agency'') specified in the related prospectus supplement.  Any such rating would be based on, among other things, the adequacy of the value of the Trust Fund Assets and any credit enhancement with respect to such class and will reflect such Rating Agency's assessment solely of the likelihood that holders of a class of securities of such class will receive payments to which such securityholders are entitled under the related Agreement."

84.     The Offering Materials for each of the securitizations at issue here had similar representations.  Examples of each can be found in Exhibits F through DD.

### G. Share of Mortgage Loans Granted Pursuant to Full-Documentation Procedures

85.     Whether the information in a loan file was fully documented, or whether it was instead approved pursuant to a reduced or no-documentation procedure, was material to Allstate. Reduced-documentation loans are riskier because the borrower provides less substantiating information for items such as his or her income and assets.  With less confirmation, it is more likely that there are errors or misrepresentations in the loan file.

86.     For example, in the CWL 2007-4 Offering, the prospectus supplement represented that 71.8% of the Mortgage Loans were issued according to Full Documentation procedures, but 28.2% were issued according to Stated Income procedures.

87.     The Offering Materials for each of the securitizations at issue here had similar representations.  Examples of each can be found in Exhibits F through DD.

### H. Servicing Quality

88.     How the loans were to be serviced after origination was material to Allstate and other investors because a failure to properly service loans can significantly increase the number of troubled loans that default rather than being brought back into compliance.

89.     For example, in the CWALT 2007-20 Offering Documents, Countrywide represented that "The master servicer [Countrywide Home Loans Servicing LP] will master service all of the mortgage loans in accordance with the terms set forth in the pooling and servicing agreement.  The master servicer has agreed to service and administer the mortgage loans in accordance with customary and usual standards of practice of prudent mortgage loan lenders."

90.     The Offering Materials for each of the securitizations at issue here had similar representations about Countrywide Home Loans Servicing.  Examples of each can be found in Exhibits F through DD.

**I.      Case-by-Case Underwriting Exceptions**

91.     Whether Countrywide was making case-by-case exceptions was material to Allstate and other investors because Countrywide's claimed underwriting standards would be made irrelevant if large portions of the loans were systemically excused from those standards.

92.     Countrywide represented that it made case-by-case exceptions to its underwriting standards, based on compensating factors that increased the quality of a loan application.  For example, in the Offering Materials for CWALT 2006-9T1, Countrywide represented that "Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower."

93.     The Offering Materials for each of the securitizations at issue here had similar representations.  Examples of each can be found in Exhibits F through DD.

**IV.    ALL OF THE REPRESENTATIONS WERE UNTRUE AND MISLEADING BECAUSE COUNTRYWIDE SYSTEMATICALLY IGNORED ITS OWN UNDERWRITING GUIDELINES**

94.     Instead of focusing on assessing an applicant's credit standing and repayment ability, Countrywide subordinated its underwriting standards to the goal of originating and securitizing as many loans as it could to expand its market share and generate fees in the secondary mortgage market.  The systematic abandonment of any underwriting standards rendered all of the above representations false or misleading at the time they were made.

95.     The representations regarding Countrywide's underwriting processes, underwriting quality, loan selection, and use of exceptions were untrue.  Countrywide systematically abandoned its underwriting standards to increase loan volumes without regard to

loan quality, "cherry picked" loans for itself, and offloaded the risky remaining pool of loans onto Allstate and other institutional investors. Countrywide systematically ignored borrowers' actual repayment ability and the value and adequacy of mortgaged property used as collateral in issuing loans. Exceptions were granted abundantly and without consideration of any compensating factors in order to grow market share pursuant to its "matching" corporate strategy. The Defendants also misleadingly omitted that Countrywide was systematically abusing "exceptions" and low-documentation loans in order to further circumvent its purported underwriting standards, that it had adopted a "matching" strategy that ensured that its loan offerings (a composite of the most aggressive features from every other lender) were at the "frontier" of the industry, that "salability" was in essence the only underwriting principle, and that Countrywide was further concealing the true quality of its practices by using a misleading and self-serving definition of "prime."

96. The representations regarding owner-occupancy and debt-to-income were untrue. Countrywide's abandonment of its underwriting practices and coaching of borrowers regarding how to game the system facilitated the widespread falsification of these statistics. In reality, a far greater percentage of properties were not owner-occupied, and borrowers' claimed income was regularly inflated. Countrywide also failed to disclose that the disclosed statistics were baseless.

97. The representations regarding loan-to-value, combined loan-to-value, and appraisal independence were untrue. Countrywide did not genuinely believe the appraisal values given to the properties because it knew that the property values were being artificially and baselessly inflated in order to increase the amount of money that it could loan to a borrower, rendering the LTV and CLTV statistics false and misleading. The statistics also omitted the effect of additional liens on the property, making the CLTVs even further from the truth. In

addition, contrary to its representations, Countrywide used affiliated rather than independent appraisers. The Defendants also misleadingly omitted that the disclosed statistics were baseless and that Countrywide was pressuring appraisers to inflate their appraisals.

98.     The representations regarding the credit ratings were also untrue. Countrywide fed baseless loan statistics to the credit rating agencies, essentially pre-determining the ratings that would be given. The use of baseless statistics also made representations about the ratings process being designed to assess credit risk false, as the entire ratings process was rigged from the start through the use of incorrect data. Countrywide thus did not genuinely believe that the Certificates' ratings reflected their actual risk. Countrywide also failed to disclose that the ratings were baseless, and were issued by rating agencies that were virulently conflicted and were using outdated models.

99.     The representations regarding servicing quality were untrue. As the Master Servicer on the Offerings, the servicing performed by Countrywide Home Loans Servicing (or in the case of CWHEL 2005-B, Countrywide Home Loans) lagged behind the standards of the industry. Countrywide failed to allocate sufficient resources to service and administer the loans, such as personnel to address customer inquiries and to conduct follow-up efforts with delinquent borrowers. Countrywide also provided inadequate resources for work-out plans. These failures were exacerbated by Countrywide's break-neck origination of loans in disregard of its own underwriting guidelines, which led to an extraordinary increase in delinquencies, defaults, foreclosures, bankruptcies, litigation, and other proceedings. The Offering Materials misrepresented these practices or failed to disclose them in the Certificates' Offering Documents.

100.    As described below, the evidence that these representations were untrue is overwhelming. As the evidence shows, Countrywide's abandonment was systemic. The

evidence is directly relevant here, even if a particular e-mail does not refer on its face specifically to Allstate's Certificates. The subprime mortgage loans discussed in the materials discussed below are the very same types of loans that backed some of Allstate's Certificates, and thus the materials are even more directly relevant to the collateral pools in this case.

101.    In June 2009, the SEC initiated a civil action against Mozilo, Sambol, and Sieracki. On September 16, 2010, the District Court denied the defendants' motions for summary judgment. Relying on just a small part of the evidence referred to below, the District Court found that the SEC raised genuine issues of fact as to, among other things, whether the defendants had misrepresented the quality of its underwriting processes:

> ***The SEC has presented evidence that these statements regarding the quality of Countrywide's underwriting guidelines and loan production were misleading*** in light of Defendants' failure to disclose, *inter alia*, that: (1) As a consequence of Countrywide's "matching strategy," Countrywide's underwriting "guidelines" would end up as a composite of the most aggressive guidelines in the market . . . and (2) Countrywide routinely ignored its official underwriting guidelines, and in practice, Countrywide's only criterion for approving a loan was whether the loan could be sold into the secondary market.

> For example, Countrywide's Chief Risk Officer, John McMurray, explained in his deposition that Countrywide mixed and matched guidelines from various lenders in the industry, which resulted in Countrywide's guidelines being a composite of the most aggressive guidelines in the industry . . . .

> SEC has also presented evidence that Countrywide routinely ignored its official underwriting to such an extent that Countrywide would underwrite *any* loan it could sell into the secondary mortgage market. According to the evidence presented by the SEC, Countrywide typically made four attempts to approve a loan . . . . According to the testimony of the Managing Director of Countrywide Home Loans' Secondary Marketing Division, once the loan was referred to Countrywide's Secondary Markets Structured Lending Desk, the sole criterion used for approving the loan was whether or not the loan could be sold in the secondary market. As a result of this process, a significant portion (typically in excess of 20%) of Countrywide's loans were issued as exceptions to its official underwriting guidelines . . . .

> ***In light of this evidence, a reasonable jury could conclude that Countrywide all but abandoned managing credit risk through its underwriting guidelines*** . . . .

*S.E.C. v. Mozilo*, No. CV 09-3994, 2010 WL 3656068, at *10 (C.D. Cal. Sept. 16, 2010)

(emphasis added).  The Court also found that the SEC presented evidence from which a jury

could find Countrywide's statistics regarding "prime" mortgages to be misleading, based on

Countrywide's internal definition of that term.  *Id.* at *14-15.  Mozilo, Sambol, and the third

defendant, Eric Sieracki, subsequently settled with SEC on the eve of trial, agreeing to pay

substantial fines.

        A.      <u>A Statistical Analysis of Allstate's Certificates Shows That the Representations Were False</u>

        (1)      **The securities' high default rates and souring credit ratings**

102.    Even though the Certificates were supposed to be long-term, stable investments,

just years after their issuance the underlying Mortgage Loans have already shown serious

deterioration in performance.  For instance, fourteen of Allstate's Offerings have had more than

30% of their Mortgage Loans either default already, or are currently in delinquency.  Many are

even higher – for instance ***over 62% of the Mortgage Loans in the current pool are delinquent***

for CWABS 2005-01 and CWABS 2005-13.  Likewise, ***60% or nearly 60% of the Mortgage***

***Loans in the current pool are delinquent*** for CWABS 2005-03, CWABS 2005-11, CWABS

2005-16, CWABS 2005-17, and CWABS 2006-01, CWABS 2006-09, and CWABS 2007-04.

These statistics are more fully set forth in Exhibit D, attached.

103.    Many of Allstate's Certificates have experienced high level of defaults.

104.     The latest available information shows that in total, 49% of the original loans

underlying CWABS 2005-13 are delinquent or written off; 49% of the original loans underlying

CWABS 2006-9 are either delinquent or written off; and 40% of the original loans underlying

CWABS 2005-13 are either delinquent or written off.

105.    An analysis of the percent of loans currently in the loan pool at any given time (i.e., that had not been removed already by way of default, foreclosure, prepayments, or otherwise), and that were at least 30 days delinquent in their payments at as of certain periods in the Offerings' history, are set forth in Exhibit D.

106.    Relatedly, the ratings given to the Certificates have significantly deteriorated. Most of Allstate's investments initially received the highest possible ratings – S&P's AAA rating or their equivalent from the other rating agencies.  According to S&P's website, "An obligation rated 'AAA' has the highest rating assigned by Standard & Poor's.  The obligor's capacity to meet its financial commitment on the obligation is extremely strong."  Moody's similarly describes its highest rating, Aaa, as meaning that the investment is "judged to be of the highest quality, with minimal credit risk."  This is the same rating typically given to bonds backed by the full faith and credit of the United States government, such as treasury bills.  Historically, a AAA rated security had an expected loss rate of less than .05%.

107.    Because of the high delinquency and default rates and other factors, most of Allstate's Certificates have been downgraded from the highest possible ratings to junk-bond ratings. ***Despite nearly all beginning with the same rating given to treasury bills (i.e., AAA), currently 93% of the Certificates are currently rated as non-investment grade***.  Indeed, ***over 70% have fallen to "junk-bond" ratings—S&P's rating of CCC  (or the other rating agencies' equivalent) or below***.  These statistics are reflected in Exhibit E.  According to S&P's website, far from having the "extremely strong capacity" to meet commitments that AAA ratings do, instead these ratings now indicate that the Certificates are "currently vulnerable and dependent on favorable business, financial and economic conditions to meet financial commitments."

108.    The Certificates were supposed to be long-term, stable investments, yet they have already experienced payment problems significantly beyond what was expected for loan pools that were properly underwritten and which contained loans that actually had the characteristics the Offering Materials claimed.  Countrywide's risk officers have acknowledged that it is usually a large and unexpected disruption to a borrower's income that causes an actual payment default.  In a properly underwritten pool of loans, one would thus not expect to see a large spike of defaults occurring shortly after origination, since it is unlikely that many borrowers would all incur a sudden and unexpected change to their payment ability so soon after purchasing a home.

109.    Indeed, as discussed further below in section IV(A), economic studies have confirmed that high default rates early in a loan's life are highly correlated with misrepresentations in the loan files.  This makes sense—as borrowers are put in loan products they cannot actually afford, they quickly and predictably fall behind on their payments.  Thus, the dismal performance of the Mortgage Loans is itself strong evidence that they were improperly written, and that they did not have the credit risk characteristics the Offering Materials claimed.

110.    The drastic rise in default rates on the Mortgage Loans underlying Allstate's Certificates, as reflected in Exhibit D, reflects Countrywide's faulty underwriting rather than the downturn in the housing market.  Among all of the deals that Allstate invested in, the rate of delinquency on the Mortgage Loans is far out of proportion to rates of delinquency in the market as a whole, and the higher rate is directly attributable to Countrywide's wrongdoing.

**(2)     There are numerous indications that borrowers did not actually occupy the mortgaged properties as claimed**

111.     As above, Countrywide repeatedly represented that the loan pools underlying the Certificates had high percentages of loans issued to borrowers that were living in the mortgaged properties.

112.     Allstate selected a random sample of loans from each offering in which it invested to test Countrywide's representations on a loan-level basis.  Allstate conducted loan-level analyses on nearly 19,000 Mortgage Loans underlying its Certificates, across a total of 14 Offerings.

113.     Allstate analyzed data from one Offering corresponding to each of the Registration Statements for its Offerings, to obtain a representative sampling of the Mortgage Loans across all of Allstate's investments.  For each of these Offerings, Allstate analyzed 800 defaulted loans and 800 randomly-sampled loans from within the collateral pool.  In some cases, less than 1600 loans were available to be analyzed.  For example, in the case of CWALT 2007-20, Allstate analyzed data for each of the 933 Mortgage Loans in the original collateral pool.

114.     For certain Offerings, the 1600 loans addressed essentially the entire loan pool.  For instance, Allstate analyzed 1,600 loans in CWL 2006-9 1AF6; there were 1,833 loans in the original collateral pool.  With CWHL 2005-HYB7 3A2, Allstate analyzed 1,600 of 1,951 loans.

115.     Allstate's sample sizes of Mortgage Loans are more than sufficient to provide statistically-significant data to demonstrate the degree of misrepresentation of the Mortgage Loans' characteristics.  Analyzing data for each Mortgage Loan in each Offering would have been cost-prohibitive and unnecessary.  Statistical sampling is an accepted method of establishing reliable conclusions about broader data sets, and is routinely used by courts, government agencies, and private businesses.  As the size of a sample increases, the reliability of

its estimations of the total population increase as well.  Experts in RMBS cases have found that a sample size of just 400 loans can provide statistically significant data, regardless of the size of the actual loan pool, because it is unlikely that so large a sample would yield results vastly different from results for the entire population.

116.    To determine whether a given borrower actually occupied the property as claimed, Allstate investigated tax information for the sampled loans.  One would expect that a borrower residing at a property would have the tax bills sent to that address, and would take all applicable tax exemptions available to residents of that property.  If a borrower had his or her tax records sent to another address, that is good evidence that that borrower was not actually residing at the mortgaged property.  If a borrower declined to make certain tax exemption elections that depend on the borrower living at the property, that also is strong evidence the borrower was living elsewhere.

117.    A review of credit records was also conducted.  One would expect that people have bills sent to their primary address.  If a borrower was telling creditors to send bills to another address, even six months after buying the property, it is good evidence the borrower was living elsewhere.

118.    A review of property records was also conducted.  It is less likely that a borrower lives in any one property if in fact that borrower owns multiple properties.  It is even less likely the borrower resides at the mortgaged property if a concurrently-owned separate property did not have its own tax bills sent to the property included in the mortgage pool.

119.    A review of other lien records was also conducted.  If the property was subject to additional liens but those materials were sent elsewhere, that is good evidence the borrower was

not living at the mortgaged property.  If the other lien involved a conflicting declaration of residency, that too would be good evidence that the borrower did not live in the subject property.

120.    The results of Allstate's loan-level analysis of true owner-occupancy rates on the Mortgage Loans underlying its Certificates are set forth below.  Failing multiple of the above tests is strong evidence the borrower did not in fact reside at the mortgaged properties.  These statistics thus show that, despite Countrywide's representations, a much higher percentage of borrowers did not occupy the mortgaged properties:

| Asset | Percentage of Owner-Occupied Properties Represented in Prospectus | Actual Percentage of Owner-Occupied Properties | Prospectus Overstatement |
|---|---|---|---|
| CWL 2005-1, MF2 | 97.9% | 87.8% | 10.1% |
| CWALT 2005-25T1 A6 | 86.8% | 73.6% | 13.2% |
| CWL 2005-13, AF5 | 96.4% | 85.8% | 10.6% |
| CWALT 2006-J1 1A6 | 78.5% | 72.6% | 5.9% |
| CWL 2006-S1, A2 | 91.0% | 82.4% | 8.6% |
| CWL (CWABS) 2006-9 1AF6 | 95.1% | 89.6% | 5.5% |
| CWALT 2006-30T1 1A3 | 88.6% | 74.1% | 14.5% |
| CWHL (CWMBS) 2006-9 A10 | 91.7% | 81.7% | 10.0% |
| CWL 2006-S5, A3 | 94.2% | 85.8% | 8.4% |
| CWL 2007-S1 A3 | 93.7% | 82.6% | 11.1% |
| CWL 2007-4 M1 | 96.9% | 87.6% | 9.3% |
| CWALT 2007-20 A1 | 95.9% | 84.7% | 11.2% |
| CWALT 2007-18C 3FL3 | 82.4% | 71.4% | 11.0% |
| CWHL 2005-HYB7 3A2 | 79.0% | 70.3% | 8.8% |

121.    The other Offerings in which Allstate invested made similar representations regarding the percentage of owner-occupied properties among the Mortgage Loans.  The percentages above for actual owner-occupied properties, which are drawn from the nearly 19,000

sample loans that Allstate analyzed, and the degree of overstatement in Countrywide's prospectuses, holds true for the other 15 Offerings in which Allstate invested that were not subjected to loan-level analysis.  The other Offerings emanate from common registration statements, share similar Mortgage Loans as collateral, and were purchased by Allstate at the same time as Allstate was purchasing the securities that were analyzed.

### (3)    Re-calculating the loan-to-value ratios

122.    For each of the sampled loans, the underlying property was valued by an industry-standard automated valuation model ("AVM").  AVMs are routinely used in the industry as a way of valuing properties during prequalification, origination, portfolio review and servicing.  AVMs have become ubiquitous enough that their testing and use is specifically outlined in regulatory guidance and discussed in the Dodd-Frank Act.  AVMs rely upon similar data as appraisers—primarily county assessor records, tax rolls, and data on comparable properties.  AVMs produce independent, statistically-derived valuation estimates by applying modeling techniques to this data.  The AVM that Allstate used incorporates a database of 500 million mortgage transactions covering ZIP codes that represent more than 97% of the homes, occupied by more than 99% of the population, in the United States.  Independent testing services have determined that this AVM is the most accurate of all such models.

123.    Applying the AVM to the available data for the loans underlying the Certificates shows that the appraised value given to the properties was significantly higher than what that property was actually worth.  This affected the LTV ratios by decreasing the actual value of the properties relative to the loan amount, which increased the overall ratio.  Overall, 18.3% of the loans sampled had recalculated LTV ratios of more than 10% higher than what was claimed in the Offering Materials, and 6.0% of the loans sampled had recalculated LTV ratios of more than

*25% higher* than what was claimed in the Offering Materials.  This overvaluation affected

numerous statistics in the Offering Materials.

124.    For instance, the Offerings each made representations about the percent of loans

that had LTVs higher than 90%.  LTVs in excess of 90% provide the lender little value cushion

to protect against borrower default and loss upon foreclosure.  However, the AVM indicates that

a much higher percentage of the loans had LTVs higher than 90%.  The LTV ratios were

understated by Countrywide, as shown in the chart below:

| Asset | Percentage of Loans With an LTV of 90% or Greater, as Represented by Prospectus | Actual Percentage of Loans With an LTV of 90% or Greater | Prospectus Overstatement |
|---|---|---|---|
| CWL 2005-1, MF2 | 6.4% | 20.7% | 14.3% |
| CWALT 2005-25T1 A6 | 0.9% | 15.9% | 15.0% |
| CWL 2005-13, AF5 | 8.1% | 24.5% | 16.4% |
| CWALT 2006-J1 1A6 | 0.9% | 8.8% | 7.9% |
| CWL 2006-9 1AF6 (CWABS) | 10.3% | 22.1% | 11.9% |
| CWALT 2006-30T1 1A3 | 0.3% | 20.0% | 19.7% |
| CWHL 2006-9 A10 (CWMBS) | 0.9% | 12.7% | 11.7% |
| CWL 2007-4 M1 | 11.2% | 27.9% | 16.7% |
| CWALT 2007-18C 3FL3 | 4.3% | 33.9% | 29.6% |
| CWHL 2005-HYB7 3A2 | 7.3% | 19.3% | 11.9% |

125.    The Offerings uniformly represented that none of the Mortgage Loans that

collateralized the Certificates had LTV ratios greater than 100 percent, meaning the size of the

loan is greater than the value of the property.  (This is known as being "underwater," where a

borrower owes more on the property than it is worth.)  Loans with over 100% LTV afford the

lender no equity cushion and leave the lender with inadequate collateral from the outset of the

loan.  Allstate's analysis has found that, despite Countrywide's representations, a substantial

number of the Mortgage Loans had LTVs greater than 100%, as follows:

| Asset | Percentage of Loans With an LTV of 100% or Greater, as Represented by Prospectus | Actual Percentage of Loans With an LTV of 100% or Greater | Prospectus Overstatement |
|---|---|---|---|
| CWL 2005-1, MF2 | 0.0% | 7.9% | 7.9% |
| CWALT 2005-25T1 A6 | 0.0% | 7.5% | 7.5% |
| CWL 2005-13, AF5 | 0.0% | 10.0% | 10.0% |
| CWALT 2006-J1 1A6 | 0.0% | 3.3% | 3.3% |
| CWL 2006-9 1AF6 (CWABS) | 0.0% | 7.8% | 7.8% |
| CWALT 2006-30T1 1A3 | 0.0% | 10.4% | 10.4% |
| CWHL 2006-9 A10 (CWMBS) | 0.0% | 6.0% | 6.0% |
| CWL 2007-4 M1 | 0.0% | 12.3% | 12.3% |
| CWALT 2007-20 A1 | 0.0% | 5.1% | 5.1% |
| CWALT 2007-18C 3FL3 | 0.0% | 14.5% | 14.5% |
| CWHL 2005-HYB7 3A2 | 0.0% | 8.4% | 8.4% |

126.    Allstate has also analyzed the weighted average LTV of the Mortgage Loans in

each pool and has found that the weighted average LTV was also overstated, because of the

overstatement of individual Mortgage Loans within the pools.  The AVM again indicates that

these representations were untrue:

| Asset | Weighted Average LTV, as Represented by Countrywide | Actual Weighted Average LTV | Countrywide's Overstatement |
|---|---|---|---|
| CWL 2005-1, MF2 | 80.4% | 85.3% | 4.9% |
| CWALT 2005-25T1 A6 | 73.1% | 81.9% | 8.8% |
| CWL 2005-13, AF5 | 79.0% | 85.3% | 6.3% |
| CWALT 2006-J1 1A6 | 70.6% | 78.0% | 7.4% |
| CWL 2006-9 1AF6 (CWABS) | 78.8% | 87.2% | 8.4% |
| CWALT 2006-30T1 1A3 | 74.9% | 88.1% | 13.2% |
| CWHL 2006-9 A10 (CWMBS) | 73.3% | 83.9% | 10.6% |
| CWL 2007-4 M1 | 77.0% | 87.0% | 10.0% |
| CWALT 2007-20 A1 | 67.0% | 77.2% | 10.2% |
| CWALT 2007-18C 3FL3 | 71.7% | 79.9% | 8.2% |
| CWHL 2005-HYB7 3A2 | 76.9% | 84.2% | 7.3% |

127.    The Offering Documents for certain of the Offerings also provided statistical data about the range of CLTVs for the Mortgage Loans underlying Allstate's Certificates. Countrywide likewise misrepresented the Offering's CLTV statistics.  The Offering Documents for CWL 2006-S1, CWL 2006-S5, and CWL 2007-S1, for example, each alleged that none of the Mortgage Loans had a CLTV ratio greater than 100%.  Despite Countrywide's representations, however, Allstate's analysis has found that 9.8%, 12.6%, and 18.4% of the Mortgage Loans in the three Offerings, respectively, had a CLTV ratio greater than 100%.

128.    Countrywide did not genuinely believe the appraised values were reasonable estimations of the properties' values at the time they were given.  As discussed below, Countrywide knew that the appraisals were being inflated to allow borrowers to be approved for loans that they could not afford.  As such, it knew the LTV and CLTV statistics were baseless.  It

also failed to disclose the fact that many of the properties that collateralized the Certificates were burdened by additional liens, a clear fact that should have been disclosed and is not based on any "opinion."

> **(4)      Statistical studies by others have similarly revealed that the problems in Countrywide-originated loans were tied to underwriting abandonment**

129.     The F.B.I. Mortgage Fraud Reports of 2006 and 2007 reported on the results of a study of three million residential mortgages that found that between *30% and 70% of early payment defaults were linked to significant misrepresentations in the original loan applications*.  Loans containing egregious misrepresentations were *five times* as likely to default in the first six months than loans that did not.

130.     Researchers at the University of Michigan have conducted studies that found that the number of loans originated by Countrywide that suffered from a particular performance problem – sixty or more days delinquent as of six months of origination – skyrocketed beginning in 2006:



131.    The same studies showed that this drastic change did not occur because of a

change in the claimed FICO or LTV scores:



132.    The fact that studies conducted by others show a spike in early payment problems,

despite the fact that key characteristics of the loan pools were supposedly not changing, is

powerful evidence that Countrywide was systematically abandoning its underwriting standards in

creating and characterizing those loans.  As set forth above, Allstate's investigation has

confirmed this to be the case with respect to Allstate's Certificates as well.  Exhibit D describes

the rates of delinquency of the Mortgage Loans in the Offerings in which Allstate invested.

**(5)    Other parties' reviews of Countrywide's full loan files have revealed
even greater deviations**

133.    Third parties with access to the complete loan files for certain Countrywide

securitizations have performed additional analysis of the mortgage loans underlying

Countrywide's offerings.  These include, among others, MBIA Insurance Corporation ("MBIA") and Syncora Insurance Company ("Syncora").  Their analyses provide additional strong evidence that essential characteristics of the Mortgage Loans underlying the Certificates were misrepresented and omitted material information, and that the problems in Countrywide's underwriting practices were systemic.

134.    MBIA's  analysis included at least three of the same deals in which Allstate invested:   CWHEQ 2006-S8, CWHEQ 2007-S1, and CWHEQ 2007-S2.  The other Countrywide securitizations that were analyzed by MBIA include CWABS 2004-I, CWABS 2004-P, CWHEQ 2005-A, CWHEQ 2005-E, CWHEQ 2005-I, CWHEQ 2005-M, CWHEQ 2006-E, CWHEQ 2006-G, CWHEQ 2006-S9, CWHEQ 2006-S10, CWHEQ 2007-E, and CWHEQ 2007-S3.

135.    The other deals that MBIA analyzed are also probative of problems underlying Allstate's Certificates because the collateral pools for the securitizations that MBIA investigated were composed of second-lien home-equity line of credit loans ("HELOCs") and closed-end second ("CES") loans—the same type of collateral underlying some of Allstate's Certificates. For example, the CWHEL 2005-B Offering that Allstate invested in was collateralized by HELOCs, while the CWL 2006-S1, CWL 2006-S2, CWL 2006-S5, CWL 2007-S1, and CWL 2007-S2 Offerings were all collateralized by closed-end fixed-rate loans secured by second liens (i.e. CES loans).  MBIA also found that the defective loans span Countrywide's securitizations from 2004 to 2007, demonstrating the consistency of Countrywide's disregard for its own underwriting guidelines over this period, the same period at issue in this case.  Because Countrywide's violation of its underwriting guidelines was a systemic problem, MBIA's findings are equally applicable to *all* of Allstate's Certificates.

136.     MBIA is a New York-based monoline insurer that wrote insurance on certain Countrywide mortgage-backed securities offerings.  MBIA conducted an investigation into Countrywide's loan files after it was asked to make payments to certain other investors.

137.     In carrying out its review of the approximately 19,000 Countrywide loan files—including loans that were securitized and sold to Allstate—MBIA found that ***91% of the defaulted or delinquent loans in those securitizations contained material deviations from Countrywide's underwriting guidelines***.  MBIA's report showed that the loan applications frequently "(i) lack key documentation, such as verification of borrower assets or income; (ii) include an invalid or incomplete appraisal; (iii) demonstrate fraud by the borrower on the face of the application; or (iv) reflect that any of borrower income, FICO score, debt, DTI [debt-to-income,] or CLTV [combined loan-to-value] ratios, fails to meet stated Countrywide guidelines (without any permissible exception)."

138.     Syncora, another insurance company that insured Countrywide's securitizations, has conducted a similar re-review analysis of defaulted loans in the securitizations that it insured to determine whether the loans had been originated in accordance with Countrywide's representations.  Syncora found that ***75% of the loans it reviewed "were underwritten in violation of Countrywide's own lending guidelines***, lack any compensating factors that could justify their increased risk, and should never have been made."  Syncora's review is probative of the problems underlying Allstate's Certificates because it again shows Countrywide's failures during this key period of 2004 to 2007 were systemic.

139.     Syncora gave examples of individual loans that diverged from Countrywide's guidelines.  The individual defective loans analyzed by Syncora reflected a long list of misstatements by Countrywide.  Many loans violated the DTI ratios and LTV ratios set forth in

Countrywide's underwriting guidelines, without adequate compensating factors to justify the increased risk of default, due in part to borrowers' exaggerated incomes and exaggerated property values.  Loan amounts routinely exceeded the maximum amounts permitted under the Company's guidelines for each given borrower, based on a borrower's credit score, documentation, and property values.  Countrywide also improperly issued loans to borrowers when their loan files lacked adequate documentation of borrowers' income, assets, credit, employment, cash reserves, or property values.

140.    In addition, the Illinois Attorney General reviewed the sales of Countrywide loans by an Illinois mortgage broker and found that *the vast majority of the loans had inflated incomes stated in the documentation, almost all without the borrowers' knowledge.*  This study covered the time period of 2004 to 2007, again the same time period during which Countrywide was generating the loans at issue here.  Likewise, a review of 100 stated-income loans by the Mortgage Asset Research Institute revealed that *60% of the income amounts were inflated by more than 50%* and that 90% of the loans had inflated income figures of at least 5%.  Again, this is highly probative of the problems underlying Countrywide's Certificates as it covers the time period of 2004 to 2007.

**B.**     **Countrywide's Own Internal Documents Demonstrate It Abandoned Its "Theoretical" Underwriting Standards**

141.    The SEC recently made public many of Countrywide's internal documents and communications.  As reflected below, these documents show that the representations at issue here were untrue.  The documents not only demonstrate that Countrywide's underwriting failures were systemic, implicating all of their loans generated at this time, but often directly deal with the same exact type of loans, products, and processes underlying Allstate's Certificates.

49

However, Allstate had no way of knowing these misrepresentations because these internal Countrywide documents were not available to Allstate and were only made public recently.

**(2)** **Countrywide's internal post-mortem shows it systematically ignored the risks created by its "matching" strategy**

142.    In November 2007, Countrywide prepared a "lessons learned" analysis.  This included key observations from interviews of Countrywide's employees and culminated in an internal presentation.  In this analysis, Countrywide repeatedly admits that it was singularly focused on market share and its "matching" strategy:

- "***We were driven by market share, and wouldn't say 'no' (to guideline expansion).***"

- "Competitiveness and aggressiveness are great, and part of our DNA.  However, it can lead to arrogance and lack of friends.  There are times when our strengths can turn into our weaknesses."

- "The strategies that could have avoided the situation were not very appealing at the time.  Do not produce risky loans in the first place:  This strategy would have hurt our production franchise and reduced earnings."

- "***Market share, size and dominance were driving*** themes . . . .  Created huge upside in good times, but challenges in today's environment.  ***Net/net it was probably worth it.***"

(Emphasis added).

143.    Countrywide also repeatedly admits that the "matching" strategy led to product development far outpacing its risk-assessment procedures and misaligned the incentives of its employees:

- "***With riskier products, you need to be exquisite in off-loading the risk***.  This puts significant pressure on risk management.  ***Our systems never caught up with the risks***, or with the pace of change."

- "Risk indicators and internal control systems may not have gotten enough attention in the institutional risk and Board committees."

- "***Not enough people had an incentive to manage risk***."

- "Decentralized and local decision making were another characteristic of our model . . . .  ***The downside was fewer risk controls and less focus on risk***, as the local decision makers were not directly measured on risk."

- "***Our wide guidelines were not supported by the proper infrastructure (credit, risk management)***."

- "[W]e did not put meaningful boundaries around the [broad product] strategy, even when our instincts might have suggested that we do so, and ***we allowed the model to outrun its critical support infrastructure in investment and credit risk management*** . . . .  Our risk management systems were not able to provide enough counterbalance . . . ."

- "***The focus of production was volume and margin, not credit risk.  There was also massive emphasis on share.***"

- "***Structure and capabilities of Secondary not in-sync with production***."

(Emphasis added).

144.     Countrywide's internal analysis of failures in its own underwriting guidelines is directly relevant to Allstate's Certificates because it is a home-grown analysis of Countrywide's systemic problems and occurred during the very time period when the loans underlying Allstate's Certificates were being generated, and when the Certificates were being issued.

### (3)     Mozilo's emails show he "personally observed a serious lack of compliance"

145.     In early 2006, HSBC had begun to contractually force Countrywide to buy back certain defective loans.  In a March 28, 2006 e-mail to Sambol and others, Mozilo admitted the problems with the loans were caused by "***errors of both judgment and protocol***."  (Emphasis added).  The "errors" referred to in this email occurred at the same time as the Mortgage Loans and Certificates at issue here.

146.     In an April 13, 2006 e-mail, Mozilo wrote to Sieracki and others that he was concerned that certain subprime loans had been originated "***with serious disregard for process***

*[and] compliance with guidelines*," resulting in the delivery of loans "**with deficient**

**documentation**":

> I want Sambol to take all steps necessary to assure that our origination operation
> "follows guidelines" for every product that we originate. *I have personally
> observed a serious lack of compliance within our origination system as it relates
> to documentation and generally a deterioration in the quality of loans
> originated versus the pricing of those loan[s].* In my conversations with Sambol
> he calls the 100% sub prime seconds as the "milk" of the business. Frankly I
> consider that product line to be the poison of ours. *Obviously as CEO I cannot
> continue the sanctioning of the origination of this product until such time I can
> get concrete assurances that we are not facing a continuous catastrophe.*
> Therefore I want a plan of action not only from Sambol but equally from
> McMurray as to how we can manage this risk going forward.

(Emphasis added).

147.    In a June 1, 2006 e-mail regarding Pay-Option ARMs, Mozilo warned Sambol

and other executives that borrowers "are going to experience a payment shock which is going to

be difficult if not impossible for them to manage."  (In a Pay-Option ARM, the borrower can

make a payment even less than that required to pay off accruing interest.  If the borrower does

this too many times, the amount of principal owed is recalculated, resulting in a sudden increase

in the minimum payments.)  Mozilo warned that "[w]e know or can reliably predict what's going

to happen in the next couple of years."  Mozilo reiterated his concern that the majority of pay-

option ARMs were originated using stated income, and that evidence suggested that borrowers

were misstating their incomes.  He asked the executives to "assume the worst" and take

corrective measures to try and avoid the disastrous consequences of Countrywide's lending

policies, including reducing its exposure to loans with low FICO scores.

148.    In a September 26, 2006 email Mozilo admitted that with respect to pay-option

ARMs "*we are flying blind* on how these loans will perform" in a stressed environment.

Mozilo's emails regarding pay-option ARMs are directly relevant here, because many of

Allstate's Certificates included such loan products, such as the Certificates Allstate purchased in

52

CWL 2005-1.  But this admission reaches further, as Countrywide's Chief Risk Officer McMurray later would testify that "I do think you could generalize [this] observation to a much broader set of loans than just pay option."

149.    According to the SEC, on May 29, 2007 Sambol and Sieracki attended a Credit Risk Committee Meeting, in which they were informed that "***loans continue[d] to be originated outside guidelines***," primarily via the Secondary Structured Lending Desk ***without "formal guidance or governance surrounding" the approvals***.  This admission is probative of how the Mortgage Loans at issue here were generated, given that the admission covered the heart of the period when the loans underlying Allstate's Certificates were being generated.

### (4)    Internal quality reviews highlight that loans were being issued outside of Countrywide's underwriting guidelines

150.    On May 22, 2005, John McMurray, Countrywide's then-Chief Risk Officer, warned Sambol that loans which were originated as exceptions to Countrywide's stated origination guidelines would likely experience higher default rates.  He wrote that "***exceptions are generally done at terms more aggressive than our guidelines***" and recommended that "[g]iven the expansion in guidelines and the growing likelihood that the real estate market will cool, this seems like an appropriate juncture to revisit our approach to exceptions."  (Emphasis added).

151.    In June 2005, McMurray warned Sambol in an e-mail exchange that "as a consequence of [Countrywide's] strategy to have the widest product line in the industry, we are clearly out on the 'frontier' in many areas," adding that that "frontier" had "high expected default rates and losses."  He also told Sambol that because of the "matching" strategy, Countrywide's guidelines "will be a composite of the outer boundaries across multiple lenders," and that the resulting "composite guides [sic] are likely among the most aggressive in the industry.

152.    McMurray's 2005 emails describe how Countrywide's "matching" strategy was resulting in a "composite" process more aggressive than any other in the industry.  These emails are relevant not only because many of the Mortgage Loans at issue here were being issued at that time, but also because Countrywide's "matching" strategy only accelerated as more of the loans at issue here were generated.

153.    In a June 2006 email chain that included both McMurray and Sambol, Countrywide circulated the results of an audit it had conducted.  Among the findings were that "approximately **40% of the Bank's reduced documentation loans . . . could potentially have income overstated by more than 10% and a significant percent of those loans would have income overstated by 50% or more.**"  McMurray admitted that it's "obviously the case" that "perhaps many" of these overstatements were the result of misrepresentations.  Another Countrywide Risk Officer, Clifford Rossi, agreed, testifying that "the vast majority" of the overstated income amounts was "likely" due to misrepresentations.  This analysis of misstatements in the applications for reduced-documentation loans is highly relevant to Allstate's Certificates, because the analysis was conducted at the same time many of the Mortgage Loans at issue here were generated, and because many of the Mortgage Loans were issued on a reduced-documentation basis—indeed, as Allstate's analysis has shown, even more than Allstate was told at the time.

154.    Around the same time, according to the SEC, there was a credit meeting where attendees were informed that **one-third of the loans referred out of Countrywide's automated underwriting system violated "major" underwriting guidelines**, **23% of the subprime first-lien loans were generated as "exceptions," and that "exception" loans were performing 2.8 times worse than loans written within guidelines**.  That the loans approved by exceptions were

performing so much worse than other similar loans is itself strong evidence that the "exceptions" were not being granted based on any purported countervailing circumstances in the borrowers' credit profile.

155.    At that same meeting, the Committee discussed evidence of borrower misrepresentation of incomes and occupations on reduced-documentation loan applications.  And according to the SEC, at an earlier meeting it was revealed that "exceptions" were being granted to accommodate ineligible borrowers, and in November 2006 Sieracki was informed that there was an increased volume of Suspicious Activity Reports being filed related to mortgage fraud.

156.    These studies are highly probative of the hidden problems in the Mortgage Loans at issue here, as Countrywide's self-analysis was conducted in mid-2006, just as many of the Mortgage Loans it would have been studying were being included in the pools underlying Allstate's Certificates.

157.    On November 2, 2006, McMurray asked Countrywide's Chief Investment Officer, in an e-mail forwarded to Sambol, whether Countrywide "want[s] to effectively cede" its underwriting policies to the market.

158.    In a February 11, 2007 e-mail to Sambol, McMurray reiterated his concerns about Countrywide's strategy of matching any type of loan product offered by its competitors, which he said could expose the Company to the riskiest offerings in the market:  "*I doubt this approach would play well with regulators, investors, rating agencies[,] etc.  To some, this approach might seem like we've simply ceded our risk standards . . . to whoever has the most liberal guidelines*" (emphasis added).

159.    During a March 12, 2007 meeting of Countrywide's credit risk committee, the Risk Management department reported that *12% of Countrywide loans that were reviewed*

*internally were rated "severely unsatisfactory" or "high risk" because the loans had loan-to-value ratios, debt-to-income ratios, or FICO scores outside of Countrywide's already-wide underwriting guidelines*.  Again, this self-scrutiny covered loans being generated during the same period as those underlying Countrywide's Certificates.

160.    In a May 7, 2007 letter to the Office of Thrift Supervision, Countrywide admitted: "Specifically looking at originations in the fourth quarter of 2006, we know that almost 60% of the borrowers who obtained subprime hybrid ARMs [from Countrywide] would not have qualified at the fully indexed rate."  Countrywide also admitted that "almost 25% of the borrowers would not have qualified for any other [Countrywide] product."  In other words, Countrywide was shuffling borrowers to exotic products because the borrowers could not afford anything else, making those loans all the riskier.  Many of these exotic products made their way into Allstate's Certificates, even though Allstate was never told that Countrywide knew such an incredibly high number of borrowers could not afford the payments on any other type of products.

161.    In a December 13, 2007 internal memo from Countrywide's enterprise risk assessment officer to Mozilo, the officer reported that Countrywide had re-reviewed mortgages originated by Countrywide in 2006 and 2007 "to get a sense of the quality of file documentation and underwriting practices, and to assess compliance with internal policies and procedures."  Countrywide found that "*borrower repayment capacity was not adequately assessed* by the bank during the underwriting process for home equity loans."  (Emphasis added).  That the study covered two complete years when loans were being generated for inclusion in Allstate's Certificates makes it highly relevant to this action.

**(5)    Exceptions were used as a way to deploy the "matching" strategy, despite Countrywide's "theoretical" underwriting guidelines**

162.    Frank Aguilera, a Managing Director responsible for risk management, reported the "particularly alarming" results of an internal review on June 12, 2006.  He reported to others in Countrywide that *23% of the subprime loans at the time were generated as exceptions*, even taking into account "all guidelines, published and not published, approved and not yet approved."  Again, this study occurred during the same period in which loans were being generated and included in Allstate's Certificates.  The exception rate for "80/20" products (which are particularly risky because they provide 100% financing) was even higher—Allstate's Certificates included many such loans.  The CWHL 2005-HYB7 Offering that Allstate invested in, for example, included such 80/20 loans.  Aguilera wrote at the time that "*The results speak towards our inability to adequately impose and monitor controls on production operations.*" (Emphasis added).

163.    In February 21, 2007 Aguilera disputed a belief stated by someone else in a prior meeting that there was adequate controls with regards to exceptions in certain areas, and stressed how the guidelines were meaningless when so many exceptions were being granted:  "Our review of January data suggests that these controls need to be reviewed.  *Any guidance tightening should be considered purely optics with little change in overall execution unless these exceptions can be contained*."  (Emphasis added).

164.    As an example, he provided data on loans that were approved as "exceptions" despite having high loan-to-value ratios.  He found "*significant levels of exceptions*" under "all high risk programs.  Full Spectrum Lending, Countrywide's subprime-mortgage affiliate was called out for "*in particular exceed[ing] any imaginable comfort level*."  (Emphasis added).  His

email highlighted that *52%* of 100% LTV loans by Full Spectrum Lending were issued by way of "exceptions."  Overall, *37% of such loans studied required "exceptions."*

165.    In June 2007, Executive Vice President of Credit Risk Management Christian Ingerslev provided a "granular performance assessment of 2006 Vintage Non-Conforming 1st lien loans that have been (or should be) going to the Secondary [Structured Loan Desk] for exception approval . . . plus loans that [Correspondent Lending Division] is buying in bulk outside the guidelines."  In other words, he was reviewing the type of loans that were all being done outside of Countrywide's already-wide "normal" underwriting standards.  Many of Allstate's Mortgage Loans were being generated at the time Ingerslev was analyzing.  His analysis concluded that "nearly every" low documentation sector reviewed exhibited "subprime-like" performance.  Allstate's Mortgage Loans included low-documentation loans such as those studied by Ingerslev here, including those generated at around the same time.  "*There is currently no formal policy or agreed upon process which identifies what Secondary can or should price, other than what they have identified as 'unsalable' (same goes for CLD bulk bids).*  While I've asked, I have not seen a comprehensive list of what they are saying no to." (Emphasis added).

166.    Ingerslev wrote this to Chief Investment Officer Kevin Bartlett because he "understand[s] you are directing a project to make Production's *theoretical requirement to underwrite a reality.  Under that scenario, should the line in the sand still be 'unsalable'?  After looking at the performance, it's hard to recommend anything other than no.*  Heretofore that has been a challenging edit for Credit to implement (for obvious reasons) and the outcry is to just price the risk – regardless of performance."  (Emphasis added).  Here, Countrywide admits that its underwriting policies were viewed as being merely "theoretical," with the only real

standard was "unsalable."  This admission came at a time when many of the Mortgage Loans underlying Allstate's Certificates would have been or were about to be generated.

167.    The above statistics regarding the massive abuse of "exceptions," though justly described as "alarming" by Aguilera, should not have been surprising given the purpose of the Countrywide's exception policy was to ensure that *all* loans were approved.  For example, in an April 14, 2005 email chain, various managing directors were discussing what FICO scores Countrywide would accept.  One Managing Director wrote that the "spirit" of the exception policy was to "provide flexibility and authority to attempt to approve ***all loans submitted under an approved program/guideline which are later determined to be outside***."  (Emphasis added). He went on:  "I would argue that the [exception] policy would also contemplate more general exceptions such as . . . ***to keep pace with fast changing markets prior to submitting a formal change***."  (Emphasis added).  In other words, he admitted that the exception process was a way for Countrywide to cover its mistakes by retroactively re-approving loans that should have not been approved in the first place, and a way to ensure Countrywide could lead the race to the bottom.  This is probative of Allstate's Certificates not only because the admission occurred around the same time as when many of the Mortgage Loans underlying Allstate's Certificates were being originated and securitized, but also because Countrywide's corporate "matching" policy driving the need to "keep pace" with the industry continued throughout the period relevant to this case.

168.    Another internal Countrywide document described the objectives of Countrywide's Exception Processing System to include "***[a]pprov[ing] virtually every borrower*** and loan profile," with "pricing add on" (i.e., additional fees) if necessary to offset the risk. (Emphasis added).  The objectives also included providing "[p]rocess and price exceptions on

standard products for high risk borrowers."  Sambol identified during his testimony a February

13, 2005 email he wrote that similarly said that the "purpose of the [Structured Loan Desk] and

our pricing philosophy" should be expanded to include that "we should be willing to price

*virtually any loan that we reasonably believe we can sell/securitize* without losing money, even

if other tenders can't or won't do the deal."  (Emphasis added).

**(6)   Countrywide admits to "cherry picking" deals**

169.    On August 2, 2005, Sambol actually questioned the company's policy of "cherry

picking" the best loans for itself while leaving the higher-risk leftovers for securitization:

> While it makes sense for us to be selective as to the loans which the Bank retains,
> *we need to analyze the securitization implications on what remains if the bank
> is only cherry-picking and what remains to be securitized/sold is overly
> concentrated with higher risk loans.*  This concern and issue gets magnified as
> we put a bigger percentage of our pay option production into the Bank because
> *the remaining production then increasingly looks like an adversely selected
> pool*.

(Emphasis added).

170.    Mozilo responded the same day:

> I absolutely understand your position however there is a price we will pay no
> matter what we do.  *The difference being that by placing less attractive loans in
> the secondary market we know exactly the economic price we will pay when the
> sales settle.*  By placing, even at 50%, *into the Bank we have no idea what
> economic and reputational losses we will suffer not to say anything about
> restrictions placed upon us by regulators*.

(Emphasis added).

**(7)   In short, Countrywide "basically continued to operate as though they
never received" risk policies.**

171.    In a March 23, 2006 email, Chief Risk Officer McMurray circulated a "Policy on

High Risk Products."  He wrote that there were also "many meetings and other conversations"

where the policy issues were discussed.  Nonetheless, over a year later, on September 7, 2007 he

admitted:  "I was never supported on this and Secondary, Production, and CCM *basically*

60

***continued to operate as though they never received this policy***."  (Emphasis added).  Similarly,

on February 9, 2006, McMurray had circulated additional policy guidance, including asking

"should we really even be offering this product?"  He complained at the time that he's

"***continuing to encounter resistance to my efforts and instructions to rein in this program***."

(Emphasis added).  In 2007 he summarized:  "I wasn't supported on this."

172.    In a March 7, 2005 email, the Vice President of Product Management (Christian

Ingerslev) similarly complained:

> [S]ounds like they got on the line with the traders, and long story short, they now
> think they can sell them . . . .  ***[I]t's frustrating to try and hold the line just to be
> overridden with whining and escalation.  [J]ust reinforces that sales can have
> anything they want if they yell loud enough*** to Drew [Gissinger, President of
> Countrywide Home Loans].

(Emphasis added).

173.    In November 2006, McMurray reiterated to Sambol his view on "***fundamental

deficiencies***" within Countrywide with regard to risk:

> First, we need to agree on a risk vision and guiding principles that the entire
> enterprise will follow.  ***I previously created a set of guiding principles, but there
> hasn't been acceptance from some of the key business units.  The most widely
> held belief is that our guiding principle is simply doing what anyone else in the
> market is doing; if it's in the market, we have to do it.***
>
> Second, we should require everyone to follow established risk guidance and
> policies[;] a product cannot be rolled out or transactions closed without required
> approvals.  ***There are several recent examples where products or transactions
> proceeded without the required risk approvals or in contradiction of established
> policy***.

(Emphasis added).

C. **The Sworn Testimony of Countrywide's Own Former Officers Demonstrate That It Abandoned Its "Theoretical" Underwriting Standards**

174.    The SEC has recently made available the testimony given by Countrywide's former executives in its action against Mozilo and others.  As described below, this testimony again confirms that the Offering Materials were false and misleading.

(1)    **Chief Risk Officer John McMurray:  "Matching policy" resulted in "routinely" using loan "exceptions"**

175.    *"Matching strategy" routinely deployed by way of exceptions – even after his department had rejected a proposed transaction.*  McMurray admitted that the "matching strategy" was a "a corporate principle and practice that had a profound effect on credit policy." In fact, he thought it was not possible to understand Countrywide's underwriting policies without knowing of and understanding the matching strategy, *and that the strategy was rolled out by use of "the exception desks," which happened "routinely."*

176.    He testified that he was aware that there were instances where his credit risk department "*would reject proposals for new products but the people in sales nevertheless used the exceptions procedure to achieve the same result.*"  He was "surprised, angry, and disappointed," for instance, when he found out that despite being previously rejected Countrywide had advertising fliers promoting loans that had low FICO requirement, only required a stated (non-documented) income, and provided 100% financing. The CWALT 2007-18CB, CWALT 2007-20, and  CWALT 2006-J1 Offerings, for example, contained Mortgage Loans that were originated according to a Stated Income/Stated Asset Documentation Loan Program, where income and asset information was not verified and borrowers were not required to give proof of income or assets, and a No Income/No Asset Documentation Program, where no documentation relating to a prospective borrower's income, employment or assets was required.

177.    McMurray believed those loans were being issued through exceptions despite such a program being previously rejected by his team.  More generally, he also testified that he was "fairly certain" he had conversations with others in Countrywide, including Sambol, about the fact that exceptions were being made without sufficient compensating factors.

178.    McMurray also agreed that the use of exceptions, even as a general matter, made the process more risky:  "Almost by definition, you are dealing with a riskier transaction" when the loan is approved by an exception, and in fact there were areas where his group found a "big disparity" in performance between "exception" loans and others.  That the "exception" loans were performing so much worse is strong evidence that the exceptions were not being used based on countervailing positive features of the borrower's credit profile.

179.    ***Expanding guidelines because of the "matching strategy" increased the default risk.***  McMurray admitted that underwriting "guidelines were expanding" at Countrywide from September 2003 and the middle of 2007—i.e., throughout the period when Countrywide was originating and securitizing Allstate's Mortgage Loans.  This guideline "drift" was a concern of his because "even if you undertake measures to transmit that risk outside the company, you're still starting with more risk that needs to be distributed."  He admitted that "the idea of risk being sold off, [] that was a key part of Countrywide's strategy."

180.    He also admitted in his testimony that "there's [a] relationship between expanding underwriting guidelines and a probability of a loan going to default or serious delinquency."  McMurray testified that he shared his concerns about this correlation with others at Countrywide, including Mozilo, Sambol, and Sieracki.

181.    McMurray also testified that he raised concerns about the "composite" effects of Countrywide's "matching strategy."  He explained:

> [I]f you match one lender on – on one – on certain guidelines for certain products
> and then you match a separate lender on a different product or a different set of
> guidelines, then in my view the composite of that – of that two-step match would
> be more – would be more aggressive than either one of those competitor reference
> points viewed in isolation.

He further testified that he was concerned about "companion mitigants" that would allow

competitors to use the products Countrywide was matching only because they had additional

terms not in Countrywide's system, such as additional credit history requirements.  In short, "the

chief concern on [the matching strategy] is that some of your risk standards get ceded to other

institutions by following that strategy.  That is my chief concern."  McMurray testified that

whether Countrywide was "ceding our credit policy to the most aggressive players in the market"

was a "pretty serious concern" he had, which he raised with others in Countrywide including his

supervisor Bartlett.

182.   ***Countrywide securitized the worst loans, keeping the better ones for itself.***

McMurray testified that he specifically raised concerns about the risks presented by

Countrywide's securities.  Part of this concern was not only Countrywide's aggressive standards,

but also that:

> There's another element that we need to bring in here that's important with
> respect to securities performance.  ***Countrywide's bank tended to – on – on some
> of the key products, tended to select the best loans out of the ones that were
> originated.***  By best – I'm talking about from a credit risk standpoint, so let me
> clarify that.  ***So as – as those loans are drawn out of the population, what's left
> to put into the securities were not – are not as good as what you started out
> with***, and then that can have an adverse effect on securities performance.

183.   That Countrywide was "cherry-picking" the loans it would keep for itself was also

confirmed by the testimony of Clifford Rossi, a Countrywide Risk Officer, who testified that the

"bank was to originate and to cherry pick the better quality assets."

**(2)    Vice President of Credit Risk Management Christian Ingerslev:
"Focus groups" confirmed borrowers were misrepresenting income**

184.    Christian Ingerslev, Countrywide's Executive Vice President of Credit Risk

Management, testified that Countrywide used ***"focus groups," which made it "seem[] like it was***

***the case" that "income was being overstated to reality in some cases."***  He testified that

Sambol, among others, was aware of these results because he spoke to Sambol about them.

Upon information and belief, these focus groups occurred during the same period when

Countrywide was generating the Mortgage Loans relevant here.

185.    Ingerslev agreed that "loan quality relate[s] to or bear[s] upon the issue of

likelihood of default or serious delinquency.  He thought it to be an "intuitive" conclusion that

loans with higher loan-to-value ratios have a higher risk of default.  He testified:

> [People default] when an income disruption event happens in their lives . . . and
> when that unexpected event happens in people's lives, if they have an equity
> cushion in their home, they have something to sort of stem off the short-term
> problem . . . .  If people were buying homes, you know, beginning without any
> cushion, they were going to be more susceptible to this income disruption event.
> And, again, this is intuitive sense based on my experience in the business and not
> necessarily analytical, but then when we attempted to model it, our modeling
> group attempted to model it, you know, we showed some more results where the
> expected default rates were going to be pretty high.

This is highly probative of the issues in this case because, as discussed above, Countrywide was

materially misrepresenting the actual LTV ratios of Allstate's Mortgage Loans.

186.    Ingerslev confirmed that internal documentation showed that products and

transactions ***were even going forward "without the required risk approvals or in contradiction***

***of established policies."  He testified that there was no "systemic way" to stop this from***

***happening because "you're talking about human beings, not systems."***  He also testified there

was no "consequence or penalty" for originating loans that had not been signed off by

McMurray.

65

### (3) Managing Director Frank Aguilera: "Matching" strategy was "not a tolerable process" for subprime products

187. The testimony of Frank Aguilera, a Managing Director responsible for risk management, confirms that the company followed a "matching strategy." To support this strategy, the company even created a large database of products offered by competitors so that if somebody tried to convince Countrywide to approve a new product all it had to do was to check the database to see if someone else had already approved it. He also testified that he did not think investors were aware of Countrywide's internal "matching" strategy.

188. Aguilera was "surprised" this strategy was deployed not just to the more well-developed prime loans, but also the riskier subprime loan area. He testified that "*from a credit perspective, my view, it's not a tolerable process*." He raised his concerns formally with at least two other managers at Countrywide.

189. *Aguilera confirmed that the way this "matching" strategy was implemented was through Countrywide's "exception" processes.* This confirms Countrywide was using its "exception" processes in order to gain market share and increase loan volume by working around its stated underwriting guidelines. He also testified that "90 percent" of his time as the person responsible for Countrywide's "technical manuals" was spent on "expansions" of the guidelines.

### (4) CEO Angelo Mozilo: Matching strategy was a "dangerous game"

190. In his testimony, Mozilo admitted that "if the only reason why you offered a product, without any other thought, any other study, any other actuarial work being done is because someone else was doing it, that's a dangerous game to play."

### (5) Depositor President Nathan Adler: "Salability" was the sole factor for giving "exceptions"

191. Defendant Nathan Adler, the President of many of the Depositor Defendants here, testified about the "evolution" of the Structured Loan Desk. He testified that Countrywide's

exception policy had "core guidelines." If those were not met, the company also had "shadow" guidelines. If even those were met, the loans were given to "Secondary Marketing to determine if the loan could be sold given the exception that was being asked for." Thus "salability" was a "factor in the determination of whether to make a loan on an exception basis." ***Indeed, by the time the loan reached Adler whether the loan could be sold in the secondary market was* "*the only criteria that we followed*."** Upon information and belief, "salability" was the sole factor governing final approval or denial of the Mortgage Loans throughout the relevant period.

> ### D.  Other Statements Provided By Countrywide Employees and Customers Further Confirm Countrywide's Abandonment of its Underwriting Standards
>
> #### (1)  Former employees:  Borrowers were coached on how to use no-doc loans to circumvent prior loan rejections

192.   Mark Zachary is a former Regional Vice President of Countrywide who claims he was fired for airing his concerns about Countrywide's underwriting practices. He told Larry King of CNN that if a borrower did not qualify for a conventional loan, Countrywide's loan officers would often steer the borrower into riskier loans that did not require documentation, so-called "liar loans." Allstate's Mortgage Loans included low-documentation loans such as those described by Zachary here. Indeed, as alleged herein, Allstate's Certificates included many more loans approved on less than a fully documented application than the Offering Materials let on.

193.   In a February 13, 2007 e-mail to one of his supervisors, the Senior Vice President Divisional Manager of Countrywide KB Home Loans, a joint venture between Countrywide and KB Homes, a homebuilder, Zachary said that "it seems to be an accepted practice for [Countrywide] to have a full doc loan and then if it can't be approved . . . we flip to a stated[-income loan] and send to FSL [Full Spectrum Lending, Countrywide's subprime-mortgage affiliate] under non-prime (sub-prime business unit)."

194.    Once in the low-documentation process, "the income stated on those loans generally was not a true representation of what the person normally makes." Zachary confirmed that Countrywide employees were coaching applicants to lie, including overstating their income by as much as 100% to qualify for a loan. According to Zachary, loan officers would coach potential homeowners on the income levels needed to qualify for a given mortgage loan and would then accept revised loan applications from those borrowers which contained an inflated reported income.

195.    Other former employees have similarly confirmed that Countrywide coached borrowers how to falsify their low- or no-documentation loan applications in order to circumvent the normal underwriting process. For instance, a former Countrywide loan officer described in the California Attorney General's complaint against Countrywide reiterated the fact that borrowers were coached on how to lie. He explained that a loan officer might say, "with your credit score of X, for this payment, and to make X payment, X is the income you need to make." And NBC News reported that it spoke to six other former Countrywide employees, who worked in different parts of the country, who described the same "anything goes" corrupt culture and practices. Some of those employees even said that borrowers' W-2 forms and other documents were falsified to allow for loan approval. One employee stated that "***I've seen supervisors stand over employees' shoulders and watch them . . . change incomes and things like that to make the loan work***."

196.    Given that Countrywide was often coaching borrowers on how to falsify their applications, or even making changes without the borrower's knowledge, it is not surprising that Countrywide did not seek to confirm that the information being provided to it was accurate. A former supervising underwriter at Countrywide explained that the company declined to check

bank balances for applicants applying for stated-income, stated-asset loans that provided account information.  Countrywide also had the right to verify the income stated on a loan application by use of Internal Revenue Service data, but only 3% to 5% of the loans that Countrywide issued by 2006 were checked.  This period covers many of the Mortgage Loans that would have collateralized Allstate's Certificates.

197.    For stated-income loans, where Countrywide promised that it would exercise discretion, during the 2005-2006 period the company directed loan officers to support their assessments by referring to the website www.salary.com.  Again, this period covers many of the loans that would have collaterlized Allstate's Certificates.  This practice was reported by former employees cited in the Illinois Attorney General's complaint against Countrywide.  The website did not provide specific salary information for any particular borrower, but provided a range of salaries for particular job titles based upon the borrower's zip code.  And even when the salaries were outside the ranges, Countrywide did not require its employees to follow-up with the borrower.

198.    *One Countrywide employee estimated that approximately 90% of all reduced-documentation loans sold out of the employee's Chicago office had inflated incomes*.  One of Countrywide's mortgage brokers, One Source Mortgage Inc., routinely doubled the amount of the potential borrower's income on stated income mortgage applications.  Similarly, according to a confidential witness relied on by plaintiffs in other actions, as much as 80% of the loans originated by Countrywide out of its Jacksonville processing center between June 2006 and April 2007—i.e., when many of the loans at issue here were being generated—had significant variations from Countrywide's theoretical underwriting standards.

### (2)     Former employee:  Countrywide knew appraisals were being inflated

199.    In September 2006, Zachary informed Countrywide executives that there was a problem with appraisals performed on KB Home properties being purchased with mortgage loans originated by Countrywide.  According to Zachary, Countrywide executives knew that appraisers were strongly encouraged to inflate appraisal values by as much as 6% to allow homeowners to "roll up" all closing costs.  According to Zachary, this practice resulted in borrowers being "duped" as to the true values of their homes.  This also made loans more risky because when values were falsely increased, loan-to-value ratios calculated with these phony numbers were necessarily incorrect.

200.    Zachary brought his concerns to executives of the Countrywide/KB Homes joint venture, as well as Countrywide executives in Houston, Countrywide's Employee Relations Department and Countrywide's Senior Risk Management Executives.  According to Zachary, Countrywide performed an audit investigating these matters in January 2007, and the findings of the audit corroborated his story.  According to Zachary, the findings of this audit were brought to the attention of Countrywide executives.

### (3)     Borrowers:  Countrywide falsified our records

201.    Julie Santoboni, who took out a Countrywide mortgage on her family's home in Washington, D.C., was interviewed on National Public Radio.  She explained that she has owned several homes and that she and her husband are professionals.  Nonetheless, when the family reached out to Countrywide to refinance their home's adjustable-rate loan, *a Countrywide loan officer pressured her to lie about her income to obtain a more attractive loan, since she had taken off two years of work for her children.*  The employee said that he could increase her husband's listed income, that the underwriters would not question the income because her

husband's job title included the word "manager," and that the employee's boss would also not verify the stated income.

202.    Santoboni also said that the Countrywide loan officer wanted her to write a letter stating she made $60,000 during each of the past two years and get her accountant to sign it, even though that would have been fraudulent, since she had no income.  The loan officer continued to give her a "hard sell," pressuring her to lie about her income in order to obtain a more favorable interest rate on the loan.  Santoboni followed up with Countrywide to complain about the incident but received no response as of the time of the interview.  She made a complaint with the Federal Office of Thrift Supervision about the wrongdoing.

203.    Another Countrywide borrower, Bruce Rose, described obtaining a mortgage loan from Countrywide that stated his monthly income as $12,166, as he realized only later, when his income at the time was only around $16,000 *a year*.

204.    One borrower told NBC News that her Countrywide loan officer told her to claim she made more than twice her actual income in order to gain approval for her loan.

205.    A potential Countrywide customer known to Zachary complained to Countrywide in a September 19, 2006 e-mail that "I was told that my loan had been turned over to Countrywide's internal fraud department for review because *a loan officer increased my income figures without authorization in order to get me approved for the stated-income loan*.  I was told by several people at Countrywide that this was done just to get me qualified and that nobody would check on it."

### (4)    Former employees:  Countrywide steered borrowers to riskier (higher fee) products and heavily incentivized employees to do so

206.    Riskier loans were more profitable for Countrywide, which provided an incentive to systematically encourage the use of riskier products.  A former employee provided documents

to the *New York Times* indicating that Countrywide's profit margins ranged from three to five percent on regular subprime loans, but that loans which included heavy burdens on borrowers, such as high prepayment penalties that persisted for three years, Countrywide's profit margins could reach as high as fifteen percent of the loan.

207.    Because Countrywide had a higher incentive to originate higher-risk loans, it similarly incentivized its employees to do so.  For instance, it paid employees who originated loans in part based on the volume and dollar value of the loans they approved.  A substantial portion of the salary of Countrywide's sales employees was based on commissions, which gave the employees a strong incentive to maximize sales volume and close the maximum number of mortgage loans regardless of quality.  For example, Countrywide's wholesale account executives, the employees who dealt with brokers, were paid only on commission – they had no base salary.

208.    Because of the higher origination fees charged with respect to nontraditional loans, employees and independent mortgage brokers were paid more when originating nontraditional loan products than when they originated standard loans.  Former Countrywide mortgage brokers reported that brokers received commissions of 0.50% of the loan's value for originating subprime loans, while their commission was only 0.20% for less-risky loans.  Moreover, adding a three-year prepayment penalty to a mortgage loan would generate an extra commission for the Countrywide employee of 1% of the loan's value.  Persuading someone to add a home equity line of credit to a loan carried an extra commission of 0.25%.

209.    That Countrywide was incentivized to push high-risk products—including on borrowers who did not understand and could not afford them—directly impacts the Mortgage Loans at issue here.  Many of Allstate's Certificates were backed with such "exotic" products

generated at the time when these incentives were in place, such as the Certificates Allstate purchased in the CWL 2005-1 Offering.

### E. Other Evidence That the Representations Were False

#### (1) Appraisal company:  Countrywide pressured companies to obtain inflated home values

210.    As described above, Countywide touted the Mortgage Loans' LTV ratios, including emphasizing that they were based on the use of independent appraisers.  In fact, Countrywide Home Loans regularly engaged appraisers that were affiliated with Countrywide, including appraisers that were owned or controlled by Countrywide, either directly or indirectly through intermediate subsidiaries or otherwise subject to Countrywide's influence.  This created a conflict of interest.  As originator and securitizer of the loans, Countrywide had an incentive to inflate the value of properties because doing so would result in lower LTV ratios.  A lower LTV ratio would allow a loan to be approved when it otherwise would not be, and would appear less risky to Allstate and other investors.  But loans based on inflated appraisals are more likely to default and less likely to produce sufficient assets to repay the second lien holder in foreclosure.

211.    The appraisals in practice were not intended to determine the adequacy of the collateral in the event of a default, but rather to ensure that a large volume of mortgages were rapidly originated, underwritten and securitized with no regard to the value of the collateral.

212.    According to Capitol West Appraisals, LLC, a company that has provided real estate appraisals to mortgage brokers and lenders since 2005, and is a "review appraiser" for Wells Fargo, Washington Mutual and other lenders, Countrywide Financial and Countrywide Home Loans engaged in a pattern and practice of pressuring even non-affiliated real estate appraisers to increase appraisal values artificially for properties underlying mortgages Countrywide Home Loans originated.  Capitol West stated that Countrywide Home Loans

officers sought to pressure Capitol West to increase appraisal values for three separate loan transactions.  When Capitol West refused to vary the appraisal values from what it independently determined was appropriate, Countrywide Home Loans retaliated.

213.    In particular, according to Capitol West, from at least 2004, and likely before, and continuing through at least 2007—i.e., for the relevant period when the Mortgage Loans at issue here were being originated and securitized into the Certificates—Countrywide Home Loans maintained a database titled the "Field Review List" containing the names of appraisers whose reports Countrywide Home Loans would not accept unless the mortgage broker also submitted a report from a second appraiser.  Capitol West was placed on the Field Review List after refusing to buckle under the pressure to inflate the value of the properties.  No mortgage broker would hire an appraiser appearing on the Field Review List to appraise real estate for which Countrywide Home Loans would be the lender because neither the broker nor the borrower wanted to pay to have two appraisals done.  Instead, the broker would simply retain another appraiser who was not on the Field Review List.

214.    According to Capitol West, Countrywide Home Loans created certain procedures to further enforce its blacklisting of uncooperative appraisers like Capitol West.  Specifically, if a mortgage broker were to hire an appraiser that happened to be on the Field Review List, Countrywide's computer systems automatically flagged the underlying property for a "field review" of the appraisal by LandSafe, Inc., a wholly owned subsidiary of Countrywide Financial.  LandSafe would then issue another appraisal for the subject property that, without exception, would be designed to "shoot holes" in the appraisal performed by the blacklisted appraiser such that the mortgage transaction could not close based on that appraisal.  Indeed, according to Capital West, in every instance, LandSafe would find defects in the appraisal from the

blacklisted appraiser, even if another, non-blacklisted appraiser had arrived at the same value for the underlying property and the non-blacklisted appraiser's appraisal was accepted. According to Capitol West, this exact set of facts happened with respect to an appraisal it submitted after it was placed on the Field Review List.

215.    Because Countrywide was one of the nation's largest mortgage lenders, a substantial portion of any mortgage broker's loans was submitted to Countrywide. Because a broker could not rule out that Countrywide would be the ultimate lender, and because mortgage brokers knew from the blacklist that a field review would be required if a blacklisted appraiser were chosen, with the likely result that a mortgage would not be issued with that appraisal, and that its mortgage applicant would have to incur the cost of retaining another appraiser, such a broker had a strong incentive to refrain from using a blacklisted appraiser. By these means, Countrywide systematically and deliberately enlisted appraisers in its scheme to inflate appraisals and issue low-quality, extremely risky loans.

216.    Several claims have been filed against Countrywide and related entities which describe individual homeowners' experiences with inflated property appraisals in obtaining mortgages from Countrywide. Such lawsuits include three class actions brought by homebuyers against KB Home, a building company that used Countrywide as its exclusive lender: *Zaldana v. KB Home*, No. 3:08-cv-03399 (MMC), currently pending in the United States District Court for the Northern District of California; *Johnson v. KB Home*, 2:09-cv-00972 (MHB), currently pending in the United States District Court for the District of Arizona; and *Bolden v. KB Home*, No. BC385040, currently pending in Los Angeles County Superior Court.

217.    The Arizona complaint cites two KB Home developments in which sample appraisals were inflated by $82,169 per property on average. The plaintiffs' lawyer explained

that "Even if we used a more conservative $20,000 per property" in inflated value, "this alleged scheme would add ($280 million) in ill-gotten profits in KB's pockets.  Those profits come at the expense of the homeowner, who moves into a house [on which the mortgage exceeds the property's value], and the secondary market, buying tainted investments."  The complaint cites instances of appraisals that used pending sales within the same development as comparable properties substantiating appraisal values.

218.  *Bolden v. KB Home* describes the experiences of Deborah and Lonnie Bolden, who purchased a KB Home residence in a new development in California's Central Valley.  She obtained an appraisal on the property from LandSafe, Countrywide's in-house appraisal company.  She also used Countrywide's in-house real-estate agents and mortgage brokerage.  The property was appraised at $475,000.  But a neighbor with an identical home was given an appraisal from an outside company, not affiliated with Countrywide, of $73,000 less.

219.  Bolden found that the outside company had based the appraisals on sales of comparable homes in the same subdivision, whereas an investigation at the country assessors' office showed that LandSafe had made its appraisal based on erroneous comparable-sales data, using properties outside of the immediate area and properties in the development with misstated purchase prices, which artificially inflated her property's value.  For example, the listed purchase price for one property in the development was $461,000 but its actual sale price was $408,500; another property's listed price was $480,500, instead of $410,000.

220.  Bolden says that KB Home, the Countrywide affiliate, never gave her a satisfactory answer.  Another couple, David and Dolores Contreras, purchased a home in the same Countrywide-affiliated subdivision and made similar allegations that LandSafe overstated their property value based on comparisons to properties that were out-of-town, and thus not

76

comparable, or inaccurately inflated. The appraisers' blatant misstatements make the inflated appraisals easy to identify.

221. Countrywide and its appraisal subsidiary, LandSafe, have also been sued by Fannie Mae and Freddie Mac investors for damages arising from inflated appraisals for property underlying mortgage packages sold to both Fannie Mae and Freddie Mac.

222. Falsely overstated appraisals were a systemic problem within Countrywide's loan origination process. The overstated appraisals meant that the stated LTV ratios for the Mortgage Loans underlying Allstate's Certificates were false and misleading and contained omissions of material fact, since they were based on inaccurate values which skewed the loan-to-value ratios. The properties' actual LTV ratios would have been much higher, since the mortgaged properties' value was so frequently overstated.

### (2) The ratings were a garbage-in, garbage out process further hindered by conflicts of interest and outdated models

223. The supposedly-independent ratings given by the major credit rating agencies (such as Moody's and S&P) were based on the loan profiles fed to the agencies by Countrywide. As previously explained, the evidence that that data was false is overwhelming. As such, the Defendants essentially pre-determined the ratings by feeding garbage into the ratings system.

224. The rating agencies accepted the garbage data because the process suffered from a serious conflict of issue problem, which was not disclosed to Allstate even as Countrywide represented that the ratings would be independent. Typically, the rating agencies were only paid if the rating is used, with preliminary work done in order to generate goodwill with issuers. This means arrangers could obtain work from multiple agencies and choose the agency that was willing to give the highest rating for worst deal structure. This is known as "ratings shopping." The agencies were thus conflicted, as the party paying their bills (like Defendants) leveraged

their ability to go elsewhere to secure a higher credit rating.  The Defendants did not disclose that the agencies were driven by a virulent conflict of interest to issue those ratings using insufficient data and baseless assumptions.  For example, an April 2010 memorandum issued as part of the Senate's Permanent Subcommittee on Investigation's analysis concluded that S&P allowed "competitive pressures" to affect ratings quality.

225.    The agencies also used models that were outdated and thus, contrary to Defendants' representations, were not actually designed to assess the true risk presented by the Certificates.  Despite the rapidly-changing mortgage market (such as the rise of subprime loans, exotic loan structures, no- and low-documentation origination programs, etc.) the rating agencies did not materially update their models until late 2007, when both S&P and Moody's belatedly announced they were revising their methodologies to deal with "loosened" and "aggressive" underwriting practices.

226.    The President's Working Group's policy statement concluded that "faulty assumptions" caused the need to eventually downgrade significant RMBS, and specifically highlighted reliance "on assumptions about correlations between ABS that underestimated the degree of linkages between underlying securities."

227.    The Congressional Research Service concluded that "the models failed to understand the likelihood of falling house prices, attached the wrong weights to the effect of falling house prices on loan default rates; and miscalculated the interdependence among loan defaults."  It blamed the fact that "the models did not contain adequate performance data from subprime, interest only, option ARM, and other high risk mortgages that had come to dominate the housing market."

228. The government's April 2010 ratings report also found that S&P "used credit rating models with data that was inadequate," and that "[b]y 2006, knew their ratings of [RMBS and CDOs] were inaccurate," and "despite record profits from 2004 to 2007 . . . failed to assign sufficient resources to adequately rate new products and test the accuracy of existing ratings."

229. For instance, S&P developed better models but chose not to use them because it would harm its bottom line. According to Congressional testimony of former S&P Managing Director Frank Raiter, S&P's 1999 model used data from 900,000 loans, but S&P later developed an alternative using 2,500,000 loans, and another using 10,000,000. He testified these more broadly-based models would have alerted investors about problems much sooner than the collapse suddenly did. He also claimed that S&P chose not to use them because they cost more, yet S&P did not think they would increase its market share.

230. S&P's own documents support Mr. Raiter's testimony that market share concerns, rather than a concern for ratings accuracy, drove S&P's modeling decisions. In a May 25, 2004 S&P email entitled "competition with Moody's," one employee lamented that a "huge" deal was lost because of "criteria issues" that threatened to "have an impact in the future deals" if not addressed. The S&P employee found that S&P's requirements were "at least 10% higher" than Moody's, and thus the only way to compete was to have a "paradigm shift in thinking."

231. In a March 2005 S&P email exchange, one S&P employee wrote: "I'm puzzled. When we first reviewed 6.0 results **a year ago** we saw the sub-prime and Alt-A numbers going up and that was a major point of contention . . . . Version 6.0 could've been released months ago and resources assigned elsewhere if we didn't have to massage the sub-prime and Alt-A numbers to preserve market share." In May 2007, an S&P employee discussing a

modeling change stated that he "would recommend we do something," before adding the qualifier "unless we have too many deals in US where this could hurt."

232.    There is similar evidence that Moody's was driven by conflicts of interest to rubber-stamp ratings despite the garbage data being fed to them by Defendants and despite the outdated models being used.  Moody's CEO, during a September 10, 2007 town-hall meeting, admitted that "It was a slippery slope.  What happened in '04 and '05 with respect to subordinated tranches is that our competition, Fitch and S&P, went nuts.  Everything was investment grade."

233.    In an October 21, 2007 Moody's document forwarded by its CEO, Moody's admitted internally that:  "[T]he market share pressure persists . . . .  Moody's has erected safeguards . . . . This does NOT solve the problem though . . . .  Analysts and [managing directors] are continually 'pitched' by bankers, issuers, investors – all with reasonable arguments – whose views can color credit judgment, sometimes improving it, other times degrading it (we 'drink the koolaid')."

234.    During his Congressional testimony, former Moody's Managing Director Jerome Fans admitted that "the deterioration in standards was palpable – as I said, evidenced – first arose at least in 2006 as things were slipping, and the analysts or the managers for whatever reason turned a blind eye to this, did not update their models or their thinking, and you know allowed this to go."

### (3)    Government investigations and other lawsuits

235.    As a result of the facts about Countrywide's practices coming to light, Countrywide Financial's market capitalization declined by more than 90% in just one year, deteriorating by $25 billion in 2008.  Bank of America subsequently acquired Countrywide Financial and its subsidiaries for just 27% of Countrywide's stated $15.3 billion book value.

236.    The scope and breadth of Countrywide's unlawful conduct have prompted a substantial number of public and private inquiries, investigations and actions.  The actions are based, in part, upon misconduct by Countrywide and its personnel that was inconsistent with Countrywide's representations to investors.  Federal and state governments have alleged that Countrywide's Offering Documents contained materially untrue and misleading statements and omissions of material facts.  For example, FBI investigators have found that Countrywide's loan documents often contained dubious or erroneous information about its borrowers.

237.    The Department of Justice and the SEC investigated potential securities fraud by Countrywide and its personnel in the securitizations of mortgage loans and offerings of mortgage-backed securities in the secondary market, allegations that false and misleading disclosures were made to influence the stock trading price, and allegations of insider trading by Mozilo and Sambol.  On June 4, 2009, the SEC filed a complaint in the U.S. District Court for the Central District of California, levying civil fraud charges against Mozilo for insider trading, and against Sambol and Sieracki for failing to tell the truth about Countrywide's relaxed lending standards in its 2006 Annual Report.  *See SEC v. Mozilo*, CV 09-03994 (VBF).  As discussed above, on September 16, 2010, the District Court rejected the defendants' motions for summary judgment.  According to news reports, a month later all three defendants settled with the SEC, for a combined total of over $28 million in penalties.  Allstate did not be come aware (nor in the exercise of reasonable diligence could have discovered) most of the e-mails and other documents alleged in this Complaint until the SEC published these documents in its civil enforcement proceeding brought against Mozilo and Sambol.

238.    A number of states and municipalities have also investigated Countrywide's lending practices, and several have commenced actions against Countrywide.  Bank of America

paid to restructure certain of Countrywide's home loans, approving and facilitating the settlement of a predatory-lending lawsuit brought by state attorneys general by agreeing to modify up to 390,000 Countrywide loans, an agreement valued at up to $8.4 billion.

239.    Countrywide has been the target of multiple state and federal investigations and proceedings regarding its lending, underwriting, and appraisal practices for mortgage loans.

240.    In addition, the *Wall Street Journal* reported on December 5, 2009 that Fannie Mae and Freddie Mac are requiring Bank of America – Countrywide's successor – and other mortgage lenders to buy back nearly $3 billion in souring loans that Fannie Mae and Freddie Mac purchased from those lenders.  The investors are invoking putback clauses in their contracts which require the repurchase of defectively underwritten loans, including loans that exaggerate borrowers' incomes or misstate their intentions to live in the mortgaged properties.  Fannie Mae explained that putting back improper loans asserts "accountability."

241.    Countrywide has also been sued dozens of times by private individuals for the Company's lending practices.  Plaintiffs allege that Countrywide has broken laws ranging from federal securities laws to state consumer-protection laws.  In addition, a number of private actions have been commenced against Countrywide, including shareholder actions challenging the accuracy and completeness of Countrywide's statements in and around the period between 2004 and 2007.  These actions allege that Countrywide failed to disclose the expansion of its origination of subprime and other higher-risk mortgage loans.  In addition, consumer actions have been filed challenging Countrywide's lending practices.  One shareholder action, *In re Countrywide Financial Corp. Securities Litigation*, cv 07-05295 (C.D. Cal), recently settled, with Countrywide Financial agreeing to pay $600 million to the plaintiffs.

### (4) Studies of the percent of loans approved on a fully-documented basis

242. The Federal Home Loan Bank of Indianapolis studied the information it was able to obtain from loan servicing companies regarding the loans underlying many of its investments. It found that Countrywide had overstated by 18% the number of underlying loans that were underwritten pursuant to the much lower risk, full-documentation procedures.

243. This study included a Countrywide transaction that occurred at the same time as Allstate's Certificates were issued, included loans being originated at the same time as the Mortgage Loans underlying Allstate's Certificates, and was done pursuant to the same purported underwriting standards. Given this overlap and the other evidence discussed herein that Countrywide was systematically abandoning all underwriting standards and controls, this is strong evidence the same type of overstatements occurred in Allstate's Offerings as well. On information and belief, the Offering Materials at issue here similarly materially overstated the percent of underlying loans that were based on a fully-documented basis, and thus materially understated the risk associated with Allstate's Certificates.

### (5) Servicing failures

244. On information and belief, Countrywide Home Loans Servicing and Countrywide Home Loans have also failed to service the Mortgage Loans consistent with industry standards, including, for example, by refusing to accept partial payments from borrowers. Countrywide also prematurely charged off loans to the direct detriment of Allstate by charging off loans where the borrower was able to, and in fact did, make payments after the date of the charge-off.

245. Countrywide's servicing of its mortgage loans lagged behind the standards of the industry, contrary to its representations. Countrywide failed to allocate sufficient resources to service and administer the loans, such as personnel to address customer inquiries and to conduct

follow-up efforts with delinquent borrowers.  Countrywide has also provided inadequate resources for work-out plans.

246.    These failures were exacerbated by the Company's break-neck origination of loans in disregard of its own underwriting guidelines, which led to an enormous increase in delinquencies, defaults, foreclosures, bankruptcies, litigation, and other proceedings, which place greater demands on Countrywide Home Loans Servicing and Countrywide Home Loans (in the case of CWHEL 2005-B) in their capacity as Master Servicer.

247.    Countrywide also provided poor customer service to its borrowers, often proving unhelpful in resolving customers' problems and frequently acting against its customers' interests by steering borrowers into repayment plans that worsened their financial problems and increased their indebtedness to the Company.  When borrowers contacted Countrywide seeking help to avoid foreclosure proceedings, Countrywide frequently offered repayment plans that actually *increased* the borrowers' monthly mortgage payments, which thereby further increased the risk of default and foreclosure.

248.    Customer-service representatives at Countrywide's Call Center were required to complete service calls in three minutes or less, and to complete as many as 65 to 85 calls in a day, which did not give the Company's employees adequate time to fully explain the details of borrowers' loans to those borrowers.  Inadequate information provided to borrowers increased the likelihood of delinquency, default, and other problems with the Mortgage Loans because borrowers were not fully apprised of the payment terms and other material aspects of their loans.

249.    Customer-service representatives received financial incentives, in the form of bonuses, for exceeding volume quotas and for successfully recommending that existing Countrywide customers refinance their loans by taking out new Countrywide mortgages, even

when doing so was not in borrowers' best interests.  For example, the Illinois Attorney General's complaint describes a widower whom Countrywide refinanced into an adjustable-rate loan; when the interest rate reset, her interest rate ballooned and rendered her mortgage unaffordable on her fixed income.

250.    The Illinois Attorney General describes a borrower whose monthly mortgage payment was $1600.  She fell behind on payments and called Countrywide to ask for help. Countrywide Home Loans Servicing ended up placing her in a repayment plan that ***increased*** her monthly mortgage bill to $2500, which included her original payment plus money toward past-due payments and fees.  She continued to be unable to pay her mortgage.  After six months of working with Countrywide, the company demanded a payment of over $5000 by the borrower before it would consider her request for loan modification.

251.    Even when Countrywide Home Loans Servicing comes up with loan-modification plans, it often fails to discuss the plan with the borrower to confirm if it affordable or fails to send timely documentation to the borrower regarding details of the plan.  A borrower who called Countrywide Home Loans Servicing on five separate occasions was only told on the fifth call that Countrywide was modifying her loan, but it failed to discuss whether that would be affordable for her.  Countrywide Home Loans Servicing should have known that the loan was *not* affordable, based on information send by the borrower.

252.    Borrowers report having difficulty reaching Countrywide Home Loans Servicing to discuss their mortgages.  For example, a woman told the Illinois Attorney General that when she called Countrywide to discuss 10 months of payments that she had made and which did not appear on her financial statements, she was put on hold and transferred from person to person, never obtaining a satisfactory answer regarding her account.

85

253.     As foreclosures have increased across the country, complaints have mounted that Countrywide and other mortgage servicers were abusing their authority by improperly claiming title to properties and overcharging borrowers.  In a number of lawsuits, judges have halted Countrywide foreclosures because they were based on errors or wrongdoing by Countrywide in servicing the borrowers' loans.

254.     For example, in the case of Connie and David Prince, a couple from Iron City, Tennessee with a Countrywide mortgage, the Company failed to credit their account with mortgage payments and foreclosed on the property based on alleged failures to pay.  In court, Countrywide claimed that the failure to credit the Princes' account was "inadvertent." Countrywide has since agreed to reverse the foreclosure and reinstate the couple's mortgage. The couple tried to explain the accounting problems to Countrywide prior to the foreclosure but was unsuccessful.  Mr. Prince remarked that "Our lives have been destroyed by this and it wasn't our mistake."

255.     Judges have criticized Countrywide for its flawed servicing practices.  In one case, a federal judge in Houston told Countrywide to "mend" its "broken practices" with regard to servicing.  The United States Trustee, which oversees the integrity of bankruptcy courts, has sued Countrywide, contending that its tactics represent an abuse of the bankruptcy system.

256.     Hundreds of Countrywide customers have posted stories on Internet websites such as the consumer-protection website ConsumerAffairs.com, at http://www.consumeraffairs.com/finance/countrywide_mortgage.html (last accessed December 3, 2010), describing their personal experiences with Countrywide's neglectful servicing practices.  The website alone lists hundreds of testimonials by borrowers who complain of their dealings with the Company's unhelpful, unprofessional, and harassing bureaucracy.  The stories describe false allegations of overdue

86

payments and resulting foreclosure notices by the Company, dozens of phone calls to resolve simple problems, uninformed employees, and mishandled records.

## V.     COUNTRYWIDE KNEW ITS REPRESENTATIONS WERE FALSE

257.   The allegations below are made in support of Plaintiffs' 1934 Act and common-law fraud claims, not in support of Plaintiffs' 1933 Act claims, which are based solely on strict liability and negligence.

258.   The same evidence discussed above not only shows that the representations were untrue, but that the Countrywide Defendants *knew* it was falsely representing the underlying process and the risk profiles behind the Mortgage Loans.  For instance:

- The large discrepancies in basic information such as owner occupancy, LTV, and CLTV statistics, detailed above and in the Exhibits, evidences a systemic underwriting failure that Countrywide could not possibly have been ignorant of given that it controlled the entire underwriting and securitization process.

- Countrywide's post-mortem admits that it did not "heed the warnings," and that "lots of experienced people were uncomfortable."

- Countrywide's CEO's emails show that he saw "errors of both judgment and protocol," "massive disregard for the guidelines," and "serious lack of compliance within our origination system."

- Countrywide's internal audits discovered that a staggering percentage of loans were being approved as "exceptions."  For instance, one "particularly alarming" audit found that 23% of subprime loans were at the time being processed as exceptions, and another found that 52% of the subprime division's 100% financings were done with exceptions.

- The amount of loans having to be approved as "exceptions" was seen within Countrywide as "speak[ing] towards our inability to adequately impose and monitor controls."

- Other correspondence and testimony confirms the "exceptions" were just a tool being used to "keep pace" as to implement the "matching" strategy.

- Countrywide's credit officers viewed the "matching" strategy as "ceding" Countrywide's policies to the market.  Another saw Countrywide's underwriting policies as "theoretical," and saw it as indefensible that Countrywide continued to use "salability" as the sole criterion for approval.

- Countrywide's risk officers wrote that the company "basically continued to act as though they never received" policies the credit officers circulated, and that the risk officers were "frustrat[ed]" to have their judgment "overridden with whining and escalation."

- Countrywide's documents refer to "several recent examples" where products were approved despite explicit rejections by the company's credit risk department.

- According to former employees, borrowers who could not quality for a loan were steered into low-documentation products, then coached on how to falsify the application to ensure it would be approved.

- According to former borrowers, in some instances Countrywide's loan officers would even fill out the required misrepresentations without the borrowers knowledge.

- Countrywide's internal reviews found at one point that 40% of the reduced-documentation loans had income overstatements.

- Countrywide's "focus group" studies found that borrower income was being overstated.

259.    That the Countrywide Defendants knew their representations were fraudulent is further supported by additional evidence from Countrywide's own documents and employees. For instance, Countrywide's post-mortem analysis, discussed above in Section IV, also shows an admission that the company knew at the time what it was doing was wrong, but it proceeded anyway:

- "*We did not fully heed the warnings of our credit models.  Delinquencies were increasing, and models predicted worse to come.*"

- "Early indicators of credit risk exposure existed.  *Internal control systems highlighted many of the risks that eventually transpired.*"

- "*Lots of experienced people were uncomfortable with underwriting guidelines.*  Going forward, we need to rely on our experience and instinct

when business practices don't make sense.  In particular, stated income and high LTV was highly counter-intuitive."

- "This crisis will stay in our minds for a generation.  We will probably not see a return to this type of ***irrational behavior*** for a long time to come."

(Emphasis added).

260.    The fact that the above concerns mirror concerns the Credit Risk Committee raised long before Countrywide's problems became public further shows that Countrywide's admissions were not mere hindsight.  In an internal document highlighting "areas of concern," alternatively known as a "wall of worries," one of the Credit Risk Committee's "areas of concern" was Countrywide's "loan quality," including "increased fraud," "exception underwriting," "guideline drift," "attribute deterioration," and "appraisal quality."  This document was generated within Countrywide at the time many of the Mortgage Loans at issue here were being generated and securitized in Allstate's Offerings.

261.    As noted above, John McMurray, Countrywide's then-Chief Risk Officer, gave repeated, explicit, and alarming warnings to Sambol, Mozilo, and others about the financial risks of Countrywide's origination practices, and advocated for stricter origination guidelines. McMurray's testimony also identified his own notes from November 3, 2006, wherein McMurray indicated that he had discussed with Sambol that McMurray was concerned that he would be personally blamed for products that he "***never advocated and often recommended against***."  (Emphasis added).  His testimony also indicates he raised "***concerns about inadequate controls, infrastructure, etc.***"  (Emphasis added).  His notes also indicated that he discussed with Sambol concerns about "the company's risk philosophy.  Discussed 'can't say no' culture, pressure from matching and no brokering policies."

262.    The testimony of another risk manager, Ingerslev, also confirms that Countrywide was made aware internally of the risks its shoddy procedures were creating:

In an organization like Countrywide, sales, the strategy of the company was predominantly, you know, a sales-oriented one because of our history as a mortgage banker and, you know, being able to sell off a lot of credit risk, that was one instant, one probability factor that contributes to the culture that we have. ***So that – and ultimately, you know, disagreements or ties were broken, you know, to the – you know, the side of erring on, well, we don't want to lose volume, we want to keep up the volume and keep up our market share. That was a strategy at the company level.***

***But, you know, John [McMurray] and I and those of us in credit still felt like it was our obligation to make sure that there was perspective, and we were doing it with eyes wide open.*** In other words, in that environment, there was conflict. Some of it you'd expect, and some of it went beyond what you would expect and was tough.

263.    He said it was "part of the culture" to have "pressure to [] move things along and say yes to things, and you felt that pressure." ***He also testified that he thought the company's guidelines had gone "too far" given the "additional layers of risk"*** in the product mix and because of changing interest rates. He testified that he was involved in a "constant dialogue" regarding requests to expand even further, but that "***I'm sure I said on more than one occasion, you've got to stop here***."

264.    In a May 26, 2006 email, Sieracki wrote:  "They're finally forced to pay me good money and I will try to ride that train as long as I can.  The big issue is risk.  Sarbanes-Oxley can ***result in me going to jail or losing my net worth for things I don't even know.  Guilty verdicts were handed down in Enron today***."  (Emphasis added).

265.    According to a former employee, Mark Zachary, whose other statements are discussed above, Countrywide's loan origination was plagued by "outright misrepresent[ation of] loans to the secondary markets, to end investors, and to buyers."  The Company's mentality, he said, was "what do we do to get one more deal done.  It doesn't matter how you get there . . . ."  Zachary confirmed that he was driven to issue mortgages even though he knew he was setting up the borrower to eventually lose their home.

266.     Zachary also recounts an October 25, 2006 e-mail in which a Senior Vice President and Divisional Operations Manager for Countrywide KB Home Loans sanctioned the falsification of information.  In the e-mail, Zachary posed to the manager a situation in which a loan officer confessed that a potential borrower did not have a job in the local area, when that is a requirement of the mortgage for which the borrower was applying.  Even more drastically, Zachary wondered what would happen if the loan officer mentioned that the borrower was applying for a stated-income loan because he was unemployed.  Zachary asked for confirmation that in those circumstances, when there was evidence that the borrower and/or loan officer were falsifying the borrower's information, the Company would reject the loan.  Shockingly, the senior executive wrote back that "***I wouldn't deny the [loan] because I didn't hear anything.  I would definitely tell the [loan officer] to shut up or shoot him!***"

267.     Zachary brought his concerns regarding no-doc loans (discussed further above) to the attention of Countrywide Employee Relations and Risk Management officials in 2006 and early 2007, but he was ignored.  He also refused to unconditionally approve borrowers that did not meet Countrywide's stated guidelines, at which point he was taken out of the approval process and the loans were approved anyway, by his supervisor.

268.     That Countrywide knew the loans it was placing into Allstate's pools were failing basic underwriting standards is further evidenced by the fact that the investment bank's due diligence reports, which it should have received, showed that large number of loans it was originating was failing basic tests but were being included in securitizations anyway.

269.     Investment banks performed due diligence on mortgages before purchasing them from originators.  Prior to a loan auction, originators provided investment banks with bid sheets, which, among other things, dictated: (1) the percentage of the pool on which the investment

banks would be permitted to conduct due diligence (e.g., 25%); and (2) the number of loans the investment banks could "kick out" due to borrower deficiencies, payment delinquencies, early payment defaults, lack of documentation and other problems.  Prior to bid submission, originators also sent the investment banks spreadsheets known as loan tapes, which contained various loan data.  The investment banks were supposed to "crack" the loan tapes, analyze them, and determine what prices to bid for the loan pools.  Once this "bid package" analysis was complete, the investment banks submitted their bids.

270.    If the originator accepted a bid, the investment bank typically had a short period of time prior to the settlement date to conduct due diligence on the loans.  The investment banks sometimes hired third-party due diligence firms such as Clayton Holdings, Inc. ("Clayton") or the Bohan Group ("Bohan") to conduct this review under their supervision.

271.    Due to strong demand, originators such as Countrywide gained bargaining power over investment banks seeking to purchase mortgages and sponsor securitizations.  One way originators exercised this bargaining power was to insist that investment banks limit their due diligence to smaller percentages of loans prior to purchase.  If an investment bank chose to kick out a large number of loans from a pool (e.g., because the loans failed to conform to the mortgage originator's guidelines or did not contain adequate documentation) it risked being excluded from future loan purchases.  As a result, investment banks performed increasingly cursory due diligence on the loans they securitized.

272.    On information and belief, Countrywide knew of the red flags raised by the due diligence conducted by Clayton and Bohan.  As an originator, Countrywide was aware of the pressure on investment banks to scale back their due diligence and limit the number of loans kicked out of a securitization.  In addition, Countrywide itself retained third-party due diligence

firms such as Clayton to perform due diligence with respect to the securitizations it sponsored.

According to a confidential witness referenced by the plaintiff in *Federal Home Loan Bank of*

*Chicago v. Banc of America Funding Corporation et al.*, No. 10CH450B3 (Oct. 15, 2010

complaint), sponsors of deals that Clayton was reviewing would even have their own employees

on site to review the loans that were being considered for inclusion in a mortgage pool.

273.    Congressional testimony by Clayton's Vice President Vicki Beal indicates that the

investment banks determined the type and scope of review performed on the loan pools.  Yet,

rather than directing the firms to conduct thorough reviews that were most likely to identify

defective loans, the investment banks pressured the loan reviewers to disregard problematic

loans through exceptions and offsets that did not satisfy the applicable underwriting guidelines.

274.    Further compounding the problems, Clayton employees were instructed to review

fewer loans in the loan pools as the securitization market grew.  According to Beal's 2010

testimony, as the securitization markets grew even more frenzied Clayton's clients were only

asking for samples of 5% of the loan pools.  Showing how careless underwriters were when

other people's money was at stake, according to the Los Angeles Times, Bohan President Mark

Hughes contrasted these low figures with the 50% to 100% sample sizes consistently seen where

loan buyers were keeping the loans for themselves.

275.    As reported by the Los Angeles Times, Clayton and Bohan employees (including

eight former loan reviewers who were cited in the article) "raised plenty of red flags about flaws

so serious that mortgages should have been rejected outright – such as borrowers' incomes that

seemed inflated or documents that looked fake – but the problems were glossed over, ignored, or

stricken from reports."  Ironically, while the investment banks pressured third-party reviewers to

make exceptions for defective loans, they often utilized information about bad loans to negotiate

a lower price for the pool of loans from the seller (i.e. originator).  Indeed, according to

September 2010 testimony before the FCIC by Clayton's former president, D. Keith Johnson,

this was one of the primary purposes of the due diligence review.

276.    Clayton provided the FCIC with documents showing the defect and waiver rates

for some of the investment banks which had retained Clayton to conduct loan pool due diligence.

These documents reveal that from the fourth quarter of 2006 to the first quarter of 2007, 23% of

the mortgages Countrywide submitted were rejected.  Of the mortgages that Clayton rejected,

12% were subsequently waived by Countrywide and included in securitizations like the ones in

which Allstate invested.

277.    Clayton also produced a report containing the rejection and waiver rates for loans

originated by Countrywide.  Those rates are as follows:

|                | 1Q 2006 | 2Q 2006 | 3Q 2006 | 4Q 2006 | 1 Q 2007 |
|----------------|---------|---------|---------|---------|----------|
| Rejection rate | 24%     | 23%     | 13%     | 14%     | 16%      |
| Waiver rate    | 8%      | 14%     | 16%     | 11%     | 14%      |

278.    Nevertheless, Countrywide never disclosed to Allstate that the due diligence

conducted by Clayton and Bohan had informed their clients that a substantial number of the

loans in the pools backing Countrywide's securities were defective, that Countrywide had

waived the defects as to a substantial number of the loans, or that the underwriters were using

this information to negotiate a lower price for the loan pools.

279.    Relying on only a part of the evidence referred to in this Complaint, the District

Court that rejected Mozilo, Sambol, and Sieracki's motions for summary judgment in the SEC

action found a triable issue of fact as to the question of scienter:

> Here, the SEC has presented evidence from which a reasonable jury could
> conclude that Defendants possessed the requisite scienter.  For example, the SEC
> has demonstrated that Defendants were aware that Countrywide routinely ignored
> its underwriting guidelines and that Defendants understood the accompanying

risks . . . .  The SEC has also presented evidence that Sambol was aware that Countrywide's matching strategy resulted in Countrywide's composite guidelines being the most aggressive guidelines in the industry . . . .

Moreover, in addition to demonstrating that Defendants were aware of the facts which made their statements misleading, the SEC has presented evidence that Sambol and Sieracki knew that Countrywide's Chief Risk Officer John McMurray firmly believed that Countrywide should include greater risk disclosure in its SEC filings . . . .

***Accordingly, the SEC's evidence is sufficient to raise a genuine issue of material fact with respect to Defendants' scienter, and summary judgment is inappropriate.***

*S.E.C. v. Mozilo*, 2010 WL 3656068, at *16-20 (emphasis added).

280.    Other courts have similarly found that allegations similar to those made here relating to the activities of Countrywide and its executives present a "cogent and compelling inference of scienter."  *See In re Countrywide*, 588 F. Supp. 2d 1132, 1192-94 (C.D. Cal. 2008).

## VI.    ALLSTATE'S DETRIMENTAL RELIANCE AND DAMAGES

281.    In making the investments, Allstate relied upon Countrywide's representations and assurances regarding the quality of the mortgage collateral underlying the Certificates, including the quality of Countrywide's underwriting process whereby it generated the underlying loans.  Allstate received, reviewed, and relied upon the Offering Materials, which described in detail the Mortgage Loans underlying each offering.

282.    In purchasing the Certificates, Allstate justifiably relied on Defendants' false representations and omissions of material fact detailed above, including the misstatements and omissions in the Offering Materials.

283.    But for the misrepresentations and omissions in the Offering Materials, Allstate would not have purchased or acquired the Certificates, because those representations and omissions were material to its decision to acquire the Certificates, as described in Section III above.

284.    The false and misleading statements of material facts and omissions of material facts in the Offering Materials directly caused Allstate damage, because the Certificates were in fact far riskier than Countrywide had described them to be.  The loans underlying the Certificates experienced default and delinquency at very high rates due to Countrywide's abandonment of its underwriting guidelines.

285.    Allstate has incurred substantial losses in market value and lost principal and interest payments, due to the poor quality of the collateral underlying the Certificates.  The income and principal payments to which Allstate is entitled have been lower than Allstate expected and lower than the payments to which Allstate is entitled under the "waterfall" provisions of the securitizations.

286.    The disclosure of irregularities in Countrywide's underwriting practices and increased risk regarding future cash flow has also led to a substantial decline in market value of the Certificates.  Allstate purchased the Certificates not only for their income stream, but also with an expectation of possible reselling the Certificates on the secondary market.  Allstate thus viewed market value as a critical aspect of the Certificates it purchased.  Allstate incurred substantial losses on the Certificates due to a drastic decline in market value attributable to Countrywide's misrepresentations which, when disclosed, revealed that the Mortgage Loans likely had a substantially higher risk profile than investors (including Allstate) were led to believe.

287.    Allstate's losses on the Certificates have been much greater than they would have been if the loans were as Countrywide described them to be.  For example, the fact that the loans were not applied to owner-occupied properties at their claimed rate made them more prone to default.  Owners who do not occupy their properties are more likely to default on their loans,

which made the Certificates poorer investments, accelerated the Certificates decline in value, and greatly worsened Allstate's losses.

288.    The drastic and rapid loss in value of Allstate's Certificates was primarily and proximately caused by Countrywide's issuance of loans to borrowers who could not afford them, in contravention of the prudent underwriting guidelines described in the Offering Materials. These rates of delinquency and default were much higher than expected for securitizations supported by collateral fitting Countrywide's representations, and much higher than they would have been if the Mortgage Loans had been properly underwritten.  The drastic increases in delinquency and default on the Mortgage Loans were not attributable to the recent decline in the American housing market, but rather due to Countrywide's wrongdoing.

## VII.   OTHER MATTERS

### A.    Defendants' Liability as Control Persons

289.    *__Primary Violators.__*   The primary violators in this action are the Depositors, Countrywide Home Loans, and Countrywide Securities.

290.    The Depositors issued the Certificates.  The Depositors purchased the Mortgage Loans that comprised the trust assets, typically from Countrywide Home Loans and other Countrywide subsidiaries.  As stated in the CWHEQ 2005-E Offering Materials, "Countrywide Home Loans, Inc. will be the seller of a portion of the Mortgage Loans.  The remainder of the mortgage loans will be sold directly to the depositor by one or more special purpose entities that were established by Countrywide Financial Corporation which, in turn acquired those mortgage loans directly from Countrywide Home Loans, Inc."  After the Depositors acquired the Mortgage Loans and created the collateral pools, the Depositors transferred the pools to the Trusts to issue the Certificates.

291.     The Trusts had no discretion or control over the mortgages in the pool.  The Trusts had no autonomy or assets of their own, but were mere agents of the Depositors created by Countrywide Financial for the sole purposes of holding the pools of Mortgage Loans assembled by the Depositors and issuing the Certificates to Countrywide Securities for sale to the investors.

292.     Countrywide Securities and Countrywide Home Loans, Inc. sold the Certificates to Allstate, and also qualify as sellers.

293.     ***Control Person:  Countrywide Financial.***  Countrywide Financial operated its consolidated subsidiaries as a collective enterprise, making significant strategic decisions for its subsidiaries, monitoring enterprise-wide risk, and maximizing profit for Countrywide Financial's executives and shareholders.  As reported in Countrywide Financial's 2003 Form 10-K, although mortgage banking remained Countrywide Financial's "core business," it had expanded operations in recent years "to capitalize on meaningful opportunities to leverage our core Mortgage Banking business and to provide sources of earnings that are less cyclical than the mortgage banking business."[1]  In other words, in conjunction with its goal of prioritizing the origination of loans regardless of the risk of default, Countrywide developed its own "in-house" subsidiaries to facilitate its ability to package and sell these risky products.

294.     Countrywide Financial managed Countrywide's enterprise-wide risks, strategic direction, and business operations through executive committees.  These committees included the Executive Strategy Committee, the Corporate Credit Risk Committee, the Corporate Enterprise Risk Committee, and the Asset/Liability Committee.

---

[1]   Throughout the relevant time period, Countrywide Financial filed consolidated Form 10-Ks, providing a cumulative assessment of the operations of Countrywide Financial and all of its subsidiaries, including the other Countrywide entity Defendants.

295.     *The Executive Strategy Committee.*  Its members included four Officer
Defendants:  Mozilo, Sambol, Sieracki, and Kurland.  They were responsible for defining and
assessing Countrywide's enterprise-wide strategic direction and risk.  The Committee's activities
included developing Countrywide Financial's Corporate Strategic Plan and reviewing the
strategic plans of each of Countrywide Financial's divisions, to ensure consistency and proper
strategic alignment.

296.     *The Corporate Credit Risk Committee and The Corporate Enterprise Risk
Committee.*  These committees interfaced directly with the Credit Committee within
Countrywide Financial's Board of Directors, assessed the risks to which the Countrywide
enterprise was exposed, and they decided which risks Countrywide Financial should sell or
otherwise mitigate.  The Credit Risk group was also responsible for managing fraud prevention
and investigation.  Sieracki and Kurland were both members of the Corporate Credit Risk
Committee.

297.     *The Asset/Liability Committee.*  This committee was responsible for addressing
market risk for the Countrywide enterprise, across all Countrywide Financial subsidiaries.  The
Asset/Liability Committee engaged in extensive modeling for the performance of Countrywide
Financial's various financial products, and maintained a dedicated Model Validation
Subcommittee for that purpose.  Five Officer Defendants—Mozilo, Sambol, Kurland, Sandefur,
and Sieracki—were members of the Asset/Liability Committee, and Sieracki became the acting
Chairman of the committee in February 2006.

298.     Through the use of these committees and others, as well as regular
communication with and among its subsidiaries and regular reporting regarding the performance
of divisions across the enterprise, Countrywide Financial maintained a high level of day-to-day

scrutiny and control over its subsidiaries.  Countrywide Financial controlled the guidelines for loan origination, decided which assets to sell and which to hold for its own investment portfolio by being advised of the quality of the underwriting and the loans originated, set protocols for servicing the vast portfolio of loans for which it had retained servicing rights, and approved the manner in which it sold those loans it elected to securitize.

299.    Countrywide Financial also exercised actual day-to-day control over the Depositors.  These Delaware corporations were structured as limited purpose wholly-owned subsidiaries to acquire mortgage loan collateral from Countrywide Home Loans and transfer the collateral to the issuing Trusts for sale to investors.  The Depositors were shell corporations that had no assets of their own.  They were controlled by Countrywide Financial through its appointment of Countrywide Financial executives (Sandefur, Sieracki, Kurland, Kripalani, and Sambol, among others) as their directors and officers.  Revenues flowing from the issuance and sale of the Certificates were passed through to Countrywide Financial.

300.    Countrywide Financial also had actual control over the Trusts.  Like the Depositors, the Trusts were shell entities that had no assets of their own or autonomy, but were mere subsidiaries of the Depositors created for the sole purposes of holding the pools of mortgage loans assembled by the Depositors, and issuing Certificates based on those mortgage pools to underwriters, including Countrywide Securities, for sale to the public.

301.    Countrywide Financial culpably participated in the violations discussed below.  It oversaw the actions of its subsidiaries and allowed them, including Defendants Countrywide Home Loans and Countrywide Securities, to engage in underwriting practices that were inconsistent with the descriptions presented in the Offering Documents; allowed its subsidiaries

to misrepresent the Mortgage Loans' characteristics in the Offering Materials; and established special-purpose financial entities, such as CWABS, to serve as conduits for the Mortgage Loans.

302.    Countrywide Financial also participated in creating the Offering Materials and the Signatories, who were Countrywide Financial employees at the time, signed those Offering Materials.  Other Countrywide Financial employees, including Mozilo and Sambol, were also culpable participants in Countrywide's wrongdoing at the time they were employed by Countrywide Financial, as reflected by the SEC e-mails.  Countrywide Financial is also the parent company of Countrywide Home Loans, Countrywide Securities, and the Depositors.

303.    Unlike arms-length securitizations where the loan originator, depositor, underwriters, and issuers are unrelated third parties, here the transactions among the loan originator (Countrywide Home Loans), the Depositors (shell companies CWABS, CWHEQ, CWALT, and CWMBS), the Trusts (all Countrywide special-purpose shell entities), and the primary underwriter (Countrywide Securities) were not arms-length transactions at all. Countrywide Financial controlled every aspect of the origination and securitization processes.

304.    All of the Mortgage Loans underlying the Certificates were originated by Countrywide Home Loans or were acquired by Countrywide Home Loans from other lenders. Countrywide Financial formed the Depositors and the issuing Trusts as special purpose entities purely to complete the securitizations.  Once the loan certificates were acquired by the Trusts, they were purchased by the underwriters including Countrywide Securities, the primary underwriter.  Countrywide Securities and other underwriters then packaged and sold the Certificates to Allstate.  Countrywide Financial also controlled the manner in which loans in the securitizations were serviced, both before and after the securitizations' Certificates were sold to the public, by using its own servicing division to service the loans.

305.     In sum, through its various committees and officers, Countrywide Financial maintained a high level of day-to-day scrutiny and control over its subsidiaries, and controlled the entire process leading to the sale of certificates to Allstate.  Countrywide Financial controlled the guidelines for loan origination, determined which traditional or non-traditional loan products to offer, set protocols for servicing the mortgage loans it originated or purchased from other lenders and for which it had servicing rights, approved the manner in which it sold the loans it elected to securitize, and controlled the disclosures made in connection with those securitizations.

306.     ***Control Person:  Countrywide Capital Markets.***  Countrywide Capital Markets exercised a high level of day-to-day control over its subsidiary, Countrywide Securities. Mandates from Countrywide Financial passed through Kripalani and Countrywide Capital Markets to Countrywide Securities, and Kripalani, who was the President and CEO of both Countrywide subsidiaries, ensured that Countrywide Securities followed priorities and practices established by Countrywide Financial and Countrywide Capital Markets.

307.     As the division of the Countrywide enterprise charged with marketing the loans originated and acquired by Countrywide Home Loans, Countrywide Capital Markets also exercised control over the Depositors and, through the Depositors, over the Trusts.  Along with Countrywide Financial, Countrywide Capital Markets determined and approved the manner in which Countrywide Securities and the Trusts selected and sold the securitized loans in the Certificate Offerings, and controlled the disclosures made in connection with each securitization.

308.     ***Control Person:  Mozilo.***  As set forth in paragraph 19, Mozilo had numerous positions and roles within Countrywide.

309.     Mozilo had the power to control and influence, and did in fact control and influence, all of the business operations of Countrywide Financial and its subsidiaries (including Countrywide Securities and the Trusts).  Mozilo had the power to control and influence, and did control and influence, Countrywide Financial and Countrywide Home Loans.  Mozilo also had the power to control and influence, and did control and influence, primary violator Countrywide Securities, a wholly-owned Countrywide Financial subsidiary.

310.     Mozilo directly supervised Sambol, who was the direct supervisor of Kripalani during Kripalani's tenure as President, Chief Executive Officer, and Managing Director of Countrywide Securities.  Kripalani provided Sambol with regular business updates regarding Countrywide Securities, and Sambol shared and discussed this information with Mozilo.  As Sambol's supervisor, Mozilo had the power to control and did control Countrywide Securities.

311.     Mozilo also exercised his control and influence through senior management meetings.  For example, Countrywide Financial's management held monthly "Business Review" meetings attended by Mozilo and other senior executives.  During these meetings, the operations and performance of each Countrywide entity (including Countrywide Securities and the Trusts) were evaluated and discussed in great detail.  Mozilo and the rest of the senior management team set the course for Countrywide Financial's various businesses including the business of Countrywide Securities.

312.     In making numerous statements to the public, Mozilo portrayed himself as the public face of Countrywide Financial and conveyed that he was speaking on behalf of Countrywide Financial and all of its subsidiaries (including Countrywide Securities and the Trusts).  Additionally, Mozilo exercised his control and influence over Countrywide Financial and other Countrywide entities by signing Countrywide Financial documents filed with the SEC.

These documents include Countrywide Financial's Form 10-Ks for the years 2003, 2004, 2005, and 2006. Many of Mozilo's statements were false and misleading for the same reason the representations at issue in this action were false and misleading.

313.    Mozilo also controlled and influenced Countrywide Financial and its subsidiaries (including Countrywide Securities and the Trusts) through his membership on several Countrywide Financial management and Board of Directors committees. Mozilo was a member of at least the following Countrywide Financial committees: (1) Executive Strategy Committee; (2) Finance Committee; and (3) Credit Committee. Through his committee and Board membership, Mozilo exercised his authority as a key member of Countrywide's decision-making team.

314.    Through his participation in the Countrywide Financial committees and its Board, Mozilo kept apprised of developments in the business practices of Countrywide Financial and its subsidiaries (including Countrywide Securities and the Trusts) and exercised control and influence over Countrywide Financial's entire business, including the business of Countrywide Securities and the Trusts.

315.    Mozilo's ability to control and influence Countrywide Financial and its subsidiaries (including Countrywide Securities and the Trusts) is further evidenced by his central role in bringing about the transformation of Countrywide Financial from a mortgage company with conservative underwriting policies into a loan-originating machine that ignored its own underwriting guidelines and took on increasingly risky loans. Mozilo directed Sambol to initiate the change in Countrywide's culture in 2003 and aggressively pushed Countrywide Financial into numerous new product offerings that changed the risk profile for the loans Countrywide issued.

316.    Mozilo's control and influence of Countrywide Financial and its subsidiaries (including Countrywide Securities and the Trusts) was further evidenced by his close involvement in the daily management of all aspects of Countrywide Financial's core operations. This included approving and overseeing Countrywide Financial's and Countrywide Home Loans' mortgage and loan product offerings – the very same mortgages and loans that were packaged together for the securitizations at issue in this case.

317.    Mozilo exercised his power to control and influence Countrywide Financial and its subsidiaries (including Countrywide Securities and the Trusts) through his involvement in developing, modifying, and implementing Countrywide Financial's guidelines for making and underwriting new loans and mortgages.  Mozilo acknowledged that "I participate every day in originations myself, and it keeps me apprised of what's happening."

318.    Mozilo also exercised his control and influence over Countrywide Financial and its subsidiaries (including Countrywide Securities and the Trusts) through his participation in all areas of Countrywide's business, including the activities of Countrywide Securities.  For example, Mozilo exerted influence over various governance responsibilities relating to Countrywide Financial's "matching" strategy, including committee supervision and responsibility for: (1) guideline review and verification; (2) surveillance; (3) pricing and valuation; (4) monitoring and economic conditions; (5) servicing coordination; and (6) Countrywide Financial's subprime market position.

319.    Mozilo decided not to intervene with respect to the loans included in the securitizations at issue even after he became aware that Sambol was directing Countrywide Securities to securitize pools of loans that featured extreme risk.  Mozilo knew the loans of deteriorating quality were being included and allowed the inclusion of these loans to continue.

320.     It was well known within Countrywide Financial that Mozilo had such extensive control and influence over the loan and origination practices that he was personally responsible for instigating breaches in protocol on numerous occasions.  For example, Mozilo personally approved loans that did not meet the applicable guidelines including (1) a loan internally flagged as "unsalable" because of a debt-to-income ratio of 89%; (2) a loan for a high-profile borrower "on a reduced doc basis as in the past"; and (3) a loan for that high-profile customer with 100% loan-to-value financing in July 2004.

321.     Mozilo's control and influence resulted in company-wide weak controls and procedures with respect to loan approval.  Countrywide Financial employees acknowledged that Mozilo's practice of personally approving loans for friends without the required paperwork that violated the stated requirements for obtaining a loan and demonstrated that the requirements did not need to be followed.  Mozilo personally controlled the risky practices about which he and others at Countrywide lied to the public.

322.     ***Control Person:  Sambol.***  As set forth in paragraphs 20-22 above, Sambol had numerous positions and roles within Countrywide.

323.     By virtue of his senior management positions, Sambol had the power to control and influence, and did control and influence, Countrywide Financial and Countrywide Home Loans.  Sambol had the power to control and influence, and did control and influence, primary violator Countrywide Securities, a wholly-owned Countrywide Financial subsidiary.

324.     Sambol was the direct supervisor for Kripalani during Kripalani's tenure as President, Chief Executive Officer, and Managing Director of Countrywide Securities.  Kripalani provided Sambol with regular business updates regarding Countrywide Securities, and Sambol provided direction to Kripalani regarding Countrywide Securities' business.  Sambol had the

power to control and influence, and did control and influence, Countrywide Securities in his role as Kripalani's supervisor.

325.    In making numerous statements to the public, Sambol portrayed himself as a public face of Countrywide Financial and its subsidiaries and conveyed that he was speaking on behalf of Countrywide Financial, Countrywide Home Loans and Countrywide Financial's other subsidiaries (including Countrywide Securities).  Many of these representations were untrue for the same reasons the representations at issue in this case were untrue.

326.    Sambol also exercised his authority to control and influence Countrywide Financial and other Countrywide entities by signing numerous materially false and misleading Countrywide Financial documents filed with the SEC.  These documents include Countrywide Financial's:  (1) Form 10-Q filed on November 7, 2006; (2) Form 10-Q filed on May 9, 2007; (3) Form 10-Q filed on August 9, 2007; and (4) Form 10-Q filed on November 9, 2007.

327.    Sambol's ability to control and influence Countrywide Financial and its subsidiaries (including Countrywide Securities and the Trusts) is further evidenced by his central role in bringing about the change that transformed Countrywide Financial from a mortgage company with conservative underwriting policies into a loan-originating entity that ignored its own historical underwriting guidelines and took on increasingly risky loans.  Sambol began to change Countrywide's culture in 2003 and aggressively pushed Countrywide Financial into numerous new product offerings that changed the risk profile of the loans Countrywide issued.

328.    Sambol's ability to control and influence Countrywide Financial and its subsidiaries (including Countrywide Securities and the Trusts) was further evidenced by his close involvement in the daily management of Countrywide's operations.  This included his creating, approving, and overseeing Countrywide Financial's mortgage and loan product

offerings through its subsidiary Countrywide Home Loans – including loans that were packaged together for the securitizations at issue in this case.

329.    Sambol had the power to control and influence, and did control and influence, Countrywide Financial, Countrywide Home Loans, and Countrywide Financial's other subsidiaries (including Countrywide Securities and the Trusts) through his heavy involvement with developing, modifying, and implementing guidelines for making and underwriting new loans and mortgages.  Others within Countrywide routinely acknowledged that Sambol had the ultimate approval power for relaxing guideline requirements for issuing new loans and implementing any Countrywide programs relating to exceptions processes.  Sambol created the Exception Processing System, which was a computer system designed to approve exception loans routinely, even though they did not even satisfy the relaxed underwriting criteria.  Sambol also was responsible for changing FICO cut-offs under Countrywide's underwriting guidelines.

330.    Sambol had the power to control and influence, and did control and influence, Countrywide Financial and its subsidiaries (including Countrywide Securities and the Trusts) through his membership on several Countrywide Financial management and Board of Directors committees.  Sambol was a member of at least the following Countrywide Financial committees: (1) Executive Strategy Committee; (2) Asset/Liability Committee; (3) Finance Committee; (4) Audit and Ethics Committee; and (5) Committee to Set Loan Loss Allowance.  Through his committee and Board membership, Sambol participated in Countrywide's decision-making team.

331.    Sambol's participation in the Countrywide Financial committees and the Board also kept him apprised of developments in the business practices of Countrywide Financial and its subsidiaries (including Countrywide Securities and the Trusts) and afforded him further

control and influence over Countrywide Financial's entire business, including the business of
Countrywide Securities and other Countrywide subsidiaries.

332.    Sambol exercised his control and influence on numerous occasions.  For example,
Sambol mandated a series of changes to the subprime mortgage business at Countrywide
Financial and Countrywide Home Loans.  At Sambol's direction, Countrywide Financial and
Countrywide Home Loans greatly expanded their roles in the subprime mortgage business
despite warnings from employees that these loans were too risky.  The subprime mortgage
market expansion is but one example of what everyone at Countrywide knew – if Sambol wanted
a change to any Countrywide program (whether at Countrywide Financial, Countrywide Home
Loans, Countrywide Securities, or any other Countrywide entity), then Sambol would be able to
effect the change because of his control and influence.

333.    It was well known that Sambol was the highest-ranking person to involve when
any issues arose in getting loans approved.  Account executives at Countrywide Home Loans
told their subordinates to take an underwriter's decision not to approve the loan to Sambol to get
the deal done.  Account executives and their subordinates recognized that Sambol had the power
to approve any risky loan deal at Countrywide Financial or Countrywide Home Loans.

334.    Sambol threatened to fire subordinates unless they devised new ways for
Countrywide Financial and Countrywide Home Loans to make money, including by pushing
risky loan products.  Sambol pressured employees to price risky loans in a way that would not
take into account the extent of the risk that the loans actually presented and would overstate the
value of the loans.  Sambol also pressured employees to relax underwriting guidelines to enable
increased production of risky loans.  Because of Sambol's ability to control and influence

Countrywide Financial and its subsidiaries (including Countrywide Securities and the Trusts), employees solicited, approved, and issued the risky loans that Sambol wanted.

335.    Through his ability to control and influence Countrywide Financial and its subsidiaries (including Countrywide Securities and the Trusts), Sambol repeatedly crushed dissenting voices within Countrywide regarding the ever-increasing risk Countrywide was taking on in its mortgage programs.  For example, when employees raised concerns regarding increases in delinquencies, Sambol consistently pushed for risky loan products and downplayed or ignored the expressed concerns.  Sambol also used his control and influence to exclude individuals who managed and oversaw the credit risk positions from the decision-making process.  As a result of Sambol's actions, Countrywide Financial and Countrywide Home Loans continued their pursuit of risky loan products from 2003 through 2008.

336.    Sambol spearheaded the "lunge for growth" with respect to subprime mortgages that were inherently risky.  Sambol brushed aside warnings from risk-control managers that underwriting standards were too lax, stating that being too cautious would turn Countrywide Financial and its subsidiaries into a "nice, little boutique."  Sambol pushed a policy of offering nearly the entire range of excessively risky mortgage products available in the market, including 100% financing, 80/20 loans, and low-doc and no-doc loans for borrowers with weak credit, and through his control Sambol was able to implement this policy throughout Countrywide.

### B.    Bank of America's Liability as a Successor-in-Interest by De Facto Merger

337.    On January 11, 2008, Bank of America announced that it would purchase Countrywide Financial for $4.1 billion.

338.    On July 1, 2008, Bank of America completed its merger with Defendant Countrywide Financial.

339.    Bank or America's Form 10-Q for the period ending September 30, 2009, reported that "On July 1, 2008, the Corporation [*i.e.* Bank of America] acquired Countrywide through its merger with a subsidiary of the Corporation . . . .  The acquisition of Countrywide significantly expanded the Corporation's mortgage originating and servicing capabilities, making it a leading mortgage originator and servicer."  According to the 10-Q, "Countrywide's results of operations were included in the Corporation's results beginning July 1, 2008."  The Form 10-Q also acknowledged pending litigation against Countrywide.

340.    On July 3, 2008, Countrywide Home Loans completed the sale of some or substantially all of its assets to NB Holdings Corporation, a wholly-owned subsidiary of Bank of America also used to effectuate the merger between Countrywide Financial and Bank of America.  NB Holdings Corporation is Countrywide Home Loans' successor.

341.    Countrywide Financial transferred substantially of its assets to Bank of America on November 7, 2008.  Around that time, Countrywide Financial ceased filing its own financial statements, instead including its assets and liabilities on Bank of America's financial statements.

342.    On April 27, 2009, Bank of America rebranded Countrywide Home Loans as "Bank of America Home Loans."  Many former Countrywide locations, employees, assets, and business operations now continue under the Bank of America Home Loans brand.  On the Form 10-K submitted by Bank of America on February 26, 2010, both Countrywide Capital Markets, LLC and Countrywide Securities Corporation were listed as Bank of America subsidiaries.

343.    Countrywide Financial's former website now redirects to the Bank of America website.  Bank of America has assumed Countrywide Financial's liabilities, having paid to resolve other litigation arising from misconduct such as predatory lending allegedly committed by Countrywide Financial.

344.    Thus Countrywide Financial and its subsidiaries, which include each of the Countrywide Defendants, have now been merged into Bank of America.  Bank of America is liable for the wrongdoing of the Countrywide Defendants because it is the successor-in-interest to each of the Countrywide Defendants.

345.    Following its merger with Countrywide Financial, Bank of America took steps to expressly and impliedly assume Countrywide Financial's liabilities.  Substantially all of Countrywide Financial's and Countrywide Home Loans' assets were transferred to Bank of America on November 7, 2008 "in connection with Countrywide's integration with Bank of America's other businesses and operations," along with certain of Countrywide's debt securities and related guarantees."  According to the Bank of America website, while the integration was being completed "Countrywide customers . . . ha[d] access to Bank of America's 6,100 banking centers."

346.    As is customary in large corporate mergers, at least some of the Countrywide Defendants retained their pre-merger corporate names following their merger with Bank of America.  However, Countrywide's operations are becoming fully consolidated into Bank of America's and the Countrywide entities will soon lose (if they have not already) any independent identity they have maintained following the merger.  On April 27, 2009, Bank of America announced in a press release that "[t]he Countrywide brand has been retired."  Bank of America announced that it would operate its home loan and mortgage business through a new division named Bank of America Home Loans, which "represents the combined operations of Bank of America's mortgage and home equity business and Countrywide Home Loans."

347.    The press release made clear that Bank of America plans to complete its integration of Countrywide Financial into Bank of America "later this year."  The press release

112

explained that Bank of America was in the process of rebranding former Countrywide "locations, account statements, marketing materials and advertising" as Bank of America Home Loans, and stated that "the full systems conversion" to Bank of America Home Loans would occur later in 2009.  "Bank of America Home Loans" is thus a direct continuation of Countrywide's operations, although the Bank of America Defendants have represented that Bank of America Home Loans is a "trade name" rather than a separate legal entity.  It is a Bank of America trade name or brand and thus a part of Bank of America.

348.    As of September 21, 2009, former Countrywide bank deposit accounts were reportedly converted to Bank of America accounts.  And on November 9, 2009, online account services for Countrywide mortgages were reportedly transferred to Bank of America's Online Banking website.  According to press reports, Bank of America Home Loans will operate out of Countrywide's offices in Calabasas, California with substantially the same employees as the former Countrywide entities.

349.    Countrywide Financial ceased filing its own financial statements in November 2008, and its assets and liabilities have been included in Bank of America's recent financial statements.  Bank of America has paid to restructure certain of Countrywide Financial's home loans on its behalf, including permitting Countrywide Financial and Countrywide Home Loans to settle a predatory-lending lawsuit brought by state attorneys general and agree to modify up to 390,000 Countrywide loans, an agreement valued at up to $8.4 billion.

350.    The Bank of America website announced that the companies merged and the now-discontinued Countrywide website previously redirected inquiries about the merger to the Bank of America webpage regarding the merger.  Bank of America noted on its website that it was "combining the valuable resources and extensive product lines of both companies."

351.     Under the "Merger History" tab of Bank of America's website, Countrywide is included among the list of companies Bank of America has acquired.  Under the "Time Line" tab, the website states that Bank of America "became the largest consumer mortgage lender in the country" following its acquisition of Countrywide in 2008.  Lastly, under the "Our Heritage" tab, the website states that the acquisition of Countrywide "resulted in the launch of Bank of America Home Loans in 2009, making the bank the nation's leading mortgage originator and servicer."  The Countrywide logo appears on the page.

352.     Mortgage contracts and legal documents state that BAC Home Loans Servicing, LP is the entity "formerly known as" Countrywide Home Loans Servicing, a Countrywide subsidiary, which clearly shows that BAC Home Loans Servicing, LP is the direct successor to Countrywide Home Loans, since it is a mere continuation of Countrywide's business.

353.     Bank of America has described the transaction through which it acquired Countrywide Financial and its subsidiaries as a merger and made clear that it intended to integrate Countrywide Financial and its subsidiaries into Bank of America fully by the end of 2009.

354.     For example, in a July 2008 Bank of America press release, Barbara Desoer, identified as the head of the "combined mortgage, home equity and insurance businesses" of Bank of America and Countrywide Financial, said:  "Now we begin to combine the two companies and prepare to introduce our new name and way of operating."  The press release stated that the bank "anticipates substantial cost savings from combining the two companies. Cost reductions will come from a range of sources, including the elimination of positions announced last week, and the reduction of overlapping technology, vendor and marketing

expenses.  In addition, Countrywide is expected to benefit by leveraging its broad product set to deepen relationships with existing Countrywide customers."

355.    Desoer was also interviewed for the May 2009 issue of *Housing Wire* magazine. The article reported that:

> While the move to shutter the Countrywide name is essentially complete, the operational effort to integrate across two completely distinct lending and service systems is just getting under way.  One of the assets [Bank of America] acquired with Countrywide was a vast technology platform for originating and servicing loans, and Desoer says that the bank will be migrating some aspects of [Bank of America's] mortgage operations over to Countrywide's platforms.

356.    Desoer was also quoted as saying:  "We're done with defining the target, and we're in the middle of doing the development work to prepare us to be able to do the conversion of the part of the portfolio going to the legacy Countrywide platforms."  Desoer explained that the conversion would happen in the "late fall" of 2009, and that the integration of the Countrywide Financial and Bank of America platforms was a critical goal.

357.    After the integration had further progressed, Desoer stated in the October 2009 issue of *Mortgage Banking* that "the first year is a good story in terms of the two companies [coming] together and meeting all the major [goals and] milestones that we had set for ourselves for how we would work to integrate the companies."  For Desoer, it was "the highlight of the year . . . when we retired the Countrywide brand and launched the Bank of America Home Loans brand."  In the same issue, Mary Kanaga, a Countrywide transition executive who helped oversee integration, likened the process of integration to the completion of a mosaic:  "Everything [*i.e.*, each business element] counts.  Everything has to get there, whether it's the biggest project of the smallest project.  It's very much putting a puzzle together.  If there is a missing piece, we have a broken chain and we can't complete the mosaic."

358.     By way of another example, in its 2008 Annual Report, Bank of America confirmed that "[o]n July 1, 2008, we acquired Countrywide," and stated that the merger "significantly improved our mortgage originating and servicing capabilities, making us a leading mortgage originator and servicer."  In the Q&A section of the same report, the question was posed:  "How do the recent acquisitions of Countrywide and Merrill Lynch fit into your strategy?"  Bank of America responded that by acquiring Countrywide it became the "No. 1 provider of both mortgage originations and servicing" and "as a *combined* company," it would be recognized as a "responsible lender who is committed to helping our customers become successful homeowners."  (Emphasis added).  Similarly, in a July 1, 2008 Countrywide Financial press release, Defendant Mozilo stated that "the *combination* of Countrywide and Bank of America will create one of the most powerful mortgage franchises in the world."  (Emphasis added).

359.     In purchasing Countrywide Financial and its subsidiaries for 27% of its book value, Bank of America was fully aware of the pending claims and potential claims against Countrywide and factored them into the transaction.  In an interview published on February 22, 2008 in the legal publication *Corporate Counsel*, a Bank of America spokesperson admitted that Bank of America had assumed Countrywide's liabilities:

> Handling all this litigation won't be cheap, even for Bank of America, the soon-to-be largest mortgage lender in the country. Nevertheless, the banking giant says that Countrywide's legal expenses were not overlooked during negotiations. ***"We bought the company and all of its assets and liabilities," spokesman Scott Silvestri says. "We are aware of the claims and potential claims against the company and have factored these into the purchase."***

(Emphasis added).

360.     Moreover, on October 6, 2008, during an earnings call, Joe Price, Bank of America's Chief Financial Officer, stated that "As we transfer those operations [*i.e.*,

Countrywide Financial and its subsidiaries] our company intends to assume the outstanding

Countrywide debt totaling approximately $21 billion."  Asked about the "formal guaranteeing"

of Countrywide's debt, Kenneth D. Lewis, Bank of America's former Chairman and Chief

Executive Officer, responded that "The normal process we followed is what are the operational

movements we'll make to *combine the operations*.  When we do that we've said the debt would

fall in line and quite frankly that's kind of what we've said the whole time . . . .  [T]hat's been

very consistent with deals we've done in the past from this standpoint." (Emphasis added).

361.    Similarly, Lewis was quoted in a January 23, 2009 *New York Times* article

reporting on the acquisition of Countrywide Financial and its subsidiaries, in which he

acknowledged that Bank of America knew of the legal liabilities of Countrywide Financial and

its subsidiaries and impliedly accepted them as part of the cost of the acquisition:

> We did extensive due diligence.  We had 60 people inside the company for almost
> a month.  It was the most extensive due diligence we have ever done.  So we feel
> comfortable with the valuation.  We looked at every aspect of the deal, ***from their
> assets to potential lawsuits*** and we think we have a price that is a good price.

(Emphasis added).

362.    Bank of America has made additional statements showing that it has assumed the

liabilities of Countrywide.  In a press release announcing the merger, Lewis stated that he was

aware of the "issues within the housing and mortgage industries" and said that "the transaction

[with Countrywide] reflects those challenges."  Despite these challenges, Lewis stated in October

2009 that "The Merrill Lynch and Countrywide integrations are on track and returning value

already."

363.    Likewise, in Bank of America's Form 10-K for 2009, Bank of America

acknowledged  that "[W]e face increased litigation risk and regulatory scrutiny as a result of the

Merrill Lynch and Countrywide acquisitions."

364.    Brian Moynihan, Bank of America's CEO and President, testified before the Financial Crisis Inquiry Commission on January 13, 2010, that "our primary window into the mortgage crisis came through the acquisition of Countrywide . . . .  The Countrywide acquisition has positioned the bank in the mortgage business on a scale it had not previously achieved. There have been losses, and lawsuits, from the legacy of Countrywide operations, but we are looking forward."

365.    Addressing investor demands for refunds on faulty loans sold by Countrywide, Moynihan stated "There's a lot of people out there with a lot of thoughts about how we should solve this, but at the end of the day, we'll pay for the things that Countrywide did."  And, in a *New York Times* article published in December 2010, Moynihan, speaking about Countrywide, stated that "Our company bought it and we'll stand up; we'll clean it up."

366.    Similarly, Jerry Dubrowski, a spokesman for Bank of America, was quoted in an article published by Bloomberg in December 2010 that the bank will "act responsibly" and repurchase loans in cases where there were valid defects with the loans.  Through the third quarter of 2010, Bank of America has faced $26.7 billion in repurchase requests and has resolved, declined or rescinded $18 billion of those claims.  It has established a reserve fund against the remaining $8.7 billion in repurchase requests, which at the end of the third quarter stood at $4.4 billion.

367.    During an earnings call for the second quarter of 2010, Charles Noski, Bank of America's Chief Financial Officer, stated that "we increased our reps and warranties expense by $722 million to $1.2 billion as a result of our continued evaluation of exposure to repurchases including our exposure to repurchase demands from certain monoline insurers."  And during the earnings call for the third quarter of 2010, Noski stated that "[t]hrough September, we've

received $4.8 billion of reps and warranties claims related to the monoline-insured deals, of which $4.2 billion remains outstanding, and approximately $550 million were repurchased."

368.    Bank of America has reached various settlement agreements in which it has directly taken responsibility for Countrywide's liabilities.  As part of a settlement agreement with certain state attorneys general, Bank of America agreed to forgive up to 30 percent of the outstanding mortgage balances owed by former Countrywide customers.  The loans were made before Bank of America acquired Countrywide.

369.    In October 2010, the *New York Times* reported that Bank of America is "on the hook" for $20 million of the disgorgement that Defendant Mozilo agreed to pay in his settlement agreement with the SEC.  The agreement and plan of merger between Bank of America and Countrywide provided that all indemnification provisions "shall survive the merger and shall continue in full force and effect . . . for a period of six years."  According to the article, "Because Countrywide would have had to pay Mr. Mozilo's disgorgement, Bank of America took on the same obligation, even though it had nothing to do with the company's operations at the time."

370.    Still, Bank of America has generated substantial earnings from the absorption of Countrywide's mortgage business.  For example, a Bank of America press release regarding the company's 2009 first quarter earnings stated that "[n]et revenue nearly quadrupled to $5.2 billion primarily due to the acquisition of Countrywide and from higher mortgage banking income as lower interest rates drove an increase in mortgage activity."  Lewis was quoted as saying, "We are especially gratified that our new teammates at Countrywide and Merrill Lynch had outstanding performance that contributed significantly to our success."

371.    A press release regarding Bank of America's 2009 second quarter earnings similarly stated that "[n]et revenue rose mainly due to the acquisition of Countrywide and higher

mortgage banking income as lower interest rates spurred an increase in refinance activity."  The press release explained that "higher mortgage banking income, trading account profits and investment and brokerage services income reflected the addition of Merrill Lynch and Countrywide."  Bank of America reported that its average retail deposits in the quarter increased $136.3 billion, or 26 percent, from a year earlier, including $104.3 billion in balances from Merrill Lynch and Countrywide.

372.   Bank of America's 2009 annual report stated that "[r]evenue, net of interest expense on a fully taxable-equivalent (FTE) basis, rose to $120.9 billion, representing a 63% increase from $74.0 billion in 2008, reflecting in part the addition of Merrill Lynch and the full-year impact of Countrywide."  Bank of America also reported that "[m]ortgage banking income increased $4.7 billion driven by higher production and servicing income . . . primarily due to increased volume as a result of the full-year impact of Countrywide . . . ."  Insurance income also increased $927 million "due to the full-year impact of Countrywide's property and casualty businesses."

373.   Based on the above, Bank of America has "de facto" merged with Countrywide Financial, consolidating and merging with the Countrywide Defendants and acquiring substantially all of the assets of all the Countrywide Defendants.  Bank of America is, thus, the successor in liability to Countrywide and is jointly and severally liable for the wrongful conduct alleged herein of the Countrywide Defendants.

374.   Based on the same facts, the Supreme Court of the State of New York in *MBIA Ins. Corp. v. Countrywide Home Loans, et al.*, Index No. 602825/08, held that MBIA sufficiently alleged a de facto merger "in which Bank of America intended to absorb and continue the operation of Countrywide."  *Id.*, Order on Motion to Dismiss at 15 (Apr. 29, 2010).

### C.      **Allstate's 1933 Act Claims Have Been Tolled By Previously-Filed Class Action Complaints**

375.     On November 14, 2007, a class action was filed against various Countrywide entities, former officers, and underwriters on behalf of all investors who purchased or otherwise acquired certain mortgage-backed securities that were issued, underwritten or sold by Countrywide. *See Luther v. Countrywide Home Loans Servicing LP*, BC380698 (Cal. Super. Ct. 2007). The *Luther* complaint alleges claims under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933.

376.     Among the Offerings that Allstate invested in, the following were included in the November 2007 *Luther* class action:  CWALT 2005-25T1, CWALT 2006-30T1, CWALT 2006-45T1, CWALT 2006-9T1, and CWALT 2006-J1.  Allstate was expressly stated to be part of the defined class in *Luther*, as of November 14, 2007, with respect to these Offerings.

377.     On June 12, 2008, a different securities class action was filed against Countrywide in California state court, *Washington State Plumbing & Pipefitting Pension Trust v. Countrywide Financial Corp.*, BC392571 (Cal. Super. Ct. 2008).  Like *Luther*, this action also alleged Section 11, 12(a)(2), and 15 claims against Countrywide, its former officers, and underwriters, although *Washington State Plumbing* based its claims on different securitizations than those in *Luther*.

378.     Among the Offerings that Allstate invested in, the following were included in the June 12, 2008 *Washington State Plumbing* class action:  CWALT 2007-18CB, CWALT 2007-20, CWHL 2005-HYB7, CWHL 2006-9, CWL 2005-11, CWL 2005-13, CWL 2005-16, CWL 2005-17, CWL 2006-1, CWL 2006-9, CWL 2006-S1, CWL 2006-S2, CWL 2006-S5, CWL 2007-4, CWL 2007-S1, and CWL 2007-S2.  As in *Luther*, Allstate was expressly stated to be

part of the defined class in *Washington State Plumbing*, as of June 12, 2008, with respect to these Offerings.

379.    On September 9, 2008, the *Luther* complaint was amended to add the securitizations from *Washington State Plumbing* to the *Luther* class.  The *Washington State Plumbing* action was consolidated with the original *Luther* action, and a consolidated and amended complaint was filed on October 16, 2008.  Allstate was included in the defined class in the *Luther/Washington State Plumbing* consolidated complaint with respect to investments in the following Offerings:  CWALT 2005-25T1, CWALT 2006-30T1, CWALT 2006-45T1, CWALT 2006-9T1, CWALT 2006-J1, CWALT 2007-18CB, CWALT 2007-20, CWHL 2005-HYB7, CWHL 2006-9, CWL 2005-11, CWL 2005-13, CWL 2005-16, CWL 2005-17, CWL 2006-1, CWL 2006-9, CWL 2006-S1, CWL 2006-S2, CWL 2006-S5, CWL 2006-S8, CWL 2007-4, CWL 2007-S1, and CWL 2007-S2.

380.    The consolidated *Luther* action was subsequently dismissed on jurisdictional grounds in January 2010 and refiled that month as *Maine State Retirement System v. Countrywide Financial Corp.,* No. 10 Civ. 0302 (C.D. Cal. 2010).  Allstate was included in the defined class in the *Maine State* complaint with respect to investments in the following Offerings, the same Offerings in the *Luther/Washington State Plumbing* consolidated complaint: CWALT 2005-25T1, CWALT 2006-30T1, CWALT 2006-45T1, CWALT 2006-9T1, CWALT 2006-J1, CWALT 2007-18CB, CWALT 2007-20, CWHL 2005-HYB7, CWHL 2006-9, CWL 2005-11, CWL 2005-13, CWL 2005-16, CWL 2005-17, CWL 2006-1, CWL 2006-9, CWL 2006-S1, CWL 2006-S2, CWL 2006-S5, CWL 2006-S8, CWL 2007-4, CWL 2007-S1, and CWL 2007-S2.

381.    In a November 4, 2010 decision, the *Maine State* court held that the named plaintiffs in the class action had standing to sue Countrywide only with respect to 81 of the offerings in which the named plaintiffs themselves invested.  *Maine State Retirement System v. Countrywide Financial Corp.,* No. 10 Civ. 0302 (C.D. Cal. Nov. 4, 2010) (opinion), at 7.  The court rejected the notion that the plaintiffs could represent class members who bought in other Countrywide offerings, even if the offerings emanated from a common registration statement.  The net effect of the court's ruling is to narrow the *Maine State* class and to exclude class members whose investments in Countrywide mortgage-backed securities do not overlap with those of the named plaintiffs.  *Id.* at 5-8.

382.    Some of Allstate's investments were made in the same Offerings as the named plaintiffs in the *Luther, Washington State Plumbing, and Maine State*.  These Offerings include CWABS 2005-11, CWABS 2006-9, and CWHEQ 2006-S2.

383.    However, certain other of Allstate's Countrywide investments appear not to overlap with the investments of the named plaintiffs (though Allstate cannot be certain of this because the *Luther* complaint does not list the individual purchases of plaintiff David Luther).  Nonetheless, it appears that the Court's standing ruling may have the effect of involuntarily excluding Allstate from the Countrywide mortgage-backed-securities class action, at least with respect to certain of its investments.

384.    Because of the uncertainty arising from this ruling, Allstate has chosen to file this separate action and to assert its 1933 Act claims and other claims, which have been tolled by the pendency of the various Countrywide RMBS class actions.  Allstate has been part of the putative class in all of the Countrywide class actions, from *Luther* to *Washington State Plumbing* to *Maine State*.  Allstate reasonably and justifiably relied on the named plaintiffs in these class

actions to protect its rights and it reasonably and justifiably relied on the class action tolling

doctrines of *American Pipe* and *WorldCom* to toll the statute of limitations on its 1933 Act

claims.

385.    Under *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), all

putative class members are treated as if they filed their own individual actions until they either

opt out or until a certification decision excludes them.  *Id.* at 255.  As the Second Circuit stated

in *In re WorldCom Securities Litigation*, 496 F.3d 245, 255 (2d Cir. 2007):  "[B]ecause

Appellants were members of a class asserted in a class action complaint, their limitations period

was tolled under the doctrine of *American Pipe* until such time as they ceased to be members of

the asserted class, notwithstanding that they also filed individual actions prior to the class

certification decision."  *WorldCom*, 496 F.3d at 256.

386.    Allstate was a member of the putative class "asserted" in *Luther* and subsequent

class actions and its 1933 Act claims are therefore timely pursuant to *American Pipe and In re*

*WorldCom.*

387.    Except for the Bank of America Defendants, Mozilo, and Countrywide Capital

Markets, each Defendant in this Complaint was also a defendant in the *Luther* or *Washington*

*State Plumbing* class actions, for the same causes of action asserted herein.

**FIRST CAUSE OF ACTION**
**(Violation of Section 10(b) and Rule 10b-5)**

388.    Allstate realleges each allegation above as if fully set forth herein.

389.    This claim is brought under Section 10(b) of the 1934 Act, 15 U.S.C. § 78j(b) and

Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, against Countrywide

Home Loans, Countrywide Securities, the Depositors, and the Bank of America Defendants as

Countrywide's successors (the "Section 10(b) Defendants").  The Section 10(b) Defendants (a)

employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon Allstate, in violation of Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder.

390.   The Section 10(b) Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal non-public, adverse material information about the Securitizations from Allstate, as reflected in the misrepresentations and omissions set forth above in Sections III and IV above and in Exhibits F through DD.

391.   The Section 10(b) Defendants each had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth by failing to ascertain and to disclose such facts even though such facts were available to them, or deliberately refrained from taking steps necessary to discover whether the material facts were false or misleading.

392.   As a result of the Section 10(b) Defendants' dissemination of materially false and misleading information and their failure to disclose material facts, Allstate was misled into believing that the Certificates were more creditworthy investments than they actually were.

393.   Allstate purchased the Certificates without knowing that the Section 10(b) Defendants had misstated or omitted material facts about the Securitizations.  In purchasing the Certificates, Allstate relied directly or indirectly on false and misleading statements made by the Section 10(b) Defendants, and/or an absence of material adverse information that was known to the Section 10(b) Defendants or recklessly disregarded by them but not disclosed in Countrywide's public statements or its communications with Allstate.  Allstate was damaged as a

result of their reliance on the Section 10(b) Defendants' false statements and misrepresentations and omissions of material facts.

394.    At the time of the Section 10(b) Defendants' false statements, misrepresentations and omissions, Allstate was ignorant of their falsity and believed them to be true.  Allstate would not have purchased or otherwise acquired the Certificates had it known the truth about the matters discussed above.

395.    Allstate is filing this action within two years after discovery of the facts constituting the violation, including facts establishing scienter and other elements of Allstate's claim, and within 5 years after the violations with respect to most of Allstate's investments.

396.    By virtue of the foregoing, the Section 10(b) Defendants have violated §10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder.

397.    As a direct and proximate result of the Section 10(b) Defendants' wrongful conduct, Allstate has suffered damages in connection with the purchase and subsequent decline in value of the Certificates, and in connection with the subsequent sale of certain Certificates for a loss.

### SECOND CAUSE OF ACTION
### (Violation of Section 20(a) of the 1934 Act))

398.    Allstate realleges each allegation above as if fully set forth herein.

399.    Each of the Section 10(b) Defendants is liable as a direct participant and primary violator with respect to the wrongdoing discussed herein.  Countrywide Financial, Mozilo and Sambol (the "Section 20(a) Defendants"), by reason of their status as parent company and senior executive officers and directors of Countrywide, directly or indirectly controlled the conduct of Countrywide's business and its representations to Allstate, within the meaning of § 20(a) of the 1934 Act.  The Section 20(a) Defendants directly or indirectly controlled the content of the

Offering Materials related to Allstate's investments in the Securities within the meaning of § 20(a) of the 1934 Act. Therefore the Section 20(a) Defendants are jointly and severally liable for Countrywide's fraud, as alleged herein.

400. The Section 20(a) Defendants controlled and had the authority to control the content of certain of Countrywide's documents, including the Certificates' Offering Materials. Because of their close involvement in the everyday activities of the Company, and because of their wide-ranging supervisory authority, the Section 20(a) Defendants reviewed or had the opportunity to review those documents prior to their issuance and therefore knew or should have known that those documents contained misrepresentations. The Section 20(a) Defendants reviewed or could have reviewed these documents prior to their issuance, or could have prevented their issuance or caused them to be corrected.

401. The Section 20(a) Defendants knew or recklessly disregarded the fact that Countrywide's representations were materially false and misleading and/or omitted material facts when made. In so doing, the Section 20(a) Defendants did not act in good faith.

402. By virtue of their high-level positions and their participation in and awareness of Countrywide's operations and public statements, the Section 20(a) Defendants were able to and did influence and control Countrywide's decision-making, including controlling the content and dissemination of the documents that Plaintiffs contend contained materially false and misleading information and on which Plaintiffs relied.

403. The Section 20(a) Defendants had the power to control or influence the particular transactions giving rise to the securities violations alleged herein, as set forth more fully in Section VII(A) above.

404.     As set forth above, the Section 10(b) Defendants each violated § 10(b) of the 1934 Act and Rule 10b-5, thereunder, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, the Section 20(a) Defendants are also liable pursuant to § 20(a) of the 1934 Act.

405.     As a direct and proximate result of Defendants' wrongful conduct, including the wrongful conduct of Countrywide Financial, Mozilo and Sambol, Allstate suffered damages in connection with its purchase of mortgage-backed securities from Countrywide.

## THIRD CAUSE OF ACTION
### (Common-law Fraud)

406.     Allstate realleges each allegation above as if fully set forth herein.

407.     This claim is brought against Countrywide Financial, Countrywide Home Loans, Countrywide Securities, the Depositors (the "Common-Law Fraud Defendants"), and the Bank of America Defendants as Countrywide's successor.

408.     The material representations set forth above were fraudulent, and the Common-Law Fraud Defendants' representations fraudulently omitted material statements of fact.   The representations at issue are identified above and in the Exhibits, and are summarized in Section III above.

409.     Each of the Common-Law Fraud Defendants knew their representations and omissions were false and/or misleading at the time they were made.  Each of the Common-Law Fraud Defendants made the misleading statements with an intent to defraud Allstate.

410.     Allstate justifiably relied on the Common-Law Fraud Defendants' false representations and misleading omissions.

411.    Had Allstate known the true facts regarding the Common-Law Fraud Defendants' underwriting practices and quality of the loans making up the securitizations, it would not have purchased the Certificates.

412.    As a result of the Common-Law Fraud Defendants' false and misleading statements and omissions, as alleged herein, Allstate has suffered damages according to proof. The Countrywide Defendants are liable to Allstate for common-law fraud, and the Bank of America Defendants are liable as their successors.

### FOURTH CAUSE OF ACTION
### (Aiding and Abetting Common-Law Fraud)

413.    Allstate realleges each allegation above as if fully set forth herein.

414.    This is a claim for aiding and abetting fraud brought against Countrywide Financial, Countrywide Capital Markets, Mozilo, Sambol, and the Bank of America Defendants as Countrywide's successor (together "the Aiding and Abetting Defendants").

415.    The Aiding and Abetting Defendants knew that the Certificates being packaged and sold by Countrywide were not backed by high-quality loans and were not underwritten according to Countrywide's stated underwriting guidelines.  The Countrywide Defendants, Mozilo, and Sambol knew that due diligence on the securitizations was not being done and/or was not being done properly.

416.    The Aiding and Abetting Defendants gave substantial assistance to and/or facilitated and encouraged the Depositors, Countrywide Securities, and Countrywide Home Loans in their fraud as set forth in Section VII(A) and elsewhere above.  In providing substantial assistance, the Aiding and Abetting Defendants knew that the information being distributed to the public was false and misleading, and that material information was being withheld, but intended to facilitate the wrongful conduct.

417.     As a result of the foregoing, Allstate has suffered damages according to proof.

## FIFTH CAUSE OF ACTION
### (Negligent Misrepresentation)

418.     Allstate realleges each allegation above as if fully set forth herein.

419.     This is a claim for negligent misrepresentation against the Depositors,

Countrywide Securities, Countrywide Home Loans, and Countrywide Financial (the "Negligent

Misrepresentation Defendants").

420.     Allstate made 67 separate investments in 29 Offerings of mortgage-backed

securities that the Countrywide Defendants securitized and sold.  The Negligent

Misrepresentation Defendants also originated or acquired, underwrote, and serviced all the loans

in the Offerings.  Mozilo and Sambol were closely involved in the everyday management of the

Negligent Misrepresentation  Defendants.

421.     Because Countrywide arranged the Securitizations, and originated or acquired,

underwrote, and serviced all of the underlying mortgage loans, it had unique and special

knowledge about the loans in the Offerings.  In particular, Countrywide had unique and special

knowledge and expertise regarding the quality of the underwriting of those loans as well as the

servicing practices employed as to such loans.

422.     Because Allstate could not evaluate the loan files for the Mortgage Loans

underlying its Certificates, and because Allstate could not examine the underwriting quality or

servicing practices for the Mortgage Loans in the Securitizations on a loan-by-loan basis, it was

heavily reliant on Countrywide's unique and special knowledge regarding the underlying

mortgage loans when determining whether to make each investment of Certificates.  Allstate was

entirely reliant on Countrywide to provide accurate information regarding the loans in engaging

in that analysis. Accordingly, Countrywide was uniquely situated to evaluate the economics of each Securitization.

423.    Over the course of more than three years, for 67 separate investments, Allstate relied on Countrywide's unique and special knowledge regarding the quality of the underlying Mortgage Loans and their underwriting when determining whether to invest in the Offerings. This longstanding relationship, coupled with Countrywide's unique and special knowledge about the underlying loans, created a special relationship of trust, confidence, and dependence between Countrywide and Allstate.

424.    Countrywide was aware that Allstate relied on Countrywide's unique and special expertise and experience and depended upon Countrywide for accurate and truthful information. Countrywide also knew that the facts regarding Countrywide's compliance with its underwriting standards were exclusively within its knowledge.

425.    Based on its expertise, superior knowledge, and relationship with Allstate, Countrywide owed a duty to Allstate to provide complete, accurate, and timely information regarding the Mortgage Loans and the Offerings.  The Negligent Misrepresentation Defendants breached their duty to provide such information to Allstate.

426.    The Negligent Misrepresentation Defendants likewise made misrepresentations which they knew, or were negligent in not knowing at the time to be false, in order to induce Allstate's investment in the Offerings.  The misrepresentations are set forth in Section III above and in Exhibits F through DD.  At the time they made these misrepresentations, the Negligent Misrepresentation Defendants knew, or at a minimum were negligent in not knowing, that these statements were false, misleading, and incorrect.  Such information was known to the Negligent Misrepresentation Defendants  but not known or readily known to Allstate, and the Negligent

Misrepresentation Defendants  knew that Allstate was acting in reliance on mistaken information.

427.    Allstate reasonably relied on the information the Negligent Misrepresentation Defendants did provide and was damaged as a result of these misrepresentations.  Had Allstate known the true facts regarding Countrywide's underwriting practices and the quality of the loans making up the securitizations, it would not have purchased the Certificates.

428.    The Negligent Misrepresentation Defendants' material misrepresentations and omissions set forth above were made without any reasonable ground for believing that the representations were true.

429.    By reason of the foregoing, the Negligent Misrepresentation  Defendants are liable to Allstate for negligent misrepresentation.

## SIXTH CAUSE OF ACTION
### (Violation of Section 11 of the 1933 Act) )

430.    Allstate realleges each allegation above as if fully set forth herein, except to the extent that Allstate expressly excludes from this cause of action any allegation that could be construed as alleging fraud or intentional or reckless conduct.  This cause of action specifically excludes the allegations as to Defendants' scienter set forth in Sections IV and V.

431.    This cause of action is based solely on claims of strict liability or negligence under the 1933 Act.  This count is predicated upon the Section 11 Defendants' strict liability for making untrue and materially misleading statements in the Offering Materials for the Section 11 Investments identified in Exhibits F through DD.

432.    This claim is brought under Section 11 of the 1933 Act, 15 U.S.C. §77k ("Section 11"), against Countrywide Securities, the Depositors, and the Signatories (David Sambol, Eric Sieracki, Ranjit Kripalani, Stanford Kurland, David A. Spector, N. Joshua Adler, and Jennifer

Sandefur) (all together, the "Section 11 Defendants") arising from Allstate's purchases of the Certificates.

433.    Each of Allstate's purchases of the Certificates was made pursuant to the false and misleading Offering Materials, including the Registration Statements.

434.    The Offering Materials for the Offerings were materially untrue, misleading, contained untrue statements of material facts, and omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading.  At the time it obtained the Certificates, Allstate did not know of the facts concerning the untrue and misleading statements and omissions alleged herein.

435.    The materially untrue statements and omissions of material fact in the Offering Materials are set forth in Section III above and in Exhibits F through DD.

436.    The Section 11 Defendants caused to be issued and disseminated, directed other parties to disseminate at the time of the filing of the Offering Materials, and/or participated in the issuance and dissemination to Allstate of materially untrue statements of facts and omissions of material facts, which were contained in the Offering Materials.

437.    The Section 11 Defendants are strictly liable to Allstate for the materially untrue statements and omissions in the Offering Materials under Section 11.  The Depositors are liable as issuers of the Certificates, in particular, within the meaning of Section 2(a)(4) of the 1933 Act, 15 U.S.C. §77b(a)(4), and in accordance with Section 11(a) of the 1933 Act, 15 U.S.C. §77k(a). Countrywide Financial is liable as an issuer, among other grounds, because it formed the Depositors as a limited purpose finance subsidiaries for the purpose of issuing the Certificates and subsequently issued the Certificates via the Depositors.

438.     Defendant Countrywide Securities is liable for its role as the lead underwriter of both Securitizations, in accordance with Section 11(a)(5) of the 1933 Act, 15 U.S.C. §77k(a)(5).

439.     The Signatories are liable for signing the Registration Statements, in accordance with Section 11(a)(1) of the 1933 Act, 15 U.S.C. §77k(a)(1).

440.     The Section 11 Defendants owed to Allstate a duty to make a reasonable and diligent investigation of the statements contained in the Offering Materials at the time they became effective to ensure that such statements were true and correct and that there was no omission of material facts required to be stated in order to make the statements contained therein not misleading.  The Section 11 Defendants failed to exercise such due diligence by failing to conduct a reasonable investigation.

441.     This action is brought within one year of the discovery of the materially untrue statements and omissions in the Offering Materials and brought within three years of the effective date of the Offering Materials, by virtue of the timely filing of the *Luther, Washington State Plumbing, and Maine State* complaints and by the tolling of Allstate's claims afforded by those filings.

442.     Allstate has sustained damages measured by the difference between the price Allstate paid for the certificates and (1) the value of the Certificates at the time this suit is brought, or (2) the price at which Allstate sold the Certificates in the market prior to the time suit is brought.  Allstate's Certificates lost substantial market value subsequent to and due to the materially untrue statements of facts and omissions of material facts in the Offering Materials alleged herein.

443.    By reason of the conduct herein alleged, the Section 11 Defendants violated Section 11 of the 1933 Act and are jointly and severally liable for their wrongdoing.  By virtue of the foregoing, Allstate is entitled to damages from each of the Section 11 Defendants.

**SEVENTH CAUSE OF ACTION**
**(Violation of Section 12(a)(2) of the 1933 Act)**

444.    Allstate realleges each allegation above as if fully set forth herein, except to the extent that Allstate expressly excludes from this cause of action any allegation that could be construed as alleging fraud or intentional or reckless conduct.  This cause of action specifically excludes the allegations as to Defendants' scienter set forth in Sections IV and V.

445.    This cause of action is based solely on claims of strict liability or negligence under the 1933 Act.

446.    This count is predicated upon Defendants' negligence for making untrue and materially misleading statements in the Offering Materials for the following Offerings that Allstate invested in (identified by the name of the Offering and the class):

447.    CWALT 2004-7T1, A4; CWL 2004-7, MF2; CWHEL 2004-I, A; CWHEL 2005-B, 2A; CWL 2005-1, MF2; CWL 2005-1, MF3; CWL 2005-1, MF4; CWL 2005-1, MF5; CWL 2005-3, MF2; CWL 2005-3, MF3; CWL 2005-3, MF4; CWL 2005-3, MF5; CWL 2005-11, AF5A; CWL 2005-11, AF6; CWL 2005-13, AF5; CWL 2005-13, AF6; CWL 2005-16, 2AF2; CWL 2005-16, 2AF5; CWL 2005-17, 1AF2; CWL 2005-17, 1AF5; CWL 2006-1, AF5; CWL 2006-1, AF6; CWALT 2006-J1, 1A6; CWL 2006-S1, A2; CWL 2006-S2, A2; CWHL 2005-HYB7, 3A2; CWL 2006-S5, A3; CWL 2006-S5, A4; CWL 2006-S8, A3; CWL 2006-S8, A6; CWL 2007-S1, A3; CWL 2007-S1, A4; CWL 2007-S1, A6; CWL 2007-4, M1; CWL 2007-4, M2; CWL 2007-S2, A6; and CWL 2005-17, 1AF5.

448.     This is a claim brought under Section 12(a)(2) of the 1933 Act, 15 U.S.C.

§77l(a)(2) ("Section 12(a)(2)"), against Countrywide Securities, the Depositors, and the Bank of

America Defendants as the Countrywide Defendant's successor (collectively the "Section

12(a)(2) Defendants") arising from Allstate's purchases of the Certificates.

449.     The Section 12(a)(2) Defendants offered and sold the Certificates to Allstate by

means of the defective Offering Materials, including the Prospectuses and Prospectus

Supplements, which contained materially untrue statements of facts and omitted to state material

facts necessary to make the statements, in the light of the circumstances under which they were

made, not misleading.  Allstate purchased the Certificates directly from the Section 12(a)(2)

Defendants, who both transferred title to Allstate and who solicited Allstate for financial gain.

450.     The materially untrue statements of facts and omissions of material fact in the

Offering Materials are set forth in Section III above and in the Exhibits.

451.     The Section 12(a)(2) Defendants offered the Certificates for sale, sold them, and

distributed them by the use of means or instruments of transportation and communication in

interstate commerce.

452.     The Section 12(a)(2) Defendants owed to Allstate the duty to make a reasonable

and diligent investigation of the statements contained in the Offering Materials, to ensure that

such statements were true, and to ensure that there was no omission to state a material fact

required to be stated in order to make the statements contained therein not misleading.  The

Section 12(a)(2) Defendants failed to exercise such reasonable care.

453.     The Section 12(a)(2) Defendants knew, or in the exercise of reasonable care

should have known, that the Offering Materials contained materially untrue statements of facts

and omissions of material facts, as set forth above, at the time of the Offerings.  Conversely,

Allstate did not know, nor in the exercise of reasonable diligence could it have known, of the untruths and omissions contained in the Offering Materials at the time it purchased the Certificates.

454.    This action is brought within one year of the time when Allstate discovered or reasonably could have discovered the facts upon which this action is based, and within three years of the time that the Certificates upon which this cause of action is brought were sold to the public, by virtue of the timely filing of the *Luther, Washington State Plumbing, and Maine State* complaints and by the tolling of Allstate's claims afforded by those filings.

455.    Allstate sustained material damages in connection with its investments in the Securitizations and accordingly have the right to rescind and recover the consideration paid for the Certificates, with interest thereon, in exchange for tendering the Certificates.  Allstate hereby tenders its Certificates and demands rescission.

## EIGHTH CAUSE OF ACTION
### (Violation of Section 15 of the 1933 Act)

456.    Allstate realleges each allegation above as if fully set forth herein.

457.    This is a claim brought under Section 15 of the 1933 Act, 15 U.S.C. §77o ("Section 15"), against Countrywide Financial, Countrywide Home Loans, Countrywide Capital Markets, Sambol, and against the Bank of America Defendants as Countrywide Financial's successor (the "Section 15 Defendants") for controlling-person liability with regard to the Section 11 and Section 12(a)(2) causes of actions set forth above.  The Section 15 Defendants were named as defendants in the Third Cause of Action in *Luther*, for "Violation of Section 15 of the Securities Act Against Countrywide Financial, Countrywide Securities, Countrywide Capital Markets and Countrywide Home Loans."

458.   The Section 15 Defendants are controlling persons within the meaning of Section 15 by virtue of their actual power over, control of, ownership of, and/or directorship of the Section 11 Defendants and the Section 12(a)(2) Defendants, defined above, at the time of the wrongs alleged herein and as set forth herein, including their control over the content of the Offering Materials.

459.   The Section 11 and 12(a)(2) Defendants acted negligently and without reasonable care regarding the accuracy of the information contained in and incorporated by reference in the Offering Materials.  The Section 11 and 12(a)(2) Defendants lacked reasonable grounds to believe that such information was accurate and complete in all material respects.

460.   For the reasons set forth in Section VII(A) above, the Section 15 Defendants had power and influence over the Section 11 and 12(a)(2) Defendants and exercised the same to cause those Defendants to engage in the acts described herein.  By virtue of their control, ownership, offices, directorship and specific acts, the Section 15 Defendants each had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Section 11 and 12(a)(2) Defendants named herein, including controlling the content of the Offering Materials.

461.   The Section 15 Defendants' control, ownership, and position made them privy to and provided them with actual knowledge of the material facts concealed from Allstate.

462.   Neither of the Defendants named herein conducted a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Materials were true, were without omissions of any material fact, or were not misleading.

463.     Allstate did not know, nor in the exercise of reasonable diligence could it have known, of the untruths and omissions contained in the Offering Materials at the time it purchased the Certificates.

464.     By virtue of the conduct alleged herein, the Section 15 Defendants are liable for the aforesaid wrongful conduct, jointly and severally with – and to the same extent as – the entities they controlled for the violations of Sections 11 and 12(a)(2) by the controlled entities.

## NINTH CAUSE OF ACTION
### (Successor and Vicarious Liability)

465.     Allstate realleges each allegation above as if fully set forth herein.

466.     The Bank of America Defendants are liable for Countrywide's wrongdoing, in its entirety, under common law, because Bank of America and Countrywide merged or consolidated, because Bank of America has expressly or impliedly assumed Countrywide's tort liabilities, and because the Bank of America Defendants are a mere continuation of the Countrywide Defendants.

## PRAYER FOR RELIEF

WHEREFORE Allstate prays for relief as follows:

An award of damages against Defendants in favor of Allstate against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, but including at a minimum:

a.     Rescission and recovery of the consideration paid for the Certificates, with interest thereon, pursuant to Allstate's Section 12(a)(2) claim;

b.     Allstate's monetary losses, including loss of market value and loss of principal and interest payments, on all other claims besides Allstate's Section 12(a)(2) claim;

c.     Attorneys' fees and costs;

d.   Prejudgment interest at the maximum legal rate; and

e.   Such other and further relief as the Court may deem just and proper.

**<u>JURY TRIAL DEMANDED</u>**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs hereby demand a trial by

jury on all issues triable by jury.


DATED:   New York, New York
         December 27, 2010

QUINN EMANUEL URQUHART &
SULLIVAN, LLP


By:   _Daniel Brockett_
      Daniel L. Brockett
      Marc L. Greenwald
      David D. Burnett
      51 Madison Avenue, 22nd Floor
      New York, New York  10010-1601
      Telephone:  (212) 849-7000
      Fax:  (212) 849-7100
      danbrockett@quinnemanuel.com
      marcgreenwald@quinnemanuel.com
      daveburnett@quinnemanuel.com

      *Attorneys for Plaintiffs Allstate Insurance*
      *Company, Allstate Life Insurance*
      *Company, Allstate Life Insurance Company*
      *of New York, and American Heritage Life*
      *Insurance Company*